# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK THOMAS, individually )
and on behalf of all others )
similarly situated, ) No. 08 C 453
Plaintiff, )
vs. )
RITZ CAMERA CENTERS, INC., )
Defendant. )

The deposition of MARK EDWARD THOMAS, called as a witness for examination, taken pursuant to the Federal Rules of Civil Procedure of the United States District Courts pertaining to the taking of depositions, taken before KELLY M. FITZGERALD, a Certified Shorthand Reporter of said state, at Suite 3000, 131 South Dearborn Street, Chicago, Illinois, on the 15th day of April, A.D. 2008, at 10:40 a.m.



PRESENT:

LAW OFFICES OF KEITH J. KEOGH, LTD., by:
MR. KEITH J. KEOGH
227 West Monroe Street, Suite 2000
Chicago, Illinois 60606
312-726-1092
appeared on behalf of the Plaintiff;

HOLLAND & KNIGHT LLP, by:
MR. RICHARD T. WILLIAMS
633 West Fifth Street, 21st Floor
Chicago, Illinois 90071-2040
213-896-2410
appeared on behalf of the Defendant.

REPORTED BY: KELLY M. FITZGERALD, CSR, RMR, CRR
CSR No. 84-4318.



(Thomas Exhibit Nos. 1 & 2
marked as requested.)
MARK EDWARD THOMAS,
called as a witness herein, having been first duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. WILLIAMS:
Q. Please state your name.
A. **Mark Edward Thomas.**
Q. Okay. Good morning, Mr. Thomas.
A. **Good morning.**
Q. My name is Richard Williams, and I'm with the law firm of Holland & Knight LLP, and we're representing the defendant Ritz Camera Centers, Inc. And we're here this morning to take your deposition. Have you ever had a deposition taken before?
A. **Yeah.**
Q. How many times?
A. **I don't recall exactly.**
Q. Well, give me an approximation.
A. **Two, three, four. I don't know.**
Q. Mr. Thomas, let me go over briefly with you the general procedures we're going to follow today.



The reporter has placed you under oath, and your testimony here should be treated by you as formally as if you were giving it in a courtroom in front of a judge or a jury. I'm going to ask you a series of questions and the reporter will take down the questions and answers that you give, any comments that are made. And we'll prepare from that a transcript. You'll have an opportunity to read and review that transcript. At that time you can make any changes or corrections that you believe are necessary to make it an accurate transcription of your testimony. Please understand that at time of hearing or trial in this matter, I should be free to comment on any change, as well as on the original. So I urge you that it's probably in your best interest to give your best and most accurate answer today as we proceed.

If there's anything I ask you, you don't understand, please let me know and I'll rephrase it. Let me tell you that for the sake of the transcript and the reporter's good health, it's best if only one speaks at a time. So please, I'll try and not speak over you and ask you to do the same with me.

It's necessary for you to answer a

5

question audibly so that the court reporter can take down your answer, so a nod of the head won't do it. Please say yes or no or I don't know or tell us the answer. I do not want you to speculate in giving me an answer but do want your best estimate if you can't be exact.

Is there anything I've said so far that you don't understand?

A. **Not at all.**

Q. You told me your name was Mark Edward Thomas?

A. **Yes.**

Q. Have you ever used any other name?

A. **No.**

Q. Where were you born?

A. **Chicago.**

Q. When?

A. **October 15, 1964.**

Q. What's your present residence address?

A. **7001 Brookbank, B-r-o-o-k-b-a-n-k, Road, Darien, Illinois, 60561.**

Q. I was born in this town but I clearly preceded the founding of Darien. Whereabouts is it?

A. **It's a west suburb, Hinsdale, Burr Ridge,**

6

**Downers Grove.**

Q. Hinsdale and Downers Grove are recognizable names to me.

A. **Right next to them.**

Q. How long have you lived at that address?

A. **About two and a half years.**

Q. And what was your address before then?

A. **40 Sawgrass, Lemont, Illinois.**

Q. How long did you live there?

A. **I think it was a little less than a year. I was actually staying with my cousin.**

Q. And what was your residence before Sawgrass?

A. **Actually I worked a year in Colorado, part of it was at a hotel and then I have a condo out there. I can't remember a specific address.**

Q. Okay.

A. **It's in Aurora though, Aurora, Colorado.**

Q. Near Denver?

A. **Yeah, just a south suburb of Denver.**

Q. And before your year in Colorado?

A. **Orland Park.**

Q. And how long were you in Orland Park?

A. **Probably total about four years, two**

7

**different residences.**

Q. Okay. Educational background, where did you go to high school?

A. **Gordon Tech in Chicago.**

Q. Did you go on to college?

A. **Yeah, I took classes at University of Chicago and DePaul.**

Q. Did you graduate?

A. **No.**

Q. Did you have a major?

A. **Well, I mean, geared towards it but I didn't attain it.**

Q. What was it?

A. **Accounting.**

Q. Have you attended any other college or university courses?

A. **Yeah, various -- I mean, one was a paramedic class at South Suburban College and various just different college, you know, oriented courses in different locations.**

Q. And are you working towards some particular degree or just taking courses as they interest you?

A. **I'm actually currently not taking any**

8

**courses.**

Q. Okay. Let's talk about your employment history. Did you go direct from Gordon Tech into college classes or was there a period when you worked?

A. **Both.**

Q. When did you graduate from Gordon Tech?

A. **'82. First job at 16, I started at All-American Bank of Chicago, six years of banking. And then I went full-time into college while I was working full-time at the bank.**

Q. Okay. And you started at the bank then in 1982?

A. **No, actually sophomore, when I turned 16, I started on the teller line and I just worked there for six years.**

Q. So that would be?

A. **'80.**

Q. 1980?

A. **Yes.**

Q. And you continued to work with the bank until when?

A. **A few years for that bank, about four years for that bank. Then I went to Golf Mills**

State Bank for two years, obviously didn't continue full-time at college. It decreased to part-time but full-time employment.
Q. How do you spell Golf Mills State?
A. Golf, G-o-l-f. It's not there anymore.
Q. And you were there two years. So that would take you to 1986?
A. About that.
Q. Okay. What did you do after that?
A. Then I went in to be an office manager at auto dealerships. First one was Orloff, Jaguar, Volvo, for a couple of years.
Q. And where was that?
A. In Chicago but not their current location, but in Chicago.
Q. And how long did you stay with that dealership?
A. A little over two years.
Q. Then what?
A. Then Borg Pontiac GMC in Downers Grove for about two and a half years.
Q. And you were office manager?
A. Comptroller there.
Q. And that takes us up to about --



A. Before that I was also -- while I was at the bank I started I think -- at one of the places I became a volunteer firefighter/EMT in River Grove.
Q. In what?
A. I'm sorry?
Q. In River Grove?
A. Yeah, in River Grove.
Q. Good for you. And how long did you continue to be a volunteer?
A. Total for 13 years, 13 or 16, I don't know. I can't remember. It was many, but I've been retired for a few years now.
Q. After your stint as controller at Borg?
A. Then I went to St. Charles Pontiac in St. Charles, probably another two and a half years.
Q. As?
A. Secretary/treasurer.
Q. And what was your next position after St. Charles Pontiac?
A. You're really testing my memory. I think I went six months at Gjovik out in Sandwich, Illinois, G-j-o-v-i-k.
Q. Auto dealership?
A. Yeah.



Q. Then what?
A. Then I think -- well, let me think now. Then somewhere in there, Gjovik could be before or after, I don't remember, I went to work for Ed Napleton, which is an auto dealer, number of dealerships in the Chicagoland area, in Oak Lawn is the first place I started. I worked for him for a total of five years.
Q. From when to when?
A. I don't remember specifically. It was in that time frame there. I should have brought a resume to refresh my memory. No, it was in the, you know, late '80s, '90s, something like that.
Q. After Napleton, five years there?
A. And then Napleton five years, I left Ed Napleton to become a full-time firefighter/paramedic in Orland Fire Protection District in Orland Park.
Q. And how long?
A. Total, seven years. I'm retired for five now.
Q. So that --
A. While I was working full-time, I went back to working full-time at a dealership then also, because we were 24 on, 48 off. On my 48 off, I



worked full-time at City Auto Group in Chicago.
Q. What position?
A. Assistant controller and that was for probably about five years. Then I got hurt on the job so I obviously wasn't working at that time while I was on worker's comp. At the dealership -- I got hurt at the fire department and then after a period of time, I couldn't return back to work so I had to take an early retirement, a disability retirement from the fire department.
Q. And when was that?
A. It was official probably six years ago now, five and a half, six years ago.
Q. 2002?
A. Yeah, that sounds about right.
Q. And did you continue to work with City Auto Group?
A. No, then I went to -- well, while I was at City Auto Group, I was also doing a little work at one of the Napleton dealerships part-time for a couple of years with all the other stuff. Then I -- after the fire department, primarily I went to go work for Bob Watson, another car dealer, for, I don't know, three years, a number of his

dealerships.
Q. Which in particular?
A. The Chevy store, there in Midlothian, their motor sports, which consisted of Yamaha, Suzuki, Kawasaki and then used car locations, they had like four used car locations, as the capacity of controller, corporate controller.
Q. Were you given an agency where you were or were you controller for the whole organization?
A. Yeah, looked over all his stores. It was a newly created position, corporate controller, for whatever, two and a half years, two years.
Q. Okay.
A. Then I think I went to Colorado for 11 months actually total, Mercedes-Benz of Littleton, part of the Brayman organization out of Miami.
Q. And your position there?
A. Comptroller.
Q. And that would be roughly 2004, 2005?
A. Yeah, the end of 2004, November 2004. You're following along there. It's a lot of jumping around. You kept on pace.
Q. And when did you finish up in Colorado?
A. Well, I came back in November, the end of



November.
Q. 2004?
A. Yeah.
Q. Okay.
A. And started out there in January.
Q. Okay. And since November of 2004?
A. Primarily just been working for myself as an independent contractor for various dealerships and businesses throughout the United States.
Q. I invite you to give me a little more specificity about that.
A. I don't remember which one is first. I mean, I'll go for short-term. Sometimes it's a couple of days, be it out to three and a half weeks in a Hawaii dealership, dealership out in Honolulu.
Q. Mostly it's auto dealerships?
A. All auto dealerships with the exception of currently the last six months, a business down in Louisiana.
Q. Okay. What's that business?
A. Well, the guy owns six convenience store gas stations. I just do the bookkeeping and accounting work for it.
Q. How did you hook up with him?



A. He used to be in a car dealership and I went to do an evaluation on the dealership down in Louisiana when he was there, about two years ago or a year and a half ago. And then some of the other dealers in Louisiana I worked for intermittently at different times and let's see where else. Wisconsin I went to once, several in Illinois, couple in -- two in Hawaii, and then a few sporadic little things out in the East Coast, Pennsylvania, New Jersey, Florida.
Q. And how do you get these jobs?
A. Just referrals, word of mouth, going to the National Auto Dealers Convention the last couple of years.
Q. And what kind of work do you perform when you're working with these dealerships?
A. Whatever they need. I mean, primarily it's accounting related, bookkeeping related, operations, operational, evaluations of performance, productivity, training of the office staff.
And there was, let's see, about a year ago, I took an internal position at a CPA firm -- well, it was -- I mean, it ended up being internal but they sold the firm. It was Devalk & Associates.



Q. D --
A. D-e-v-a-l-k, probably about six months before they sold the firm.
Q. Where was it located?
A. Downtown Chicago.
Q. Where?
A. I don't know. Over by union station. I can't remember whether it was a Canal address or Monroe or Randolph. Oh, it was a Riverside Plaza address, now that I think of it. And that was primarily tax work, accounting work for a few dealership clients that they had, also.
Q. Did you take any accounting classes at Gordon Tech?
A. Yeah, one in Gordon and a couple in college, mostly hands-on experience from the bank is where it all started.
Q. What kind of work did you do at the bank?
A. I started at 16 on the teller line for about six months. And the bank president took me under his wings and moved me through all the facets of bookkeeping. By the time I was 18, I was doing the board reports and financial reporting investments. And that kind of consisted of the same

period, he went out to Golf Mills State Bank and then I went out there with him, kind of doing the same type of duties at that time, doing all the FDIC regulatory reporting and the board reports.

Q. He had been president of that All-American and became president at Golf?

A. Right, then he went out to Golf Mills State Bank.

Q. What was his name?

A. Raymond Wojnar.

Q. How do you spell that?

A. W-o-j-n-a-r.

Q. You were a comptroller at various auto dealerships. What does the comptroller at an auto dealership do?

A. Depending on the size and the operation and if it's a holding company, it does vary -- it can consist of just running the full financial reporting for the single dealership. But in a few of those where they were multiple dealerships, I had people do that and I just reviewed the reports and kind of made sure they did their jobs. But I would do all the financial reporting, regulatory issues affecting the dealership, keeping up to date and



informed on those items, cash management. In the small one, it might have included payroll or doing the full spectrum of all the payroll reports.

Q. Interaction with retail customers?

A. Very little but yeah, I mean definitely if you've got a complaint, you, you know, interject and try to handle them, but primarily not.

Q. People --

A. Not at the forefront. I was more at the back end if issues would occur, if people had titling problems that weren't getting addressed by the billers let's say doing the title work for them, purchasing their vehicles, then I might get the call and try to interject and get the matters handled or resolved.

Q. Or approval of credit for --

A. No, I really didn't -- I mean, that wasn't my main -- that's what a finance manager would do.

Q. Would the finance manager report to you?

A. No, he would report to the general manager or owner.

Q. Mr. Thomas, this morning we're taking your deposition. What did you do to prepare for



this deposition, if anything?

A. Nothing specific.

Q. Did you meet with Mr. Keogh to prepare for this deposition?

A. Just briefly before coming over here.

Q. How long?

A. Ten minutes, if that.

Q. Have you done anything else for preparation?

A. No. I mean, reviewed the documents that were forwarded to me at different times.

Q. What documents did you review in preparation for the deposition?

A. Copies of the filing.

Q. Mr. Thomas, do you subscribe to any newspapers?

A. No, not really.

Q. Magazines?

A. Nothing recently.

Q. Last two years?

A. No.

Q. What are your principal sources of information for news?

A. Well, nowadays with the Internet when you



log on, you have the news sector of the websites and that.

Q. msn.com?

A. Yeah, or whatever comes up on AOL when I log on, primarily otherwise the news obviously on TV, CNN, that kind of stuff.

Q. Did you happen to bring any documents with you today other than the receipt that your counsel provided me?

A. Just the receipt, yeah.

MR. KEOGH: Just make sure you don't talk over each other is what I was going to interject.

MR. WILLIAMS: Other than the receipt, Mr. Keogh, are there any documents that you've brought with you today with respect to this deposition for Mr. Thomas?

MR. KEOGH: You're asking me a question?

MR. WILLIAMS: Yeah, just to see.

MR. KEOGH: No, I don't have any documents.

MR. WILLIAMS: Fine. Thanks.

BY MR. WILLIAMS:

Q. Mr. Thomas, you're the plaintiff in this lawsuit, the guy who is bringing the complaint.

Have you ever been a class representative before?
A. No.
Q. Have you ever been a party to a lawsuit, the plaintiff or the defendant?
A. **I mean, nothing that I can remember, recall offhand, but I'm sure there were different times that things consisted of it. I guess define the lawsuits or whatever so that I have a clear picture of your question.**
Q. Okay. This current case is a lawsuit?
A. **Correct.**
Q. You're the person bringing the complaint and we call that the plaintiff. Ritz Camera Centers is the person against whom you're bringing a complaint. They're the defendant. This particular case is pending in the federal court. There are also state courts. Have you ever been a plaintiff bringing a complaint in another court before this case, whether it's federal or state or whatever?
A. **I don't -- I'm not positive on the classification of the suit, but obviously there were some settlement suits with my worker's comp settlement and the fire department and at different times on the fire department, we were named as**



**parties, occasionally when different people were, you know, sued on behalf of the village obviously. But nothing ever materialized out of those.**
Q. Setting aside your worker comp proceedings and any judicial proceedings connected with that and setting aside anything where you were sued because you were a firefighter, have you ever otherwise been involved in a lawsuit?
A. **One time suing ATA Airlines for injury on a flight.**
Q. When was that?
A. **Probably about six years ago.**
Q. 2002?
A. **To my recollection, yeah, 2002 or 2003. I can't remember.**
Q. Flight from where to where?
A. **Flight from Honolulu that landed in San Francisco.**
Q. Had you been in Honolulu on vacation or on business?
A. **Yeah, I was on vacation, that time.**
Q. How were you injured?
A. **The plane kind of slammed down on the runway and reinjured my back.**



Q. Okay. And where did you bring that lawsuit?
A. **I'm sorry?**
Q. Where did you bring that lawsuit?
A. **Where was it filed?**
Q. Yeah.
A. **Here in Chicago.**
Q. State court, federal court?
A. **I don't recall.**
Q. Who was your attorney?
A. **His last name is slipping me. First name was Paul. I don't recall.**
Q. Was your deposition taken in that lawsuit?
A. **I'm sure it was, yeah.**
Q. Was your deposition taken in any of the firefighter lawsuits?
A. **Yes.**
Q. Other than the ATA lawsuit and the firefighter lawsuits, has there been any case before today where you've had your deposition taken?
A. **No, not that I can recall.**
Q. Did the ATA case go on to trial or was it settled?



A. **It was settled.**
Q. Before trial?
A. **Yes.**
Q. Have you ever given trial testimony?
A. **Not that I can recall it ever being called a trial. I don't recall. I mean, I've been at court before but not in front of a jury. I mean, so I don't believe it being a trial.**
Q. What brought you to be in court?
A. **Divorce court.**
Q. When were you divorced?
A. **It was in the neighborhood of '86, I believe, but I don't recall specifically the date and time. Maybe it was '90. I don't remember. It was eleven years ago.**
Q. That would be 1997?
A. **'86 when I got married so '90 something. '86 is when I got married so ten years. About '87, '88, '88 actually. My daughter was born in '87 -- no, '90. I don't know. Let's see.**
Q. You were married for approximately ten years?
A. **Yeah. My daughter was born '87, so it would be like '97 because my daughter was around ten**

years old. I've got to associate it to different things to remember the dates.

Q. And the divorce was filed and took place in --

A. Cook County.

Q. Cook County. Have you subsequently remarried?

A. Yes, I had and divorced again.

Q. When was that? When was the remarriage, when was the second divorce?

A. Remarriage was 2002, I believe. Those are bad memories I don't latch onto. And then divorce two years after that so probably 2004.

Q. And you're presently single?

A. Yes.

Q. Any other occasion that you have not talked about yet where you have been in court?

A. Not that I can recall, no. I don't believe I went to court for any of the fire department things but they were many years back. As a witness, no.

Q. Have you been a witness in any cases where you were not a party?

A. That possibly could have been the fire



department. They called us in as witnessing the treatment of that patient.

Q. But other than that?

A. No.

Q. We've got two kinds of witnesses. We have what we call percipient witnesses, people who have actually experienced something and they tell us about what happened to them, and we have expert witnesses, people who testify because there's something about their experience or education that enables them to express an opinion about a subject that's relevant to a lawsuit. Have you ever been an expert witness?

A. No.

Q. Did you take any courses in law in college?

A. Business law in high school, high school and college actually.

Q. Any lawyers in your close family, parents, grandparents, cousins?

A. No.

Q. Siblings?

A. Not yet.

Q. You've got siblings. Is one of them a



lawyer?

A. No.

Q. Have you ever been employed in a law firm?

A. No.

Q. Your attorney in this case, the firm of Mr. Keogh and his colleague Mr. Burke, when did you first meet either Mr. Keogh or Mr. Burke? Who did you meet first?

A. Mr. Keogh.

Q. When did you first met him?

A. Briefly I met him one time at a charity event I was at with my cousin.

Q. What charity was that?

A. I don't recall specifically.

Q. When was that?

A. A couple of years ago. And it was basic general conversation. They introduced me. He used to be a college roommate of my cousin's.

Q. So Mr. Keogh was the college roommate of your cousin?

A. Yeah. That was based on how I was introduced.

Q. I understand. And what was your cousin's



name?

A. Jeff Batterson, with a B.

Q. B-a-t-t-e-r-s-o-n?

A. Yes.

Q. When did you next see Mr. Keogh?

A. I believe the next time was -- it could have been an event or something I was at with my cousin, just, you know, he was at the same event at the same time. But other than saying hi and just being at the same place at the same time, that generally was probably it.

Q. And the next time you met Mr. Keogh?

A. Actually seeing him was probably -- well, other than here, more phone conversations.

Q. Was when?

A. Seeing him physically was within today, seeing him at the office and here. I had conversations with him on the phone prior to that.

Q. Well, glad for the chance for the two of you to see each other today. Anything we can do to accommodate.

Alex Burke is Mr. Keogh's colleague. Have you ever met Mr. Burke face to face?

A. No.

Q. Your complaint was filed earlier this year, Mr. Thomas. As I recall, it was February but I could be mistaken.
A. **Time flies too fast for me to remember.**
Q. Okay. How did you come to see Mr. Keogh and his firm professionally for the purpose of this case? What led you to him?
A. **In conversation with my cousin.**
Q. Did you consult any other lawyers?
A. **No.**
Q. And before today in connection with this lawsuit, you dealt with Mr. Keogh on the telephone?
A. **Yes, and e-mail.**
Q. I've asked the reporter to mark as Exhibit 1 a copy of the complaint in this action. Would you take a look at it, sir.
Do you recognize it as the complaint in this lawsuit?
A. **Yes, I do.**
Q. Have you read the complaint?
A. **Yes.**
Q. Did you read the complaint before it was filed?
A. **I may have. I believe I did. It was one**



**of the e-mails that I received and read.**
Q. Did you see it in draft form before it was filed?
A. **Yeah, I'm sure I saw it in draft form.**
Q. Did you make any changes to it?
A. **No, I did not.**
Q. Other than today, how many visits have you made to the Keogh Burke law offices?
A. **None.**
Q. Did Mr. Keogh or Mr. Burke come to visit you?
A. **No.**
Q. Have you received any compensation from Mr. Keogh, Mr. Burke or their law firm?
A. **No.**
Q. Do you expect to?
A. **No.**
Q. What are your goals with respect to this lawsuit?
A. **Other than hopefully, you know, business and people, you know, following the things that continue to protect people's identity from being stolen and creating problems for the individuals.**
Q. Anything else?



A. **No.**
Q. I asked the reporter to mark as Exhibit No. 2 a receipt which you had before you, Mr. Thomas. Is that a receipt, copy of a receipt, for a credit card transaction that you made at a Ritz Camera Center store location?
A. **Yes, it was.**
MR. KEOGH: And if I could interject for one second, we previously produced this receipt and produce it again today with the understanding that it be kept confidential, that if anything is going to be attached to the court records, the expiration dates will be redacted. I believe Suzanne of your office agreed to it. Eventually I'm sure we'll get a protective order in place.
MR. WILLIAMS: I hope so. The only information that you're receding confidentiality for on the receipt is the expiration date, correct?
MR. KEOGH: That's correct.
MR. WILLIAMS: Well, that's our agreement.
BY MR. WILLIAMS:
Q. Mr. Thomas, let's talk about this transaction and Ritz for a minute. Where did you



make a purchase from Ritz Camera?
A. **Which location?**
Q. Yes.
A. **The Woodfield Shopping Center.**
Q. And where is Woodfield Shopping Center?
A. **Schaumburg, I believe, Hoffman Estates, Schaumburg.**
Q. And at the time that you made that purchase, what's the date on that receipt?
A. **December 20, 2006.**
Q. December 20, 2006. Does that square with your recollection of when you made the purchase at the Woodfield Mall from Ritz?
A. **Yes, it was just before Christmas.**
Q. Is that a Ritz Camera location or some other brand name?
A. **I believe it's Ritz Camera.**
Q. Okay.
A. **Some of the chains here are called Wolf, but I believe it was a Ritz Camera.**
Q. And at that point in time, you were living on Brookbank Road in Darien?
A. **Yeah, if not Lemont. I think I bought the house but I didn't move into the house right**

away. I was in Lemont for a while, actually through the holidays because I did remodeling at the house on Brookbank before moving into it, from my recollection.
Q. How far distance is Lemont from Woodfield Mall in Schaumburg?
A. 25, 30 minutes, depending on traffic.
Q. How many miles would you say?
A. 15 maybe, 20.
Q. How far is Darien from Schaumburg?
A. Probably close to the same, maybe a couple miles less than that because it's from a little different direction.
Q. 12, 15?
A. 15.
Q. 15 miles?
A. Yep.
Q. So what took you to the Woodfield Mall on December 20?
A. Christmas shopping.
Q. Why that mall? Good news about Chicago is there's a slew of malls.
A. More selection, more stores in a shorter amount of time running around.



Q. So like me, you're not big on shopping if you can avoid it?
A. Yeah, especially around Christmas.
Q. Okay. Had you shopped at that Ritz location before?
A. I believe I've been in and out of it. I don't believe I bought anything at that specific location before.
Q. Have you bought anything there since?
A. Not at that location.
Q. The top line on that receipt, Exhibit 2, makes reference to a Fuji Finepix. Do you see that?
A. Yes, digital camera I purchased.
Q. It has the notation and handwriting returned?
A. I returned it to a Ritz in -- I believe it was Downers Grove for a different camera.
Q. So if I understand, you purchased the camera on this date, December 20, at the Ritz in Schaumburg?
A. Yes.
Q. And there came a later time when you returned that camera?
A. Correct.



Q. To a different Ritz store?
A. To my knowledge, yeah.
Q. And the store you returned it to was a Ritz location in Downers Grove?
A. Yeah, I believe so.
Q. Approximately when did you return that camera?
A. I don't remember specifically. It was around that time, shortly around that time.
Q. So within a month or two after you bought it?
A. Less than a month probably.
Q. Less than a month?
A. Yeah.
Q. And what caused you to return the Fuji camera?
A. I don't remember specifically whether it was an option or didn't work or whatever and got a different Fuji camera.
Q. So when you returned it -- when you returned the Fuji camera referred to on this receipt to the Ritz Camera store in Downers Grove, in exchange for that return you got another Fuji camera?



A. Correct.
Q. Same model, different model?
A. I don't recall. I don't have it anymore.
Q. You no longer have the Fuji camera you got and returned?
A. Correct.
Q. What happened to it?
A. I don't remember specifically. I have the box still. I ran across it not too long ago actually. I think one of my kids borrowed it and left it somewhere.
Q. You mentioned you have a daughter. How old is she now?
A. She'll be 21 in July.
Q. Congratulations. Do you have any other children?
A. A son, 16. That's it.
Q. Any other children?
A. No.
Q. You returned that camera to a Downers Grove location for Ritz. Have you shopped at the Downers Grove location before that time?
A. I don't believe so, afterwards buying film, returning film, maybe a frame or something

like that.
Q. So no prior transactions with that Downers Grove store before you returned the Fuji camera, but subsequently, more recently, you have gone back to that Downers Grove Ritz location for film imaging products?
A. Not recently but probably within that first year after buying that camera.
Q. Have you been to any Ritz location more recently than visiting the Downers Grove store?
A. Not purchasing anything. I think I looked at cameras for my mom back at Christmas this past year, just looking at that location.
Q. Downers Grove?
A. Other locations, other Ritz Camera locations.
Q. When would you estimate was the last time you were in the Downers Grove location and made a purchase?
A. Made a purchase, over a year ago. I don't remember specifically. I think it would have been to buy film from what I recall.
Q. Could have been --
A. I mean turning film in.



Q. April 2007, May 2007?
A. Could have been. I don't recall. Obviously from my job, being in and around all over places, it's hard to, you know, remember specific times.
Q. Are you a pretty avid photographer and picture taker?
A. I travel a lot so I take pictures when I travel.
Q. You don't?
A. I do travel a lot so I take pictures when I travel.
Q. I'm sorry. So how many pictures would you take in a year; hundred, 500, a thousand?
A. Probably a couple hundred over the course of a year.
Q. Have you had them developed or printed any other place other than Ritz?
A. Oh, yeah.
Q. Mr. Thomas, I'm going to ask that we take a short break right now. I'm going to use the restroom.
A. Okay.
Q. And then expect to resume in a few



minutes. I invite you to stand up, stretch, use the restroom as well.
(WHEREUPON, a recess was had.)
BY MR. WILLIAMS:
Q. Long shot. Your lawyer in the ATA case, you mentioned his first name was Paul.
A. I think maybe Paul Akin now.
Q. A-k-i-n?
A. A-k-i-n, I believe. As soon as you were starting to ask that again, it started to ring a bell.
Q. Okay. Thank you. I asked you about Downers Grove but I'm not sure I asked you about Schaumburg. Had you bought anything at the Schaumburg Ritz Camera store before December 20, 2006?
A. I don't believe so.
Q. I want you to take me through that day, that transaction as best you can remember it. When you -- why did you go into the Ritz store in Schaumburg that day, anything in particular you were looking for?
A. Just looking for a camera, and I know you get the most selection at a camera shop than a Sears



or a different store.
Q. Camera for yourself, camera for someone else?
A. It was for myself.
Q. Any particular kind of camera you were looking for?
A. I think that was my first digital camera purchase actually.
Q. How long were you in the store?
A. I don't recall specifically. Probably picking it out and ringing it up and all that, probably took 20, 20 minutes to get the description on what it did.
Q. Did you look at any other products, just digital cameras?
A. Yeah, I mean, that's all I was looking for at that store.
Q. And did you pretty much buy the first one you saw or did you go through a process?
A. I think actually from what I remember as you're asking me this, as I came in, I parked and walked through the Sears and happened to see one at the Sears. And it kind of struck my interest to check them out, coming up to the holidays, I never

had a digital camera. I saw them then and I went into Ritz and looked at them. And they had one on sale and I purchased it.

Q. And that particular Fuji model was on sale?

A. Well, they had other ones on sale, but that was the one that struck me. For whatever reason, I decided to buy that one.

Q. Okay. Do you have any recollection of the reasons?

A. No, not specifically. It seemed to do everything I wanted it to do.

Q. So after you picked it out, what happened next?

A. I would assume they rang me up. And after I knew what I was buying, I purchased it.

Q. Did you have any particular conversation with the cashier?

A. Not that I can recall, other than purchasing it.

Q. Okay. You tendered a Visa credit card it says here. Was it a Visa card?

A. I believe so. I don't recognize the last four of the numbers.



Q. I'm sorry. You do --

A. I said I do not recognize offhand the last four to signify which company it's with. It could have been my credit union.

Q. How many credit cards were you using at that point in time, December '06, on a regular basis?

A. Probably two or three.

Q. Was this the only Visa card or were they all Visas?

A. No, there was an American Express card in there also and Visa. I didn't have any Mastercards.

Q. And at that point, you were doing most of your banking with a particular credit union?

A. Well, I mean, I had the credit union through the fire department and I also had -- I don't know what it was back then, First National, Bank One, now currently Chase, which I have been with for a period of time.

Q. So one of your credit cards came from a credit union?

A. Yeah.

Q. What was the name of the credit union?

A. Illiana.



Q. You better spell that.

A. I-l-l-i-a-n-a, something like that, Illiana Financial Credit Union. I believe they're based out of Calumet City, Illinois.

Q. And where is the branch at which you're --

A. That was it at the time. I mean, they had a couple other branches that weren't geographically close to me, I think in Bradley and Chicago Heights. And then they had one in Naperville that they opened recently. I think they had one in Downers Grove for a period of time that's closed up now.

Q. And do you think your Visa card was with the Illiana Credit Union?

A. That one I would have to look back at a statement to know for sure. It was either that or it could have been Chase or one of the other ones.

Q. Okay. And Chase has acquired the Bank One?

A. Like I said, it was First National Bank, Bank One, Chase, all during the course of the --

Q. Okay. Do you remember if that was a Visa?



A. Yeah, it is a Visa logo on the cash station card.

Q. And then you have an American Express?

A. Yeah. Probably at that time also had a Union Plus card which is also Visa.

Q. What bank is that with?

A. Union Plus is the name. Don't ask for the address because I don't know what it is.

Q. Did you have any conversation with the cashier when you checked out buying the camera?

A. You asked me that. I answered it as far as the purchasing it and checking out, that was all that I could recall.

Q. Okay. Did you examine your credit card receipt at the time?

A. I don't recall specifically. If I did, it could have just been to look at the amount at that point in time.

Q. And was the amount the correct amount?

A. I would assume so or I would have said something at that time. I don't recall specifically.

Q. Did you have any conversation with anybody at the store about the expiration date on

the credit card?
A. No, not at that location.
Q. At any time, regardless of the day, at that location, did you have any conversation about the expiration date on the credit card?
A. No, not at all.
Q. At the Downers Grove location, have you had any discussion with any personnel at a Ritz store about the expiration date on a credit card?
A. No, not at any Ritz locations.
Q. When you made purchases at the Downers Grove Ritz store, did you use a credit card?
A. When I made purchases, other purchases, whenever I purchased them, I may have. I don't recall specifically each transaction. I mean, if I have cash on me, I pay with cash. If I don't have cash with me, depending on the price, I may pull a card out and may use a card. Whether it's American Express or Visa, I don't recall specifically.
Q. Have you saved any of your credit card receipts from the Downers Grove Ritz store?
A. I don't recall specifically. I don't have one that I'm aware of at this point in time.
Q. Do you have any kind of habit or custom



or practice with regard to saving your credit card receipts, how long you save them?
A. Generally I save them with all the travel that I do for tax purposes obviously, general practice I save my receipts.
Q. And how long do you save them, a couple of years?
A. Yeah, at least. Sometimes I'll thin them down at some point in time, but generally speaking, I usually save them for at least three years.
Q. Any reason to think that you wouldn't have saved any credit card receipts from the Downers Grove Ritz location?
A. Any reason I wouldn't have, as far as for some reason I didn't have it, it accidentally got thrown out in the bag, I mean, just general if I had it in my pocket versus occasionally, you know, not checking to make sure I have the receipt, but nothing specifically.
Q. Do you compare your receipts with your credit card statements each month?
A. Not as much as I probably should, but --
Q. Pull up more studies.
A. Well, I only say that because that's kind



of my job that I do, is checking balance and accounting, and that's the only reason I preface that.
Q. You'll notice that, too.
A. Practice what you preach. It's one of those type things.
Q. Do you have any recollection of encountering any of the Downers Grove Ritz location credit card slips --
A. No.
Q. -- on your statements?
A. No. Actually tell you the truth, other than asking me at this point, I never really thought of that location to see if I had any receipts so it is possible. I mean, I know it's possible since I know I bought things before, but I know I have not actively recalled that since you questioned me today on it.
Q. Okay. Have you purchased any products at a Ritz Camera location or Wolf Camera location other than the Schaumburg and Downers Grove stores?
A. I'm sure at different times when I traveled and sometimes got cameras, you know, photos developed. I know I might have gone into one or



two, be it in Florida, California or wherever.
Q. But no particular recollection?
A. No. I know I've been into some and I know at some point in time in my history, I remember taking film in to get developed. I know once or twice I brought them into a Ritz Camera location.
Q. What about during 2007, any recollection?
A. I don't recall specifically other than the Downers Grove one.
Q. During 2008?
A. Possibly traveling I could have. Not 2008, no.
Q. Going back to 2007, any particular recollection come to mind of any particular Ritz location other than Downers Grove or Schaumburg?
A. No, not particular. I mean, like I said, I do recall going to one, you know, in another state somewhere to get film developed. It might have been in '07, but I don't know. I have not checked my records to know whether I have, if that's where you're going with that question. And I may have bought something over the years prior to '06 actually at the Orland Park location as I start to think about that.

Q. Orland Park?
A. **Yeah, I believe that would have been prior to '06 because that would have been more when I was on the fire department and living out there.**
Q. The credit card that you used, and let me just review each of them, and the question is going to be for each of these cards, is this a personal card in your name.
A. **They all are.**
Q. The Illiana Credit Union credit card is personal in your name?
A. **Yes, all of them are.**
Q. So the Chase Visa is personal in your name?
A. **Yes.**
Q. The American Express credit card is personal in your name?
A. **Yes.**
Q. And the Union Plus bank Visa is personal in your name?
A. **Yes.**
Q. Is anybody else -- pardon me. Was anybody else besides yourself authorized to use any of those four credit cards in December '06?



A. **No, not then or any time.**
Q. Your purchase of the camera -- strike that.
Looking at Exhibit 2, what else did you purchase at the same time as the Fuji camera from Ritz in Schaumburg?
A. **The 9.99 was a package -- I mean, I'm sorry -- was a case.**
Q. Okay. This is the raki ridge black for $9.99, that was a case for the camera?
A. **Correct.**
Q. And then the digital package?
A. **That was not anything I selected. That was what they rang up with a promo package they had at Christmas which they claimed was a $300 value worth of coupons and school and stuff and training classes and all bunch of stuff that I never actually used anything. And they rang it up and took it off as a promotional item.**
Q. So you were charged nothing for that item?
A. **No. I mean, obviously they rang it up and I even questioned it actually now that I think of it, why they rang it up for $300, not knowing**



**that there was no way that it actually had a true value of $300.**
Q. What leads you to say it may not have had a value of $300?
A. **Because a coupon doesn't have a value unless you use the coupon for a value. It's just a piece of paper. So that was primarily all that was in that package that was in there. So that's my interpretation of coupon. It's no value until it's tendered for some exchange of a monetary value or value of something in exchange.**
Q. But you received the coupons?
A. **Yeah.**
Q. Did you ever have occasion to use any of them?
A. **No, as I said before, I never even used anything that was in there.**
Q. Okay. Do you recall any conversation with anybody in the store other than the cashier?
A. **No.**
Q. Okay. Did you make any notes after you left that store about what happened at the store?
A. **No.**
Q. Okay. Fine. When you returned the



camera to the Downers Grove store, did you also return the case?
A. **I don't believe so.**
Q. Okay.
A. **Actually that posed -- that question just posed. Okay. They only circled the one. I might have gotten -- you know, I don't know. I don't recall returning that, wherever it was, that I don't know why that wasn't returned also because like I said, I turned the camera in and I got one back in exchange. So I'm sure that replacement camera fit into the case and that's why the case wasn't returned also.**
Q. Okay. Possible.
A. **Yeah.**
Q. Is this your handwriting, the word returned?
A. **No, it's not.**
Q. Is it a clerk from the Downers Grove store?
A. **Clerk from whichever store I returned it to. Like I said, I don't know for sure, but I think it was Downers Grove that I returned it, but I don't know specifically. But it was the handwriting and**

circling by a clerk.

Q. When you returned the Fuji camera and got a replacement camera, did you pay anything additional?

A. I don't recall. I would have to look back at my receipts and find out. You're posing questions that are bringing up additional questions in my mind as far as that purchase.

Q. Sorry, but it's my job.

A. No, I'm just stating that I don't know.

Q. I'm trying to just bring your memory back with regard to the replacement of this camera, can you recall, is it a nonfunctioning problem that led you to replace it, was it something it just wouldn't work?

A. I don't remember specifically, as I stated earlier.

Q. Was it something you didn't like?

A. As I stated earlier, I either brought it back for the model, it wasn't doing what it was supposed to do or it wasn't operable. I don't recall what reason that I returned it and got one in exchange for it.

Q. And you were satisfied with the one you



got in exchange?

A. Yeah, because I had it for however period of time until it was -- whatever happened to it, it vanished.

Q. And you used --

A. My kids.

Q. -- it successfully?

A. Yes.

Q. In your complaint, Exhibit 1, there's a paragraph No. 17 I would draw your attention to and it says third page, and it reads Mr. Thomas is a former victim of identity theft?

A. Yes.

Q. When did you realize that you had been a victim of identity theft?

A. A couple of years ago.

Q. More precise?

A. I don't remember specifically. It was a couple of years ago, two, three years ago. I don't recall specifically. I would have to look back at my documentation and find out, but I had a courtesy call from American Express and from the credit union because of purchases that were out of state. And also I received regularly, even prior to this,



credit management or whatever on my credit report and obviously saw that after I was already informed of it, but I saw the purchasing activity of somebody fraudulently stealing my identity. And at a later date, it was again stolen about a year later and used again, a repetitive time.

Q. Same card or replacement card?

A. Same --

Q. Same card as the --

A. I don't recall specifically now which one it was on. Again, it wasn't on -- it was identity theft so it's not on a specific card. They took my identity and went to Lowe's and they went to Home Depot or whatever and made purchases. And actually one of the occurrences, I believe it was the Bridgeview Police Department caught somebody using one of my cards and identity at one of the stores at a Bridgeview location by Ford City, at which time I was asked about that being pursued. I mean, I got initial calls in regards to it and whether I was willing to press charges, and I did and I never heard anything back, whoever was doing the charges, state attorney's office or whatever.

Q. So you were willing to press charges and



you did but nothing --

A. I said I did but nothing ever materialized out of it. They told me they would call back. And obviously at that point in time when they caught the person that did it, they asked if I give them any permission to do all that, all that typical stuff over the phone. I never had to go into -- I don't believe I went in to fill anything out.

Q. Okay. The date on the Ritz receipt, Exhibit 2, is December 20, 2006?

A. Correct.

Q. The identity theft the first time was before that?

A. I don't remember specifically. I would have to look back at my records to know exactly when it was, which obviously won't be too difficult to find because there were numerous purchases that were made, both the first time and the second time that it happened.

Q. Back in 2006 did you have a shredder at your home?

A. Yes. I don't remember specifically when I acquired one, but I did purchase a shredder

several years ago.
Q. Before your identity theft or after?
A. Oh, no, before. Again, part of what I do, part of my jobs in the dealerships kind of pertain to the Fair Credit Act to some extent and some of the safeguard and safekeeping or safeguarding, whatever that law is called, that as far as proper documentation, driver's license, things with Social Security numbers being shredded in the location and stuff like that. So I become abreast of those issues at that point in time from my job.
Q. What kind of documents do you shred at your home that are personal documents, not business?
A. Generally all the lousy credit card applications that you keep getting in the mail, like every single day you get one, those seem to be the main ones. Other than that, just generally if I'm going to be throwing out receipts, I shred those. But like I said, I generally save my receipts.
Q. For three years?
A. Generally, yes, although my daughter is starting to tell me dad, you don't need to keep all these papers, you got to throw some of them out.



Q. In the complaint on the same page, paragraph 20, it says you received a receipt from Ritz that is a 2255 West 95th Street store in Chicago. That statement is not correct?
A. Yes. I don't know where that -- I didn't recall seeing that there.
Q. But it is correct that you did not get a receipt from such a store?
A. No, I don't know of any such store, unless that -- well, I don't recall any of these stores. I mean, one of the purchases that they had found from that fraud case was at a 95th Street address, one occurrence, and then also in Bridgeview. Whether it's related or not, I don't know, now that I see that. But I don't even recall seeing that previous time that I read this as far as the 95th Street address in Chicago. But as I'm reading it now, I know there was one of those times where they caught the guy in Bridgeview, but it also pertained to some purchase on 95th Street in the city. If there is such a location, I don't know.
Q. You don't have a recollection of visiting a Ritz store yourself on 95th Street?
A. No, like I said, I don't even know if



there is a specific location there on 95th Street.
Q. And you wouldn't be surprised if I told you there isn't?
A. Not at all. Because I don't know if that's Chicago even, 2200 on 95th Street. I think it's closer to Evergreen Park.
Q. That was what I thought.
A. Only from my buddies on the Evergreen fire department, I know kind of the location there.
Q. That's where I was born.
MR. KEOGH: I think most people know Little Company of Mary. My grandma lived on 87th and California.
MR. WILLIAMS: Yes.
BY MR. WILLIAMS:
Q. Mr. Thomas, in this lawsuit, you complain about a federal statute called FACTA for short, Fair Accurate Credit Transactions Act, and it's an amendment to the Fair Credit Reporting Act that you just mentioned. When did you first become aware that there was a statute dealing with expiration date display on credit cards?
A. I think it was brought up actually and really didn't dawn on me effectively in February



when I was at the National Auto Dealers Convention in Las Vegas. And I say I don't recall that because when it was brought back up again this year at the NADA convention in San Francisco, they referred to last year talking about it, and I know I was in on that class.
Q. So you're referring to a class you participated in on the subject of FACTA at the National Auto Dealers Association annual convention in Las Vegas, February 2007?
A. Yes. I had to pause for the year, but yes, it was February '07 was Las Vegas and possibly even the year before, the first NADA I went to in Orlando, but I don't recall going to any fair credit reporting seminars at that point in time.
Q. And after the February '07 class on FACTA at the NADA convention in Las Vegas, when did you first think about how it applied to you personally?
A. Actually applied to me personally was just in conversation with my cousin.
Q. How did that --
A. For whatever reason it just never dawned on me, you know, even though I'm doing this for the dealership and made sure the stores that I was at at

the time were not violating the FACTA law.
Q. When was the conversation with your cousin that you're just talking about?
A. Within this year, maybe the end of last year but the first part of this year, around Christmas time I believe.
Q. And this is Jeff Batterson?
A. Yes.
Q. And tell me about the conversation. Who else was in the conversation?
A. Just him. He just basically stated that, you know.
Q. What were you talking about?
A. It reminded me of -- it reminded me of the FACTA from the dealership side, you know, but I never dawned on it from a personal standpoint of looking at the receipts and that.
Q. Were you in a store with him and looking at a receipt?
A. No, we were in a restaurant at dinner, something like that.
Q. Okay.
A. I believe from what I remember he was making -- he was picking up dinner and when he paid



for it, he had made mention of the receipts. And he looks for that at that point because whatever, however, he learned of it prior to that to, you know, keep an eye on it.
Q. What business is he in?
A. Currently I believe he's like an investment banker.
Q. And what was he before he was an investment banker?
A. Well, I mean, he's just doing that as far as I know. He was in college before that. I can't remember specifically what he was doing. Over the years I have seen him, many times with the holidays as we grew up, we were second cousins and, you know, in the recent years, we hung out a little bit more often. So I don't -- other than going to college and I know he was down in -- he lived in the city for a while and went and saw him once or twice down there. But other than that, I can't specifically recall.
Q. The two of you were in a restaurant early this year, he's picking up the tab, looking at the receipt and he makes a comment about the expiration date, correct?



A. Yeah.
Q. Was the expiration date shown or not shown on that tab?
A. At that place I believe it was not shown, yeah.
Q. Okay.
A. And that's where he said, you know, hey, do you happen to check your receipts, you know, for the expiration date being on there. And I was like, what are you talking about actually. And then like I said, when he started talking about it, then it reminded me from, you know, the dealer application, which that's just one small sliver of the fair credit that affects a lot of the issues within my job. That it dawned on me and I started to be more conscious that any time I purchase, I make purchases and then also, you know, I happened to look back, randomly through my receipts. I didn't dig through every single one, but I went through mine to see, you know, if I had any at that time that, you know, had that situation which led me to, you know, ask him about it and learned of, you know, Keith at that point in time.
Q. Why did you go back through your prior



credit card receipts?
A. Well, to see if I had any. Because again, after learning the hard way from identity theft, you know, I don't take that, you know, lightly. I take that pretty seriously, especially when it has inconvenienced me numerous times when I would, you know, make any future purchases at this point in time because I had to have the fraud alerts put on each of my credit bureaus. I've seen it in issues where other people have had their identity stolen that I've had to handle situations at dealerships for, and when it personally happened to me and I'm still to this day still feeling the effects of it because it is on there. So when you go to buy a car or you go to make a home purchase or whatever, they're questioning you like crazy whether you're the real person or not.
Q. Partly because of the reference on your credit report that relates to the identity?
A. Right. Which I didn't have on there prior to the identity theft, which even after it was put on, somebody still managed to steal my identity a second time after there was a fraud alert. So like I said, I don't take that lightly.

Q. You said you went back through receipts randomly. Why didn't you go back through all your receipts?

A. **From what I had seen handy there, I have receipts in various places, I stumble across when I pull out a folder and realize this is for remodeling repairs that I did on the house, they're in a separate folder, you know. Then I keep general receipts on a regular basis. I started to come to a point where I keep them kind of in envelopes based on months in case I need to refer to something, but when I do specific projects, I try to keep track of what I spend on that. Obviously with my travels and different clients I do work for I will have those receipts filed by, you know, the work that accompanies that client's job so I can get a true and accurate track of the expense structure on that job versus the income I've taken. So that's what I mean by it's different locations. If I kept them all in an envelope by each month that obviously would have been easier. But I don't keep every single receipt in that filing system.**

Q. Did you keep the receipt that's Exhibit 2 in a file with any of your business?



A. **No, that would have been -- that was in one of those monthly files.**

Q. Did you go through your monthly files for personal receipts?

A. **No, the monthly is what I primarily looked at.**

Q. And did you go through all of your monthlies?

A. **What I had on my -- my regular monthly stuff I have there.**

Q. So when you used the word randomly a few minutes ago, you actually went through all of your monthlies that you have retained?

A. **I randomly went through all of my receipts, but I specifically went through my monthly accumulation of receipts.**

Q. Personal rather than business?

A. **I have receipts in various locations based on, as I just explained, whether it's home repairs and home projects versus business projects that are in different locations as you're questioning me, those are locations that I have not reviewed receipts that maybe it may have other incidents on that.**



Q. And did you find receipts from retailers other than Ritz that had an expiration date?

A. **Yeah, actually I even found one from in Colorado where this year they had the entire credit card number in addition to the expiration date for a restaurant in Colorado this year. Like I said, I'm conscious of that at this point.**

Q. The receipt is from 2008?

A. **I'm sorry. 2007, I believe. The last 12 months is what I meant when I said last year or this current year.**

Q. All right. So you found the Ritz receipt from December 2006. What did you do with it?

A. **Out of the receipts that I had found, you know, in a brief recap, I had forwarded, you know, copies of the receipts to the attorney's office and had them review the receipts that I had questioned as far as being possible violations of the FACTA law, both in state and out of state. Again, I travel so there's numerous I have from other states also.**

Q. How many receipts did you send to Mr. Keogh's office?

A. **I would guesstimate around 15 or 20 that**



**had the, you know, limited number of digits listed and the expiration date fully stated on the customer copy.**

Q. And did you send him any receipts that had more than five digits of the credit card number printed?

A. **Possibly six or so but that one that I, you know, recall recently was when I was reviewing my bills and my business files for the tax year of 2007, that's where I had just saw that one for the purchase at the restaurant in Colorado that had the entire credit card number on the receipt.**

Q. Okay. Did you send Mr. Keogh any receipts other than Exhibit 2 from Ritz Camera Centers?

A. **I don't believe so.**

Q. In your jobs as controller or other similar positions with auto dealerships, what have you done to assist the dealerships in compliance with FACTA?

A. **Well, some policies and procedures, again, the truncation is only a sliver of the issues for the dealership, and I focus more in on driver's license and Social Security numbers and credit aps,**

that they're not left openly and freely and make sure they are kept in a locked office, kept locked up at night, do random audits, if you want to call it that, like if I come in first thing in the morning at the dealership, I'll scope the sales department and see if I find any that are left out. Then if I find any that are left out, I bring it to the general manager. Then we have a little discussion with the individual that left them unlocked and out in the open.

Q. Appreciating as you've said that this is a tiny sliver of the overall security related work you were doing with the dealerships, did you take steps to make sure the point of sale printers for credit card receipts at the dealerships were compliant?

A. Yeah, at different times when I recalled it, yes, I did, and they were. So I can't tell you what I would have done if I found that they weren't. They were in each of the situations that I reviewed.

Q. Were you responsible for changing the software or hardware to make it compliant?

A. No. Again, they all were from any time that I looked at that so we didn't need a change.



Q. Have you at the time of a transaction with a credit card brought it to the attention of any merchant that their credit card receipt was not in compliance?

A. I don't remember specifically. I think once or twice I may have brought that to somebody's attention at a restaurant, but I don't recall at this time specifically where or when it was. My tendency leads me to believe it was in Hawaii.

Q. When about would that have been?

A. I think this year --well, it wasn't this year. It was actually last year, March of '07. I was doing work out there.

Q. About a month after the convention in Las Vegas?

A. Actually not even because that's part of my routine I kind of done the last couple of years. I do the NADA convention and then I go out to Hawaii after that for vacation and for work the last two years in a row.

Q. So it was fresh in your mind?

A. Exactly.

Q. So you had a situation in Hawaii. You go to a restaurant. They printed out something they



shouldn't have printed out on the credit card receipt and you brought it to their attention?

A. Specifically whether it was that time I don't recall, but I do remember one time that I did bring it to -- ask for a manager and I brought it to their attention, and I think it was in Hawaii.

Q. And you got home after that and it didn't register with you to take a look at your credit card receipt at that time?

A. In March of '07?

Q. Right.

A. I don't -- not that I know of. I mean, actually I didn't get back into Chicago until April actually of '07 and went on to my next job and didn't look at those receipts until the later period of time. But actually that could have been actually this year now that I think of it because I don't recall -- I don't know. I know it was within the last time after this -- as I brought up before, you know, my years don't tend to solidify all together so it actually was probably this year when I was in Oahu because it was after this filing of this issue.

Q. After the complaint was filed?

A. Yes, so obviously it was in 2008 and not



2007. And this was fresh in my mind.

Q. This being Exhibit 1, the complaint?

A. This, yes, knowing there was a situation that was there that again, you know, businesses had greater than a year to already start to get to a point of correcting these issues. And it was because San Francisco was where it was brought up again in the NADA convention again, that was the truncation issue was brought up specifically.

Q. And the San Francisco convention was which year?

A. 2008, just a few months ago.

Q. After the Las Vegas convention, 2006 --

A. 2007.

Q. You told me Orlando was 2007.

A. Orlando was '06.

MR. KEOGH: I think you're misstating the record. I think he did state '06 for Orlando.

MR. WILLIAMS: Maybe I got it wrong.

THE WITNESS: Because Orlando in '06 was actually prior to the law because I believe the law took effect sometime in the end of '06. I was only making reference of Orlando as one of the conventions I went to.

BY MR. WILLIAMS:
Q. Did the effective date of FACTA in December of '06 come to your attention at or about that time as part of your job?
A. I think a little bit where I was at and what I was doing at that point in time, I believe December of '06 I was not working at the dealership specifically and I didn't start working -- yeah, I was off that -- part of November, into December and didn't take a first job until January of '07.
Q. And which job was that in January of '07?
A. Since I came back from Colorado, just doing consulting work. I wasn't employed there, and in January, I started to work at Fletcher Jones part-time for a period of seven months here in Chicago as again an independent contractor. None of those places I was on the payroll as an employee. I worked for myself. One of the plus sides of being self-employed is I didn't have to work during the holidays so I was able to spend time with my kids when they were off for school.
MR. KEOGH: Hopefully I'll find that as a part of my being self-employed.
THE WITNESS: I can't lie. The fire



department makes it a little bit easier to do when they cover my benefits. Then I don't have to stay full-time to have insurance benefits.
MR. KEOGH: Just a reminder, there's no question pending.
BY MR. WILLIAMS:
Q. Using the NADA conventions as kind of time markers, you've now told me February '06 is Orlando and February '07 is Las Vegas and February '08 is San Francisco?
A. Correct.
Q. There first identity theft, is it before Las Vegas, is it before Orlando?
A. I don't recall.
Q. The second identity theft, is it before Las Vegas or before Orlando?
A. Again, I don't recall specifically when it was.
Q. I'm trying to get the best you got.
A. I don't know. I would have to look back at my records. I didn't know that was going to be a point of reference that I would need to know the fact for. I don't recall right now as you're questioning me when it was.



Q. What records would you look at?
A. Well, numerous records. Obviously I filed and I saw my credit report that there were all these credit cards that were opened so I retained those records.
Q. Do you have that in a particular file or folder?
A. In my credit file folder, where periodically I get credit reports. Plus I had to fill out a form to send in for, what is it, Citibank credit protection, whatever, that they file the thing. So I would have a point of reference at that point in time of filing.
Q. Okay.
A. On the first occurrence. Now, that second one when they caught the guy and all that, I don't know offhand what date that was, although probably on the report there would be a card that was opened and closed during that time due to fraud.
Q. And do you have any documents from that time relating to your conversation, Bridgeview police?
A. My credit files I keep as I get them for numerous reasons, but obviously so I could look back



at the files because I do keep those.
Q. Okay. Would it be fair to say that you were aware of the requirement of FACTA that's printed in paragraph 2 of your complaint as of the class at Las Vegas in February '07?
A. No, not specifically. I know it was brought up again this year in San Francisco.
Q. Okay.
A. And I only make reference that it could have been brought up in Las Vegas because one of the classes that I took had to do with safeguarding.
Q. Credit?
A. You know, whatever that -- they call it from the dealership side, safekeeping something. I can't remember the name of it. But that was the name of that class and obviously that might have been one -- again, I could tell you if I had to look up the records because I do save that material as the handout that I could reference to to see whether it was, in fact, in that packet that I got. But whether it was covered in the class, I would have to acquire the tape that was presented.
Q. So if there was a handout from the Las Vegas, Nevada NADA class, you would likely have

77

retained it?
A. **Yeah. It doesn't mean I recall that I actively went and reviewed that at that point in time at places I was working.**
Q. After your identity was stolen for the first time, did anybody counsel you on things you might do to better protect your identity?
A. **Well, they mail you brochures and information or booklets and then through a general conversation on the phone.**
Q. And who?
A. **I think it's sponsored by Citibank.**
Q. Okay.
A. **Again, I have that file if I had to pull it out because it came in a brochure that I use as a file.**
Q. And was there any reference in that counseling to truncation of information on credit card receipts?
A. **I don't recall.**
Q. Do you recall being sensitive to looking at credit card receipts after that time?
A. **For that specifically, I don't recall.**
Q. Okay.

78

A. **That it was brought up.**
Q. Basically the first time it kind of flashed in your mind to think about it for yourself was your conversation with Jeff?
A. **When my cousin brought it up, yes.**
Q. And that was early in 2008?
A. **Well, either December of '07, whatever it was, yeah, in or around that time.**
Q. The complaint, Exhibit 1, makes reference to various statements and publications. Let me ask you to turn to page -- well, paragraph 38. And you'll see there's a reference to comments by the CEO of Visa U.S.A. on March 6, 2003. Do you see that?
A. **Yeah, I see that.**
Q. Is that information you provided to Mr. Keogh?
A. **No.**
Q. Is that information you yourself came across?
A. **No.**
Q. That's information that Mr. Keogh has located?
A. **I would assume so.**

79

Q. You haven't?
A. **No.**
Q. Okay. Paragraph 39 refers to Mastercard and American Express announcing certain requirements within 24 hours. Do you see that?
A. **Hold on one second.**
Q. Paragraph 39.
A. **Can you restate the question again, what are you asking?**
Q. Did you provide the information about that to Mr. Keogh?
MR. KEOGH: I just want to caution you, anything you told me or I told you is privileged and I'll instruct you not to answer. If maybe you can rephrase the question.
MR. WILLIAMS: I'll be happy to.
BY MR. WILLIAMS:
Q. Before reading it in a complaint, had you been familiar with that statement?
A. **Not specifically that I could recall.**
Q. Did you have any information about Mastercard or American Express requirements on merchants?
A. **Not specifically.**

80

Q. The paragraph 41 makes reference to an August 12, 2006 edition of rules for Visa merchants. Do you see that?
A. **I see that.**
Q. Back in August of 2006, were you aware of rules for Visa merchants?
A. **Not that I can recall.**
Q. The paragraph 42 refers to contracts requiring compliance for Visa. Have you, before the lawsuit was filed, reviewed anybody's contracts with Visa, any merchant contracts with Visa?
A. **Well, what do you mean Visa specifically? Merchant contracts as far as agreements for dealerships I review but not as far as their regulatory responsibilities. They don't cover any merchant contract.**
Q. Have you reviewed merchant contracts with credit card processors such as Visa or American Express?
A. **From what point in time?**
Q. Before 2007.
A. **Before 2007?**
Q. Yeah.
A. **Well, yeah, because one of my duties**

would be to limit the expense of the dealership for what they would be paying.
Q. Okay.
A. But I don't read -- I read the contract for what the charge is, not for what the guidelines are spelled out on regulatory issues.
Q. Did you -- in the course of your work with dealerships, did you receive manuals or newsletters from Visa or American Express about their rules or their changes to rules?
A. I might have, but that's not my regular job description.
Q. And does that mean you did or didn't look at them?
A. No, I would not have looked -- that would not have been -- I would have looked and said okay, you're paying 3 percent on Visa, Mastercard, you could pay less than that and request a quote from the company for that. And that would be the extent of what I would do at that point in time.
Q. And if there were information on other credit card receipt related subjects in that mailer or manual or whatever from Visa or American Express, you wouldn't have paid particular attention to that?



A. No, my extent of what I would look at would be primarily for the fee structure the processors are charging the business that I assess.
Q. Paragraph 43 refers to a manual by American Express. Prior to 2007, do you recall ever seeing the manual from American Express for credit card processing?
A. Not from American Express, no.
Q. Paragraph 45 refers to a statement before Congress by Mr. Fischer of Visa U.S.A. Were you familiar with that statement before 2007?
A. No, not until seeing it in this document.
Q. Paragraph 46 refers to an early 2006 edition of a handbook published by the Office of Thrift Supervision in the Treasury Department. Prior to 2007, had you seen that handbook?
A. No.
Q. Paragraph 47 refers to website information from Heartland Payment Systems, Inc. Have you ever done business with Heartland Payment Systems, Inc.?
A. Not specifically that I can recall.
Q. Have you ever looked at the Heartland Payment Systems website?



A. Not specifically that I can recall.
Q. Paragraph 49 refers to Commerce Bank, a credit card processor, and merchant compliance awareness notices in 2004. Do you see that?
A. Uh-huh.
Q. Prior to 2007, had you become aware of any of these merchant compliance awareness notices from Commerce Bank?
A. Not specifically.
Q. When you say not specifically, do you have any recollection at all?
A. To what, Commerce Bank?
Q. Yes.
A. Not specifically to Commerce Bank sent merchant compliant awareness, quote, unquote, no, I don't specifically.
Q. Do you even have a general recollection that you saw them?
A. No.
Q. Paragraph 50 refers to restaurant and retail trade associations and in particular to the newsletter in 2005 of the Virginia Retail Merchants Association. Do you see that?
A. Yes.



Q. Have you ever seen publications of the Virginia Retail Merchants Association?
A. No.
Q. Paragraph 51 refers to the National Association of Convenience Stores magazine in 2003. Have you ever seen that magazine?
A. No.
Q. Paragraph 52 refers to the Food Industry Advisor newsletter of April 2005. Have you ever seen that newsletter?
A. No.
Q. It also refers to appearance of the same article in the National Association of Convenience Stores magazine from 2005. Have you ever seen that?
A. No.
Q. Paragraph 53 refers to the Connecticut Restaurant Association newsletter in spring 2004. Have you ever seen that document?
A. No.
Q. Paragraph 54 refers to the Wisconsin Restaurant Association credit card transaction alert document. Have you ever seen that document?
A. No.
Q. Paragraph 55 refers to the Massachusetts

Restaurant Association newsletter from January 2005. Have you ever seen that document?
A. No.
Q. Paragraph 56 refers to the Ohio Restaurant Association and Oklahoma Restaurant Associations. Have you seen any newsletters or publications of those two organizations?
A. No.
Q. Paragraph 57 refers to the 2000 -- March and April 2006 edition of the Ohio Independent Automobile Dealers' Association Dealer News Magazine.
A. No.
Q. Pardon me. Let me ask you the question. Have you ever seen that document?
A. No.
Q. Thank you. Paragraph 57 also says this article appeared in the March/April edition of the West Coast Independent Automobile Dealer News. That would be 2006. Did you see that?
A. No.
Q. Paragraph 58 refers to the Independent Insurance Agents & Brokers of America report to members in 2005. Have you ever seen that document?



A. No.
Q. Paragraph 59 refers to the Compliance Challenge from 2004 published by Credit Union National Association News. Have you ever seen that document before?
A. No.
Q. Paragraph 60 refers to the PT Bulletin newsletters of the American Physical Therapy Association from 2003. Have you ever seen that document?
A. No.
Q. Paragraph 63, 64, 65, 66 and 67 provide information about the individual digits of a credit card number. Prior to 2007, were you familiar with the information that's contained in these paragraphs, that is what the significance of a given digit in a credit card number is?
**A. The only ones, I knew the first several letters signified Visa or Mastercard, you know, started with a 4 or 5 from years back in banking, but nothing specific on the remaining numerals' locations.**
Q. Prior to your talking with Mr. Keogh professionally earlier this year, did you have any



information concerning Ritz's efforts at compliance with FACTA?
**A. Did we have any -- I'm sorry?**
Q. Did you have any information concerning Ritz Camera stores' compliance with FACTA?
**A. No.**
Q. Anything about their efforts?
**A. No.**
Q. Anything about whether there came a time when they were not printing expiration dates on receipts?
**A. No.**
Q. Did you, before talking with Mr. Keogh professionally in early 2008, yourself do any investigation or inquiry with respect to Ritz practices on the printing of expiration dates on credit cards?
**A. No.**
Q. You've mentioned that you've dealt with Mr. Keogh on telephone conversations, among other things, between the beginning of '08 and today in connection with this lawsuit. How many telephone conversations would you say you've had?
**A. Three or four, four or five, something**



**like that.**
Q. And of those three to five telephone conversations, how long would you estimate the longest one was?
**A. Very short, primarily just to centralize where and when I'm in town to set up the appointment for the deposition.**
Q. Would you estimate that each of those five conversations, if there were that many, took ten minutes or less?
**A. Yeah.**
Q. You've communicated with Mr. Keogh by way of e-mail you've said?
**A. Uh-huh.**
Q. Roughly how many e-mails would you say you've sent to him?
**A. That I have sent to him? In response to questions that he's asked as far as, you know, copies of receipt or we need a better legible copy.**
Q. Okay. Have you sent -- have you initiated any e-mails to Mr. Keogh where you were not responding to his question, you were doing something?
**A. Not that I can recall specifically.**

89

Q. Other than the complaint, have you reviewed any other documents in this lawsuit before they were filed in court?

**A. Have I reviewed any documents prior to them being filed?**

Q. Right.

**A. Yeah, the initial report prior to being filed, I believe he forwarded me and I read it to make sure I didn't have any comments or questions in regards to it.**

Q. How about any later documents?

**A. After the filing, I believe I got a copy of it, also.**

Q. Okay. Let me be clear. After the filing of Exhibit 1, the complaint in this case, Mr. Keogh has filed other papers in the lawsuit?

**A. Correct.**

Q. Have you seen any of those papers in draft form before they were filed with the court?

**A. I don't remember specifically. I know I got a set before and I got a set through you afterwards.**

Q. Of the complaint?

**A. Yeah.**

90

Q. Okay.

**A. And I didn't print them to look to see whether they could have been specifically the same. I don't know.**

Q. Have you been in touch with any other persons who might be members of the class that you're seeking to represent?

**A. No.**

Q. Do you know of any other persons who are members of the class you're seeking to represent?

**A. No.**

MR. WILLIAMS: I don't think I have any further questions at this time. I thank you very much for your patience.

THE WITNESS: Thank you.

MR. KEOGH: And I have no questions.

THE COURT REPORTER: Signature?

MR. WILLIAMS: I don't know what your practices are in this. We ask the transcript, the original would be sent to Mr. Keogh and he were to arrange with his client for it to be reviewed and signed. And if it hasn't been signed within 30 days of receipt, it may thereafter be used without signature as if it had been signed.

91

MR. KEOGH: It's the same procedure here.

MR. WILLIAMS: Fine. May we stipulate to that?

MR. KEOGH: If you want better, I know you have a deadline for classification coming soon.

MR. WILLIAMS: Yes.

MR. KEOGH: I think, you know, you're free to use it pending, you know, our reading and obviously --

MR. WILLIAMS: Thank you.

MR. KEOGH: -- I can't imagine much being changed. If it will be, we'll bring it to your attention before bringing it to the Court's attention.

MR. WILLIAMS: Thanks very much, Keith.

MR. KEOGH: Sure.

MR. WILLIAMS: I know it won't surprise you, I hope it doesn't come as a shock to your client, but I am going to ask you for the production of the documents that he's made reference to today in connection with any of the Ritz receipts and in connection with any documents related to the identity theft and in connection with the conferences he attended on the FACTA subject at the

92

NADA, if he has any handouts from those things.

MR. KEOGH: For the most part, I mean, obviously there has been no document production. And some of it is irrelevant, especially since he's not seeking actual damages. We'll make our objection. I don't foresee withholding any documents. I think it will just be easier to produce them.

MR. WILLIAMS: Fine. Thanks.

MR. KEOGH: We will want the protective order, especially if there are credit records being produced. We can work that out.

MR. WILLIAMS: We can work that out, but yes, I agree, we're certainly going to want to treat those confidential.

MR. KEOGH: Yes.

FURTHER DEPONENT SAITH NOT.