# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

—

MARK THOMAS, individually and on behalf of all others similarly situated,

Plaintiff,

-vs-

HUGO'S FROG BAR-NAPERVILLE, L.L.C.,

Defendant.

No. 08 C 455

ORIGINAL

The deposition of **MARK EDWARD THOMAS**, called by the Defendant for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Linda A. Barger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 525 West Monroe Street, Suite 1900, Chicago, Illinois, commencing at the hour of 9:58 a.m. on the 13th day of May, A.D., 2008.

A P P E A R A N C E S:

LAW OFFICES OF KEITH J. KEOGH, LTD., By
MR. KEITH J. KEOGH
227 West Monroe Street, Suite 2000
Chicago, Illinois 60606
(312) 726-1092

On behalf of the Plaintiff;

KATTEN, MUCHIN, ROSENMAN, LLP., By
MS. DAWN M. CANTY
525 West Monroe Street, Suite 1900
Chicago, Illinois 60661
(312) 902-5200

On behalf of the Defendant.

* * *

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK THOMAS, individually and on behalf of all others similarly situated,

Plaintiff,

-vs- No. 08 C 455

HUGO'S FROG BAR-NAPERVILLE, L.L.C.,

Defendant.

The deposition of MARK EDWARD THOMAS, called by the Defendant for examination, pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Linda A. Barger, Certified Shorthand Reporter within and for the County of Cook and State of Illinois, at 525 West Monroe Street, Suite 1900, Chicago, Illinois, commencing at the hour of 9:58 a.m. on the 13th day of May, A.D., 2008.





APPEARANCES:

LAW OFFICES OF KEITH J. KEOGH, LTD., By
MR. KEITH J. KEOGH
227 West Monroe Street, Suite 2000
Chicago, Illinois 60606
(312) 726-1092

On behalf of the Plaintiff;

KATTEN, MUCHIN, ROSENMAN, LLP., By
MS. DAWN M. CANTY
525 West Monroe Street, Suite 1900
Chicago, Illinois 60661
(312) 902-5200

On behalf of the Defendant.

* * *





INDEX


| WITNESS | EXAMINATION |
|---|---|
| MARK EDWARD THOMAS | |
| By Ms. Canty | 4 |


EXHIBITS


| THOMAS DEPOSITION EXHIBIT | MARKED FOR ID |
|---|---|
| No. 1 | 5 |
| No. 2 | 14 |
| No. 3 | 39 |
| No. 4 | 89 |
| No. 5 | 107 |
| No. 6 | 116 |
| No. 7 | 119 |
| No. 8 | 121 |


Note: Exhibits Number 3 not tendered for inclusion into deposition transcript.





(Witness duly sworn.)

MARK EDWARD THOMAS,

called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MS. CANTY:

Q. Mr. Thomas, have you ever given a deposition before?
A. Yes, I have.
Q. Can you state your name for the record?
A. Mark Edward Thomas.
Q. Do you understand that the court reporter will be taking down everything that you say and everything I say?
A. Yes.
MS. CANTY: This deposition is taken pursuant to agreement. It's taken pursuant to the Federal Rules of Civil Procedure. And if I ask you a question and you answer, I'm going to assume you understood the question; is that okay?
A. Uh-huh.
Q. And you have to answer it verbally so that the court reporter can get your yeses and nos, not your nods and shakes?

A. Right.
Q. Are you represented today at your deposition?
A. Yes.
Q. By whom?
A. Mr. Keogh.
Q. When did you meet Mr. Keogh?
A. Through conversation I talked to him on and off a few months back. I met him for the first time within the office for the first time last month.
Q. Did you meet him before or after the complaint was filed in Thomas versus Hugo's Frog Bar?
A. Yes. In just passing I was introduced to him at one point in time last year.
MS. CANTY: Let's mark the complaint as deposition Exhibit Number 1.
(Whereupon, Thomas Deposition Exhibit No. 1 was marked for identification, LAB.)
BY MS. CANTY:
Q. You see that this complaint -- if you look at the top it says "filed January 22nd, 2008."
Do you see that?
A. Yes.





Q. Before this complaint was filed had you ever met Mr. Keogh?
A. Yes. I met him before that.
Q. And in person or by phone?
A. In person one time in passing, as I said, sometime last year just at a fund-raiser and he happened to be there. I was out with my cousin and he introduced me to him. Other than that no conversation or anything much more than that.
Q. Just an introduction in passing?
A. Yes. I knew who he was at a later date where I seeked to have him represent me in the case.
Q. If you take a look at Exhibit Number 1, do you recognize this as the complaint in Thomas versus Hugo's Frog Bar?
A. Yes.
Q. Did you review this complaint before it was filed on January 22nd?
A. Yes, I did.
Q. Did you prepare any of the -- did you write any portion of the complaint?
A. Other than maybe simple correspondence and e-mails, but nothing formal in the packet. Nothing formally that's in here (indicating). I mean,





obviously if I'm answering questions within an e-mail there would have been some typing or whatever, not just verbal conversation.
Q. And when you say you were answering questions within an e-mail, what questions do you recall before --
A. Nothing specific.
MR. KEOGH: I'm going to object. What we talked about or communicated either via telephone, e-mail or writing or whatever, that's protected by attorney-client privilege, and I'll instruct you not to answer any question what you and I talked about in regards to the formal communications.
MS. CANTY: Okay.
MR. KEOGH: And I'll actually equivocate to say you're free to talk about what we talked about in our introduction, if you recall. But let's not talk about the representation of this lawsuit.
BY MS. CANTY:
Q. When did you retain Mr. Keogh?
A. Shortly before this date. It was probably the end of the year. I don't remember specifically. Probably somewhere some December perhaps.
Q. What led you to retain Mr. Keogh?





A. Well, obviously the incident that happened as far as the receipt that was generated that was the first step in the action of the violation of the FACTA truncation law. That started the whole ball rolling as far as going and seeking him out.
Q. When did you decide to file a FACTA lawsuit against Hugo's Frog Bar-Naperville?
A. Again, I don't recall specifically.
Q. When did you first notice an expiration date on a receipt from Hugo's Frog Bar?
A. Whatever the date is of the copies of the receipts that were turned in.
Q. In your complaint, I'll direct you to paragraph 20.
A. Okay. That appears to be, without looking at the actual receipt, appears to be about the time frame for what those receipts were for.
Q. Okay. When you received a receipt on May 12, 2007, did you notice that there was an expiration date displayed on the receipt?
A. Yes.
Q. Were you concerned?
A. Yes.
Q. Why was that?

A. Well, I mean obviously because finding out a little -- with one of the receipts also my name was on there, which, again, being a previous victim of identity theft, raises concern because it heightens my risk factor of somebody possibly stealing my identity again.
Q. What is it that heightens your risk factor of somebody stealing your identity again?
A. The name on the receipt and the expiration date.
Q. And how does that heighten your risk factor of being a victim of identity theft?
A. Because it's giving more information out there that is required to make purchases or to use my credit rating.
Q. On May 12th, 2007 do you recall visiting Hugo's Frog Bar in Naperville?
A. Yes.
Q. Do you recall that you looked at the receipt and noticed the expiration date displayed on the receipt on that day?
A. Whether it was that day or the 19th, and then I looked back at the previous receipt, I don't remember specifically. But, yeah, it was definitely





one of the two dates.
Q. Definitely in May of 2007?
A. Yes.
Q. And, to the best of your recollection, you retained Mr. Keogh in May of 2007.
A. Yeah. I don't remember specifically the date.
Q. Do you recall generally, was it in May of 2007?
A. It was the latter part of last year.
Q. Did you approach Mr. Keogh or did he approach you?
A. No. I got his information from my cousin, and I seeked him out.
Q. What do you mean you got his information from your cousin?
A. I knew of him through my cousin.
Q. From the time you met?
A. Not the yellow pages. I mean, through my cousin.
Q. What did you know about Mr. Keogh when you sought him out in terms of what kind of law he practices or --
A. I knew he was an attorney in an area that





would fit what I would need for this case.
Q. When you say "in an area that would fit what you need for this case," what do you mean by that?
A. Exactly what I said. That's what I mean.
Q. That he specialized in FACTA?
A. That he would be able to take on this case.
Q. How did you know that?
A. The specifics, I don't remember. I just know at the time that's what led me to hire him, and that's what I decided to do, and I stuck with my initial decision.
Q. Was it through conversation with your cousin that led you to know that Mr. Keogh would be able to take on your case?
A. In combination with that.
Q. In combination with what?
A. Whatever I was thinking at the time. I don't remember specifically.
Q. Did you do any research on Mr. Keogh before hiring him?
A. General information. But, I mean, I already had known of him. Like I said, I met him once before, so I was a little familiar with who he





was as a person versus looking at the yellow pages and not even knowing anything about that individual.
Q. When you met him the first time, did you learn what kind of law he practiced?
A. No, not at that time.
Q. When did you learn information that led you to believe that Mr. Keogh would be the appropriate lawyer for this case?
A. I don't remember specifically.
Q. Was it before you retained him?
A. Obviously I retained some information prior to obtaining him. That was what my decision was based on.
Q. What I'm trying to find out is what is that information?
A. I don't remember.
Q. That's what I don't think we got to.
A. I don't know specifically. I don't remember what --
Q. Generally?
A. I don't know what the deciding factor was at that point in time.
Q. Do you know any of the factors that led you to choose Mr. Keogh to pursue this case?

A. Nothing specifically, other than what I already stated.
Q. I haven't heard you say anything, so if you could just give me the information --
A. You're looking for a tangible, specific item. Like I said, I didn't look at the yellow pages, which generally some people would look at for attorneys and, you know, whichever one you strike across you decide on that.
I mean, at the time I made a decision to go with him, and I knew of him to some extent more than going through the yellow pages.
Q. Can you give me any of the criteria that you used to determine that Mr. Keogh was the right person to pursue this action for you?
A. No, I don't have anything specific.
Q. Anything generally?
A. No.
Q. What is your current address?
A. 7001 Brook Bank Street, Darien, Illinois.
Q. And your birth date?
A. 10-15-64.
Q. Are you familiar with FACTA?
A. Yes, in a generalization, not all the legal





specifics of it. But generally what the purpose of it is.
Q. What is the purpose of it?
A. It's part of along the lines of the Fair Credit Act.
Q. What does FACTA require?
A. I don't know specifically what it requires.
MS. CANTY: Mark this as Exhibit Number 2.
(Whereupon, Thomas Deposition Exhibit No. 2 was marked for identification, LAB.)
BY MS. CANTY:
Q. (Indicating). Let me know when you've had a chance to review Exhibit Number 2. Deposition Exhibit Number 2 is section 1681 C of FACTA.
MR. KEOGH: Do you want him to read all four pages of it.
MS. CANTY: I'd like him to at least skim through it to see if at least he's seen this before.
THE WITNESS: Not in this specific format, but excerpts of it appear to be familiar in articles and or information that I have read previously.

BY MS. CANTY:





Q. Can you point out to me which parts of it are familiar to you?
A. Well, just part of the topics that are discussed and found on page three here where it states three years after December 4th, 2003 with respect to cash receipts, one year each of these different things are topics I know that were along the lines of the FACTA truncation law or documents thereof.
Q. When did you become familiar with the general parameters set forth on page three of Exhibit 2 with respect to truncation of credit card and debit card numbers?
A. I don't remember the specific date and time frame of when I sought for the first time.
Q. Was it before May 12th, 2007?
A. It's possible it could have been prior to May in some form.
Q. In any of your dealings either in employment or personally, did you have occasion to become familiar with FACTA's truncation requirements?
A. Not -- I can't remember. Rephrase the question. In specific? Did you say specific or just in general?





Q. In general?
A. In general, yeah. Part of my jobs in the past had to do with issues of fair credit and obviously extensions thereof that truncation is part of that.
Q. What jobs that you've had in the past can you recall that dealt with issues of fair credit?
A. I mean, all the way back to when I was 16 starting in banking. I worked in banking for six years, and I worked as a controller at auto dealerships.
Q. In your capacity working in banking, you were aware of the Fair Credit Reporting Act?
A. To some extent. I mean, obviously whatever pertained to my job at that point in time. Starting out in the teller line, obviously, didn't pertain to that. But as I got to know more in banking and obviously more through the dealership and controller, because we individually become part of a lending institution because you're doing indirect lending. So there are facets of the Fair Credit Act that I would try to be somewhat familiar with. Though it wasn't a required aspect of my job to know it specifically.

17

Q. Were you familiar in your jobs as controller of various car dealerships -- is that what you said?

A. Yes. I mean, specific ones over the last 20-some years and various ones over the latter part of the three years as a consultant.

Q. During that job history as a controller for various dealerships, were you familiar with any aspects of FACTA?

A. Yes, I was familiar with it. I mean, specifically, I mean at the National Auto Dealers convention that I attended the last three years in a row, to some extent, those would be issues in some format that would be highlighted as far as issues of a dealership.

Q. Did you have any understanding that credit card digits needed to be truncated?

A. Well, I mean, specifically as far as just in general, yes. I mean, I have through readings over time.

Q. And you had that understanding even before May 12th, 2007?

A. I don't remember to what extent prior to May.



18

Q. Did you have that understanding when you functioned as a controller at various car dealerships?

A. Again, I don't remember the specifics of it. The format -- I mean, there are different facets of the Fair Credit Act. Specifically, the truncation I don't recall.

Q. Did you ever gain an understanding that it was necessary to block out expiration dates from receipts under FACTA?

A. Well, again, I mean to what extent, I don't remember specifically. One I know of specifically, but I already priorly had some knowledge of it, but specifically this year at the convention it was also brought up again in one of the classes that I took it was specifically brought up the specifics of expirations dates not being on there and also of the limited number of numbers that could be on the card.

Q. And you say this was also --

A. But I knew of it prior to that. But I know it was also brought up this year when I attended the convention in one of these seminar, classes that I attend.

Q. What convention was this?



19

A. National Auto Dealers Association.

Q. Where was this convention?

A. San Francisco.

Q. When was it?

A. February.

Q. So as of February of 2008 you were aware of --

A. No. As I said, I knew of it previous to that. But it was, again, reiterated in specifics, as you stated, you wanted to know what I new about the certain numbers being X'd out, and that it was reiterated again in that seminar that I attended this year.

Q. Do you recall did you attend the seminar the year before, the NADA?

A. I attended it the last three years in a row. But what topic and what extent was covered in those years, I don't remember the specifics of it.

Q. Do you remember what was the one prior to the February 2008 seminar?

A. What do you mean, what was it?

Q. Where was it. Where was the NADA seminar?

A. Las Vegas last year.

Q. Do you remember if anything relating to



20

FACTA was covered at that seminar?

A. To some extent it would have been.

Q. Do you recall whether --

A. Not the specifics, again.

Q. Did you ever have occasion or were you ever notified of any FACTA requirements as we -- Exhibit 2, 1681 CG. It's called truncation of credit card and debit card numbers.

If you look at G1 --

MR. KEOGH: Turn to page three.

MS. CANTY: On page three it says, "except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the credit card number or the expiration date upon any receipt provided to the card holder at the point of the sale or transaction."

Do you recall when you first became generally aware of this requirement.

A. Do I recall when it was?

Q. Yes.

A. No, not specifically.

Q. Generally?

A. No. I mean I don't know.

Q. Do you know if you've known about this requirement for more than a year?

A. Not in this specific regard I don't recall.

Q. Generally?

A. No, I don't specifically or generally. I don't recall it.

Q. Do you recall anything about truncation of credit cards. What is the first time you recall anything relating to truncation of credit cards?

A. I don't remember a specific date other than a general date. But sometime in the past.

Q. Okay. Can you give me your educational background?

A. I'm sorry?

Q. Educational background.

A. High school?

Q. Starting in college, please.

A. Okay. Numerous college classes.

Q. Where?

A. University of Illinois, Chicago.

Q. In what?

A. What do you mean "in what"?

Q. What classes did you take at the University of Illinois, Chicago?





A. I don't remember specifically.

Q. Do you remember generally?

A. Well, I mean, I took classes to go along the lines to obtain a degree, which I never completed, so --

Q. Okay. I mean, general --

A. General classes that were required. I mean, there's history classes. There's art classes. There's business classes.

Q. What degree were you pursuing?

A. General business, accounting.

Q. Did you take any accounting classes?

A. Yes.

Q. What time frame did you take classes at the University of Illinois at Chicago?

A. I don't recall. A couple of year out of high school is when I started there so --

Q. In the 1983, 1984?

A. Graduated in 1982 so, '83, '84. I don't remember specifically. I know I attended some classes the year after graduating, so --

Q. Did you have any classes that covered the Fair Credit Reporting Act?

A. No. I didn't attend a class that was





called that.

Q. Do you recall covering that in any of your classes?

A. No, nothing specifically.

Q. Okay. Any other --

A. Business law class. I also took some business law, so, again, to what extent, I don't recall any of the content of the class specifically.

Q. What yore classes have you taken? Were all of your college classes at University of Illinois t Chicago?

A. No. I took some classes at DePaul. I took some paramedic classes at South Suburban College. I took some fire-fighting classes at Triton College.

Q. Have you had any seminars relating to accounting or business issues?

A. Yes. I mean, that's my general focus of when I would attend a seminar of some type. It was always business and/or accounting related. It was pretty much the field that I have performed over the last 25, 30 years, whatever.

Q. And what business and accounting seminars do you recall attending?

A. I don't remember specific names of the





classes as it related to car dealerships or general business. Obviously going all the way back to banking, I attended some seminars and/or classes sponsored by the American Institute of Banking.

Q. Do you recall any classes or seminars that covered issues relating to the Fair Credit Reporting Act?

A. They were numerous ones, to some extent, that they would have covered. But the specifics of it, I don't recall other than what I had mentioned earlier. This year was highlighted again in the NADA convention in San Francisco.

Q. Prior to this year in San Francisco, did you have any understanding about truncation requirements for credit card receipts?

A. To some extent.

Q. What was your understanding prior to February 2008, when you attended this seminar in San Francisco?

A. I don't remember the specifics. I just know of the law as it pertained to it prior to that.

Q. In your own words, what was your knowledge of the law?

A. That limited information was to be -- could

only released on the credit card receipt.
Q. What was your -- I want to go through your job history. What is the first job you had after school?
A. After high school?
Q. After high school?
A. I started at 16 in banking for six years.
Q. What did you do in banking?
A. Teller line, bookkeeping.
Q. Where?
A. All American Bank of Chicago. Golf Mill State Bank in Niles.
Q. What is your next job?
A. Car dealership.
Q. Which one?
A. Howard Orloff Jaguar/Volvo, Chicago.
Q. How long were you there?
A. Couple of years.
Q. What was your role?
A. Office manager.
Q. What were your responsibilities?
A. General accounting and financial reporting of the dealership.
Q. Did you have any responsibility for





compliance with law?
A. I don't recall at that time.
Q. Did you ever, in any of your jobs, have any responsibility to assure that any of the entities for which you worked complied with credit laws?
A. To some extent. I mean, some of it as it regards to safekeeping of documents, compliance issues.
Q. What jobs did you have that responsibility?
A. Well, to some extent it wasn't required, but it was -- if you, as an extension of the main part of the job responsibility with accounting and finance reporting and through all the other dealerships I worked at as controller.
Along with that, if there was different times, additional readings and/or whatever was followed up and sent to me, I would have forwarded it to finance directors or finance managers for them to be aware of the issues that would -- that I would run across that would pertain to them.
Q. Do you recall being sent anything with respect to service compliance?
A. Pardon?
Q. Do you recall in your position, your job





positions, over the years, being sent any materials relating to Fair Credit Reporting Act requirements?
A. Again, I don't remember specifically, but, yes, all of those jobs, to some extent, have some extension of the Fair Credit guidelines. But in no case was it actually required of me to be up to date on any of those issues.
Q. In any of those jobs were you sent materials with respect to FACTA compliance?
A. Again, I wasn't required to, so it wasn't sent directly to me. I would have possibly read it in different articles or ran across it. And if I saw that it pertained to something that related to the dealership, as I stated earlier, I would forward it to the finance department, where it was their responsibility to follow those guidelines as they pertained to the dealership.
Q. When you discussed the finance department for the dealership, what is the role? Who is in the finance department for a particular dealership? You're the controller, and is the finance department something different?
A. Well, yeah. Controller is an accounting position, the finance reporting. The finance





department is, as I'm sure you bought a car previously in your life as anybody else has, is that you go to the final stage of signing the paperwork. And if you finance, your paperwork is then performed in an indirect lending capacity at the finance department.
Q. So your view is that any Fair Credit Reporting Act or FACTA compliance was the role of the finance department in a car dealership, in the car dealerships that you work at?
A. That's the primarily exposure part of the guidelines that would be there. Obviously, from a specific truncation standpoint, it would not be the finance department. It would be whatever the establishment would have set up for the credit card processing and the paperwork that would be filed thereafter as far as where the merchant copies or the other documentation that would be kept with that within that service office or parts office or whatever accounting office files.
Q. And that's not an accounting function?
A. What is not?
Q. The credit card processing merchant copies dealing with merchant banks?

A. Well, I mean, to what extent? Explain.
Q. Any extent.
A. To some extent they were. Obviously the cashier processes a credit card if somebody is making a form of payment.
Q. That's an accounting function, correct?
A. Yes. Well, generally it falls within the accounting department, the cashiers.
Q. After your first car dealership job, what was that, again? I didn't write it down?
A. You wrote it down. But it was Howard Orloff office manager.
Q. I got the office manager. It's Howard Orloff, that's what I didn't write down. Okay. After Howard Orloff what was your next job?
A. It followed through consistently for the next 20 years at various dealerships. I don't remember in he specific order. Ford Pontiac in Downers Grove. St. Charles Pontiac.
Q. Do you recall what you position was at Ford Pontiac?
A. They would all be along the same lines, office managers, controller or comptroller.
Q. Okay. It is controller or comptroller?





A. All the same. Different places called it different positions.
Q. So at each of the car dealerships that you worked at, you were the accounting function?
A. Yes.
Q. And you were either an assistant controller, a controller or a comptroller?
A. Or office manager.
Q. Board Pontiac. What other --
A. St. Charles Pontiac. Gjovik Chevy, Sandwich, Illinois. Mercedes Benz in Littleton, Colorado. Watson Chevy, City Auto Group down in Chicago. And the last three years have been numerous dealerships from a consultant basis all the way from Florida to Hawaii.
Q. What basically are you doing as a consultant?
A. Whatever various things.
Q. An accounting functions?
A. Some related account function, be it reconciliations or operational training or staffing. There is a huge variety.
Q. Have you given any depositions prior to today?





A. Yes.
Q. Any relating to FACTA?
A. Several weeks ago.
Q. Yes?
A. I don't remember the specific date.
Q. How many depositions have you given relating to FACTA?
A. Not relating specifically to FACTA. In regards to FACTA along this line with a similar case against Ritz Camera.
Q. You gave a deposition in the a case against Ritz Camera?
A. Yes.
Q. A case were you were the named plaintiff in?
A. No.
Q. Are you a plaintiff or involved in any other class actions?
A. No.
Q. And you don't recall when you did this deposition in Ritz Camera?
A. A few weeks ago.
Q. Have you given your deposition at any other time?





A. Various depositions to some extent. In my opinion, they were depositions relating to requesting through my years on the fire department, ambulance calls or different cases.
Q. Where you were a witness?
A. Pardon me?
Q. Have you given your deposition where you were a witness?
A. In the capacity I was a paramedic and an ambulance call and they wanted our opinion on what happened. There were several occurrences of that over the last -- I have been retired for five years on the fire department. I was on two different fire departments and did it for 16 years volunteer and seven years full time. So to what extent or time frame when those occurred, there were several cases, I mean three to 25, let's say, to some capacity.
Q. Any other depositions that you've given?
A. Well, I mean, again, I don't know the true -- your opinion versus my opinion of a deposition is questions in regards to -- I mean, obviously to some extent you're answering questions from a divorce situation or whatever. I mean, there were other court situations that I had spoke upon.

Q. So you gave a deposition in a divorce proceeding?
A. I don't know if that classifies or was called a, per se, deposition. I was questioned in a legal matter within the divorce situation.
Q. Was there a court reporter present?
A. Yes, in court there is.
Q. Was it in court?
A. In a courtroom?
Q. Yes.
A. Yes.
Q. Have you given testimony in a courtroom before?
A. Yes.
Q. That's with respect to your divorce proceeding?
A. And other things that I mentioned, yes.
Q. With respect to your work as a firemen or paramedic?
A. Yes.
Q. Any other context in which you've given testimony in a courtroom? How many times have you given testimony in a court room?
A. Nothing that comes to mind other than those





at this time.
Q. Did you perform any accounting or business functions for the fire department, any of the fire departments that you worked with over the years?
A. To what extent did I do any accounting functions?
Q. Yes.
A. To some extent on the volunteer fire department I was the treasurer of the Association for a couple of years.
Q. Okay. Anything else?
A. Not that I can recall right now.
Q. So you're work at the volunteer fire department --
A. I was a fire paramedic, an EMT, emergency medical technician.
Q. Are you involved in any other class action other than the one against Hugo?
A. As I stated a few minutes ago, the Ritz Camera.
Q. Is that all?
A. Yes.
Q. Have you been proposed as a class representative in any other class action?





A. Have I been what?
Q. Proposed as a class representative?
A. What do you mean?
Q. Has anyone -- do you not understand what I mean by "prepared"?
A. No.
Q. What is your understanding of what your situation is here as a class representative?
A. I'm representing obviously the other people that the similar situation has occurred to.
Q. Do you know any of those people?
A. Not personally.
Q. Have you tried to reach out to any of these people?
A. Not personally, I haven't.
Q. Has anyone on your behalf?
A. Through the attorney's office.
MR. KEOGH: Well, I'll stop you right now. I'll caution you, I should say. Anything that we discuss is privileged, and I ask you not to speak to that. Ask you not to answer anything that I have spoken to you about.
BY MS. CANTY:
Q. So to the extent to that you can respond to





the question about revealing a conversation between you and your counsel, you're being instructed not to answer. Can you respond to the question without --
A. I have not personally reached out to any of those people as you've stated.
Q. Are you aware of anyone else reaching out to those people?
A. Not specifically.
Q. Are you generally?
A. No.
Q. Are you aware of whether there are any other members, any other people who are similarly situated as you with respect to Hugo?
A. I'm sure there are.
Q. You're sure there are? How are you sure?
A. If I go into an establishment on one date and go in on a second date and the same situation occurred, obviously there were other merchants that were in that store that day at Hugo specifically that paid not only at the point of time that I made my purchase and the violation occurred, but also everybody that was in, around or prior to or at whatever point in time Hugo's decided to specifically change their policy on that.

Q. You stated earlier that one receipt that you had had your name and an expiration date; is that correct?
A. Yes.
Q. Did both receipts have your name?
A. I don't recall the other one having a name specifically.
Q. Do you know how many of the people that you purport to represent in this class action had their name and an expiration date on their receipt?
A. Again, I haven't seen any of the documentation of their receipts. That would be their information. But I can look for mine and see that the Visa receipt, I believe, was the one that stated the name.
Q. The Visa that you used at Hugo's on May 12th or May 19th, do you still use that card?
A. I'd have to look back at the number. I don't know specifically whether I have.
Q. How many Visa cards do you have?
A. Today presently?
Q. Yes.
A. I have a couple Visa cards.
Q. A couple of Visa cards?





A. Yes.
Q. Why do you have more than one?
A. One is a check card.
Q. Visa credit card, how many Visa credit cards do you have?
A. I have more than one.
Q. Why do you have more than one Visa credit card?
A. Because I choose to.
Q. Any particular reason you keep more than one and you don't know if you used the card that used at Hugo's since that time?
MR. KEOGH: Objection that's misstating his testimony.
THE WITNESS: Have I used what?
BY MS. CANTY:
Q. The Visa credit card that you used at Hugo's?
A. Whatever card number that is, I'd have to look back and see what that card number is, and, yes, I would have used it because I know I didn't cut it up or tear it up the day after purchase at Hugo's. I know I used it in some capacity thereafter. Whether it remains to be one of the current ones that I





currently use, I don't know. I'd have to check the numbers specifically.
Q. Did you ever cancel the Visa card that you used?
A. I don't recall without looking at the number, as I just stated.
MS. CANTY: Let's mark this as 3.
(Whereupon, Thomas Deposition Exhibit No. 3 was marked for identification, LAB.)
BY MS. CANTY:
Q. I'm showing what has been marked as deposition Exhibit Number 3, and you see a May 19th, 2007 receipt for a Visa card ending in 4835. Do you see that?
A. Yes.
Q. Did you cancel the Visa card that ends in digits 4835?
A. I don't recall cancelling the card. I would have used that card until it expired. And what point in time a new card was issued or given at that time because that expiration date was in May of '07.
So the numbers of times I would have used that specific card after that date would obviously be





minimal, because it expired and within that month I would have gotten a new card.
Q. Do you recall whether you used the new card after that card expired? Did you continue to use the card with that card number?
A. I'd have to look up to see which card it is. This doesn't tell me who the credit card company name/ is I don't remember.
Q. Do you recall as a result of receiving this receipt on May 19th, 2007 whether you cancelled this card or the replacement card, the Visa reflected on the receipt?
A. I don't recall cancelling.
Q. Now, for the other receipt dated May 12th, 2007, that was an Am Ex card?
A. Yes.
Q. And did you use the Am Ex card after May 12th of 2007?
A. Yes. Currently, without verifying it specifically, but I do recognize the last four digits of that card as also the one that I probably have in my wallet at this time that I continue to use.
Q. You continue to use that card?
A. (Indicating.)

Q. The receipts that are reflected on Exhibit 3, after May 12th, 2007, where did you retain the May 12th receipt?
A. Where did I retain it?
Q. Where did you keep it?
A. In my household.
Q. Where in your house?
A. I don't remember specifically. In an envelope, where I generally keep my receipts.
Q. Did you keep it under lock and key?
A. Did I keep -- my house is always locked when I'm not home.
Q. The receipt itself?
A. In my house the house is locked, so, yes it's under lock because I leave my house locked when I leave the house.
Q. Inside your house. But was the envelope kept in a locked drawer or other locked piece of furniture inside of your house?
A. No.
Q. Where was the envelope kept that the receipt was in?
A. I don't recall specifically.
Q. What about the May 19th, 2007 receipt?





A. The same general area.
Q. What does this mean, "the same general area"?
A. As I just stated, I don't remember specifically. It may have been in an envelope. And it may have been in my house, so it was locked within my house, but not specifically in a locked compartment or drawer in the household.
Q. Do you have any other receipts that contain a card's expiration date?
A. Yes.
Q. How many?
A. I don't recall. I don't know a specific number at this time.
Q. Do you have any receipts where the card number itself was not truncated?
A. Yes. I do recall one. Just offhand, I know I have one that has no X'd out dates on it.
Q. And where did that receipt come from?
A. I don't recall.
Q. Did it come from a restaurant in Colorado?
A. I don't recall. Possibly.
Q. Did that receipt display an expiration date for the credit card?





A. I don't recall.
Q. What credit card did that receipt relate to?
A. I don't recall.
Q. Do you recall if it was the Visa or American Express card referenced on Exhibit 3?
A. I don't recall whether it was specifically or not.
Q. Have you filed any lawsuit with respect to the receipt that does not have the credit card number truncated?
A. No.
Q. Why not.
A. I don't know the reason why. I'd have to look back to see which one that is. If I even still have it. I know that I ran across one not too long ago.
MR. KEOGH: And I also want to interject and instruct him not to answer any reasons that has to do with any communication between you and I. To the extent they do, don't answer that. Otherwise you may answer the question.
BY MS. CANTY:
Q. And you've answered, correct?





A. I'm sorry?
Q. You answered the question. Do you have anything to add to your answer?
A. No.
Q. Have you pursued any other FACTA lawsuits with respect to other receipts where the expiration date is displayed?
A. Other than what I have previously stated?
Q. Other than Hugo's and Ritz?
A. No.
Q. Why not?
MR. KEOGH: Same objection. If you can answer without divulging attorney-client privilege between you and I, you may answer.
THE WITNESS: None have come to a point of deposition other than Ritz Camera and Hugo's.
BY MS. CANTY:
Q. Have any of them come to a point of filing a complaint such as Exhibit 1?
A. In my opinion that relates to conversations between my attorney and I.
Q. Are there any complaints that have been filed with your name on them?
MR. KEOGH: If I may interject, maybe it

45

would be easier if I ask him what he thinks he's talking about communication between counsel and himself. And it may be that we can clarify this up if he's mistaken.

MS. CANTY: Sure. If you want to step out and discuss it, that's fine.

BY MS. CANTY:

Q. Have you failed any other complaints with respect to FACTA violations or relating to receipts that you received with expiration dates on them?

A. Those are the only two that have been filed at this time.

Q. Are you contemplating any other complaints?

A. I don't know specifically. There is nothing, any aspect. I may, I may not have.

Q. Have you taken any steps with respect to bringing action against any other businesses or entities for FACTA violations?

A. Not at this time.

Q. Why not?

MR. KEOGH: Reiterate the objection. Obviously, if it had anything to do with the communication between you and I, it's protected by attorney-client privilege. And I'll instruct you not

shelley plate reporting, inc.
(312) 345-1414

46

to answer. If you can otherwise answer, please do so.

THE WITNESS: Rephrase the question.

BY MS. CANTY:

Q. Why have you not filed any lawsuits with respect to FACTA violations for other receipts that you've gotten with expiration dates displayed?

A. I don't know what the deciding factors are at this point in time. Those are the only ones that I have.

Q. Did you decide?

A. I'm not making a full-time position of going out and finding all my receipts and going after each of those companies. That is not my agenda. That is not my plan, so I'm not actively doing that. This is just something else that I --

Q. Is there any reason that you brought suit against Hugo's and Ritz but not against other companies where you have receipts that show expiration dates?

MR. KEOGH: Same objection. To the extent it doesn't call for communication between you and I, you may answer. If it does, I'll instruct you not to answer.

shelley plate reporting, inc.
(312) 345-1414

47

A. I don't know the specific reasoning at whatever point in time I made the decision for these two companies.

Q. Did you make this decision in conjunction with your attorney or on your own?

A. With my attorney.

Q. And based on your attorney's advise?

A. I don't remember specifically what decided, in my mind, at that time to go after these two companies.

Q. Did you decide or did your attorney decide which companies to go after?

MR. KEOGH: Objection, asked and answered.

MS. CANTY: You can still answer.

THE WITNESS: I don't know.

BY MS. CANTY:

Q. Have you been approved as a representative in any class action?

A. Have I been approved?

Q. Approved as a class representative?

A. I don't know what that means.

Q. Have you ever been a member of a class in a class action that you know of where somebody has sent you them forms and you have to send them back in and

shelley plate reporting, inc.
(312) 345-1414

48

you obtained a class award?

A. To some extent, yes.

Q. What class actions do you recall being members of?

A. Different stocks that I purchased at different times. I know from documentations there has been class action suits related to that.

Q. Do you recall any recoveries that you've received as a result of any class action?

A. Not specifically.

Q. Have you ever received any money as a result of being a member of a class in a class action?

A. I don't recall specifically.

Q. Have you ever been arrested?

MR. KEOGH: Objection. It's irrelevant. You can answer.

THE WITNESS: I don't see the relevancy.

MR. KEOGH: You can answer.

THE WITNESS: Have I ever been arrested?

MS. CANTY: Yes.

THE COURT: Falsely accused, yes.

BY MS. CANTY:

Q. When were you arrested?

shelley plate reporting, inc.
(312) 345-1414

A. I don't remember specifically the date. It was several years ago.
Q. What for?
A. Violation of restraining order.
Q. Against you? Violation of a restraining order against you? You had a restraining order against you and you were arrested for violating that?
A. Yes.
Q. Who had the restraining order issued?
A. Currently ex-wife.
Q. Any other times that you were arrested?
A. No.
Q. Were you prosecuted for that, for the violation of the restraining order?
A. I don't know what the full definition of prosecuting is. I went to court. It was thrown out because there was no information on it.
Q. It was prosecuted, but you won ultimately?
A. My interpretation. Your definitions of each of those situations -- I obviously, until I had the opportunity to go in front of the judge and state the situation that occurred, the judge heard my case and at that time through it out.
Q. Have you ever been brought before the Court





for a crime other than that discussion we just had?
A. No.
Q. Did you know anyone else from Mr. Keogh's firm prior to becoming involved in this action?
A. Do I know anybody else within his firm?
Q. Yes.
A. No.
Q. Mr. Keogh was your contact?
A. Yes.
Q. You said you met Mr. Keogh through your cousin. What is your cousin's relationship with Mr. Keogh?
A. He's a friend of him. Exactly, specifically, I don't know what their rapport is, relationship.
Q. Did you discuss your decision to file a FACTA lawsuit against Hugo's or Ritz Camera with your cousin prior to filing?
A. We had a general conversation in regards to -- but the specifics of it, I don't recall.
Q. What is your cousin's name?
A. Jeff Batterson.
Q. With a "P"?
A. "B."





Q. Where does he live?
A. Currently he lives in Wheaton.
Q. What is his address?
A. I don't know.
Q. What is his phone number?
A. I would have to look in my phone. It's programmed in the phone. I don't know.
Q. He's in Wheaton, Illinois?
A. Yes.
Q. What does he do?
A. What is his occupation?
Q. Yes.
A. He's a broker to some extent, stockbroker.
Q. What conversations do you recall having at any time with your cousin concerning your pursuit of a FACTA lawsuit against Hugo's?
A. I don't remember all of the specifics of the conversation other than just generally that the truncation violation, about what it is.
Q. Did he tell you about the truncation violation or did you tell him?
A. It just happened to be a topic of discussion at some point in time when we had gone out.





Q. Have you ever visited any establishments specifically to obtain a receipt and see if that receipt had an expiration date?
A. No.
(Whereupon, Laura Bernatowicz entered the deposition proceedings.)
BY MS. CANTY:
Q. After your May 12th visit to Hugo's, did you -- between your May 12th and May 19th visit, were you aware that there was an expiration date displayed on the May 12th receipt?
A. I don't understand your question. Between those two dates did I know there was a date on there?
Q. Yes.
A. I don't recall. I very well could have because I would have seen this receipt on the 12th, and because I had signed my copy of it and took this copy (indicating), and obviously on the 19th I would have seen the other copy.
Q. Between the 12th and the 19th did you notify anyone at Hugo's that there was a an expiration date displayed on your May 12th, 2007 receipt?

A. No.
Q. Did you have any hesitation about presenting your Visa card on May 19th, 2007 knowing that on May 12th, 2007 an expiration date had been displayed on a prior receipts?
MR. KEOGH: Objection, mischaracterizes his testimony. He never testified he knew it appeared on May 12th.
THE WITNESS: I don't know of a specific -- what my decision factor was on the 19th when I paid the bill, paying one card versus the other specifically.
BY MS. CANTY:
Q. Do you remember having any hesitation about visiting Hugo's and/or paying with a credit card based on the May 12th receipt?
A. No, I don't recall any hesitation.
Q. And do you know whether at the time you visited Hugo's on May 19th, 2007 whether you were aware that your expiration date had been displayed on the May 12th, 2007 receipt?
A. As of today, I don't recall.
Q. Have you provided your counsel with your other receipts with expiration dates that have been





displayed?
A. Some of the receipts that I have, I have given to him.
Q. What is your deciding factor on which ones to provide and which ones not to provide?
A. Ones that I've seen to be similar in occurrence.
Q. If there is an expiration date on a receipt, you've provided it to your counsel?
A. From what I recall, yes.
Q. Why did you maintain the Hugo's receipt that you displayed as Exhibit 3?
A. Why did I keep them?
Q. Right.
A. I generally keep all my receipts.
Q. Do you throw out any of your receipts?
A. I mean, I generally keep all my receipts. I have generally all my receipts for several years. I keep them for tax purposes. I keep them for whatever purpose that I keep my receipts for, budgeting and various personal reasons I have retained receipts.
Q. Do you keep your account statements for your Visa card ending in number 4835?





A. I keep my statements in general. So that would be one of the statements that would be covered in all of my records that I keep.
Q. And have you kept them for the last several years?
A. Yes.
Q. Do you keep your account statements for your Am Ex card ending in 2001?
A. Yes.
Q. Have you kept those statements for the last several years?
A. Yes.
Q. Have you thrown out any statements from the Visa card ending in 4835?
A. No.
Q. Have you discarded any account statements from the Am Ex ending in 2001?
A. No.
Q. Where are those account statements kept?
A. In my house.
Q. Are they kept near in proximity to the receipts that were displayed on Exhibit 3?
A. Some are, some aren't.
Q. Are they kept under lock and key within any





furniture or safe in your house?
A. My household is locked whenever I'm not home, so they are within the house that's locked up.
Q. They are in a locked house, but they're not within a locked drawer or safe or anything like that?
A. No.
Q. For the receipts that you identified where the number itself is not truncated, do you recall what card you used?
A. No, I don't.
Q. And do you have any recollection of cancelling the card that you used?
A. I don't recall which one it is, so I can't answer it.
Q. Have you cancelled any cards in the last two years, any credit cards?
A. Not specifically that I know of. I generally don't cancel cards.
Q. How many credit cards do you currently have?
A. I don't know, three, four.
Q. Have you discarded any credit cards in the last three years?
A. Other than the ones that would be expired,

I would have – that would be the only thing that I would have discarded in that regard.
Q. Do you do you discard expired cards?
A. I cut them and I actually don't throw them out. I cut them up, and I have them in my file cabinet at home.
Q. And you maintain them in your file cabinet?
A. Uh-huh.
Q. How many in-person meetings did you have with your counsel before January 22nd, 2008?
A. Two to my knowledge.
Q. Was one the time that you met him casually?
A. Yes.
Q. When was the second one?
A. Prior to coming to this office.
Q. Was prior to coming to this office today?
A. Yes.
Q. So up through today you've had two meetings with your counsel, and one was –
A. In person?
Q. Yes, in person?
A. One time I met him at his office.
Q. That was today?
A. One time prior to today and today.





Q. When was the one time prior to today?
A. Whatever date we had the Ritz –
Q. Deposition?
A. Deposition.
Q. Did you discuss anything relating to the Hugo's lawsuit on that day?
MR. KEOGH: Objection. Anything we discussed is protected by attorney-client privilege, and I'll instruct the client not to answer.
THE WITNESS: I don't recall specifically.
MS. CANTY: Don't answer.
BY MS. CANTY:
Q. Have you had any meetings, in-person meeting, with your lawyer with respect to the Hugo's lawsuit before today?
A. No –
MS. CANTY: Same objection.
BY MS. CANTY:
Q. Did you make any changes to the complaint? Did you read the complaint before it was filed –
A. Yes.
Q. – as Exhibit 1. Did you read the entire thing?
A. Yes.





Q. Is it accurate?
A. Yes.
Q. Did you make any changes to the complaint?
A. Not that I can recall.
Q. Did you have any questions of your counsel about the complaint?
A. We may have discussed items.
MR. KEOGH: Once again, anything e discussed, I'll instruct you not to answer.
BY MS. CANTY:
Q. Not the substance.
Do you recall any discussions with your counsel about the lawsuit against Hugo's prior to today without revealing the substance of the conversation?
MR. KEOGH: Subject to the conversation too regarding Hugo is still protected by attorney-client privilege. And I'll instruct him not to answer.
MS. CANTY: No, that's not protected. But if he had any conversations with you about the Hugo's lawsuit, there is no substance. I'm not asking for the substance. I want to know how many conversations he's had with you about Hugo's.
THE WITNESS: I don't recall specifically





how many conversations –
MR. KEOGH: Just wait until –
BY MS. CANTY:
Q. Do you recall any meetings or conversations you had with your counsel about Hugo's, without revealing the substance, prior to today?
A. Yes.
Q. How many?
A. I don't recall.
Q. More than one?
A. Yes. I don't remember exactly how many.
Q. Do you recall any conversation lasting more than ten minutes?
A. I don't recall.
Q. Were you promised anything to get involved in this lawsuit?
A. No.
Q. What do you expect to get by the lawsuit? What do you want to recover?
A. The main issue is the compliance to protecting individual's private information on card receipts.
Q. Do you know if Hugo's today displays expiration dates on credit cards?

A. I don't know. I haven't been there in some time.
Q. Anything else that you expect to get from this lawsuit?
A. Nothing specifically that comes to mind.
Q. Have you been damaged by the receipts that are displayed as Exhibit 3?
A. I don't know of any situation currently other than the, obviously, heightened risk of the information that is out there.
Q. And when you say "obviously heightened risk of information," what do you mean by that?
A. The general concept of the pursuit of this violation of the expiration date and specifically along the lines of this Visa card that also just spells out my name on it.
Q. And how is there a heightened risk?
A. We went over prior to -- in earlier questioning, because of the more information that's given on the receipt makes it -- I would assume makes it easier to obtain information from those that decide to steal the identity and take advantage of using other people's credit.
Q. Were you promised anything to get involved





in the case against Ritz Camera?
A. No.
Q. Why did you pursue a case against Ritz Camera?
A. Same reasons I'm perusing this case.
Q. Which is?
MR. KEOGH: Once again, to the extent any reasons that involves conversations between you and I, I'll instruct you not to answer. To the extent you can answer without revealing those privileges, you may.
THE WITNESS: As generally, I answered already several times, the information that is on these receipts.
BY MS. CANTY:
Q. After May 19th 2007, have you checked your credit report?
A. Yes. I know I have seen it prior to this date -- or since this date.
Q. Between May of 2007 and today you've seen your credit report?
A. Yes.
Q. And is there anything displayed on your credit report that can be linked to any adverse





credit as a result of the May 12th or May 19th receipts from Hugo's Frog Bar?
MR. KEOGH: Object to the extent it calls for an expert opinion, but you may answer.
THE WITNESS: I don't know of specific -- I don't recall any specific thing the last time I looked at the credit report. But the last copy that I received I did not read it in that entirety for that purpose. So if there is something, I don't know. If there isn't, I don't know either.
BY MS. CANTY:
Q. Did your credit report change from the prior vision that you had seen?
A. Change in what record?
Q. Any regard?
A. Yes. Just as anybody else's credit report changes every day a day goes by, people are either making another payment or not making another payment, which constitutes whether they are -- as it is with anybody else, a credit report is constantly changing.
Q. Did your credit rating change between the prior version and the last version you saw?
A. I don't recall.
Q. Nothing that struck you? Nothing that





jumped out at you?
A. No.
Q. Did you notify Visa about the display of the expiration date for the card ending in 4835?
A. No.
Q. Did you notify American Express about the display of the expiration date on the receipt ending in 2001?
A. No.
Q. Why not?
A. I don't know.
Q. If you had thought there was a risk that the card would be used by fraudsters, would you have notified either of these credit card companies?
A. I already have a -- because of being a prior victim of identity theft, I already have a fraud alert on my credit report.
Q. Did you receive any information that anyone had attempted to use the American Express card displayed on the May 12th receipt?
A. Since this date I have not.
Q. Did you receive any information that anyone had tried to use the credit card displayed on the May 19th receipt?

A. Since that date I don't recall.

Q. Regardless of the fraud alert, if you had believed that the May 19th, 2007 receipt from Hugo's had increased the risk to you that someone would use your Visa card, would you have informed Visa?

A. I don't know.

Q. Why not?

A. Because I was not posed that specific questioning in a manner that you just asked it to have me make a decision whether I would look at that as being an option to possibly have this addressed also.

Q. Well, I'm asking you now, if you had thought this receipt had caused you a risk of a greater likelihood of identity theft, would you not have cancelled that card?

A. Would I have cancelled?

Q. Yes.

A. No, I would not have cancelled it.

Q. Why not?

A. Because cancelling credit cards also adversely affects your credit score.

Q. Even if you thought that this receipt would cause somebody to use your card, you would not have





cancelled the card?

A. I would not.

Q. Would you have notified Visa?

A. Now that you proposed that, I would consider that as an additional option to contact them and inform them that there are retailers that are disposing more information than there.

But up until the time you've thrown that to me and asked that, I never contemplated as that being an option.

Q. So when you noticed that the May 19th, 2007 receipt displayed an expiration date and the last four digits of your Visa card, you didn't contemplate that that might expose you to greater risk and that you should, therefore, notify Visa of that; is that a fact?

THE WITNESS: No.

MR. KEOGH: Mischaracterizes his testimony. But you may answer.

THE WITNESS: Not in the specific manner to contact them in regards to that.

BY MS. CANTY:

Q. Is that a "no"?

A. Rephrase the question.





MS. CANTY: This time can you read it back.

(Whereupon, the record was read as requested.)

THE WITNESS: And then you threw the question and said, is that a "no"? No, I would have not contacted them.

BY MS. CANTY:

Q. If you had thought that this receipt exposed you to a greater risk of identify theft or somebody else using your credit card, would you have notified Visa?

A. Up until today when you threw that as an additional option of me to contact them and tell them that there is -- this would be another issue for another resource for me to contact of your violation of the information on the cards, I may have considered it. But up until today I never thought of contacting the company directly for these violations.

Q. Did you think of contacting the company directly with respect to your personal information and your security? Not with respect to Hugo's violations, but your security of your Visa card, did it occur to you to contact Visa and say, look, I used my card at an establishment and they displayed the





expiration date. I think I'm at risk?

A. I'm saying the same thing. I don't know why you think I'm saying something different.

Q. Because you're not answering my question.

A. Up until today and you throwing out that that would be a possible option for me to call, I never looked to them as being an option for me to call that this law is being violated as being a resource for them to watch out for that.

Q. Was it an option for you to call as being a resource to say your card expiration date has been received from your perspective, not from the perspective of an establishment that presented the receipt?

A. Up until today, I never considered them as an option to call.

Q. So that's a no?

A. If that's the way you interpret it, I'm not going to say yes or no. Other than what I am saying, I don't know how else to explain it.

Q. How do you define a class action in your words? What is your understanding of what a class action is?

A. Primarily one party pursues something to

benefit others that have been equally either violated or equally suffered damages or whatever the case might be of circumstances where one represents or a party of a few that benefit more people.

Q. With respect to the lawsuit that you filed against Hugo's, how do you define the class that you're representing?

A. In that same manner, anybody that paid with a credit card and their information is equal to or possibly greater than the information that is given on my receipts may be out there.

Q. What does it mean to be the class representative?

A. My interpretation, in this case the party, the main party, benefitting the others that have equal or greater violation.

Q. Are you representing people who suffered actual damages as a result of display of expirations dates on receipt?

A. Possibly.

Q. Do you know if there is anyone who fits into that category?

A. I don't know of any specific --

Q. Are you representing people who may have





noticed the expiration date on a receipt printed at Hugo's in Naperville and cancelled their card?

A. Possibly.

Q. You don't know?

A. I don't know specifically.

Q. Are you representing people who may have noticed -- who did notice he expiration date on their receipt from Hugo's of Naperville and notified their credit card company of that?

A. Possibly.

MR. KEOGH: Just a clarification -- well, first answer it and then I'll make my clarifications.

MS. CANTY: I think he said possibly.

MR. KEOGH: Are you asking are they excluded from the class, or are there people out he knows specifically who had this happen to them?

MS. CANTY: I'm asking him whether he knows they're included in the class.

BY MS. CANTY:

Q. Why did you agree to become a class representative?

A. I don't recall the specific reason other than the violation and the heightened risk that has been out there as earlier stated in this deposition.





Q. Have you done anything to mitigate the heightened risk that has been out there, in your view, since May 19th of 2007?

A. I don't know what you "mitigated."

Q. Have you done anything to try to lessen that heightened risk as you see it?

A. I may pay cash more in some situations than I would have before. I'm obviously more observant of the information that's on the cards -- I mean, the receipts. I'm sorry.

Q. Have you done anything with respect to the heightened risk that you believe or that you state has occurred based on the May 12th and May 19th 2007 receipts from Hugo's with respect to the information displayed on those receipts?

A. I don't know what you mean other than what I just answered.

Q. What is it about the receipts that created a heightened risk, in your view, of identity theft?

A. As earlier stated, the number of digits that are listed on the card, the expiration date and my full name.

Q. Have you done anything to lessen or to mitigate to --





A. As I said, I occasionally pay cash now versus the card. Or any future purchases, I am more observant of the information that is on the receipts.

Q. Have you been back to Hugo's since May 19th, 2007?

A. I don't remember specifically. I may have.

Q. Do you recall how you paid if you were there?

A. No. I don't remember when, so I can't answer that.

Q. Did you discuss your discussion to become involved as a purported class representative with anyone other than Mr. Keogh?

A. Not that I can recall.

Q. What are your duties and responsibilities as a class representative?

A. I don't know the specifics. I mean, in my opinion, it's to represent the class as a whole in this violation.

Q. What is the definition of the class that sought to be certified by the lawsuit that you brought?

A. I'm sorry?

Q. What is the definition of the class that

sought to be certified by the lawsuit that you brought? Who are you representing? What is the class of people that you're representing?

MR. KEOGH: Objection, asked and answered. You can answer.

THE WITNESS: As I have stated already, it's people that have equal to or greater information that had the similar situation happen by Hugo's.

BY MS. CANTY:

Q. For any time frame?

A. Prior to the law going into effect, actually, yes.

Q. So what is the time frame of your class what class? What is the date range in the class that you're seeking to represent?

A. My immediate concern is from the date that I've noticed in my situation. Obviously to currently if they are still in violation.

Q. And you don't know whether they are still in violation?

A. I don't know, because I haven't been there.

Q. Are you seeking to represent people who may have used a credit card before May 19th, 2007?

A. They may benefit from this, from the date





of -- whenever it was, December of 2006 or whenever the law went into effect.

Q. Are you seeking to represent those people? Are they included in the class action that you're bringing?

A. I don't know. I'd have to look back to see what specifically we are -- that is spelled out in the document, Exhibit A -- or 1.

Q. Who defined the class that's included in the class action complaint that you're bringing?

A. Who defined the class?

Q. Yes.

A. Between my attorney and I, we established the document, Exhibit 1, which was filed.

Q. What input did you have into the definition of the class?

A. I don't know what bits and pieces of our conversation were tied up specifically within this.

Q. Do you remember is there an end to your class period? Do you know when the class period ends without reading the document?

A. No. I don't not off the top of my head.

Q. Have you met with any other potential class representatives?





A. Not to my knowledge.

Q. Do you know what the requirements are to certify a class?

A. No, I don't.

Q. If we turn to the complaint marked as Exhibit 1, and if you turn -- have you read this document before?

A. I read it before it was filed.

Q. Have you read it since then?

A. Yes.

Q. Are you generally familiar with the document?

A. Generally.

Q. If we turn to page 415 --

MR. KEOGH: There is no page numbers on the bottom. The page number is on the top.

THE WITNESS: What page did you say?

MS. CANTY: Page four of 15.

BY MS. CANTY:

Q. See paragraph 23, "the class is so numerous, the joinder of all individual members in one action would be impracticable."

Do you recall reading that paragraph before the complaint was filed?





A. Yes.

Q. What is the basis for that allegation?

A. My interpretation of that is because, again, not knowing -- without having all of the documents of any and all the receipts from the date after the law went into effect up until even currently, to get the identical parameters, that information would be required.

Copies of receipts would be required after the date of the law going into effect. Obviously up until this moment right now as business continues in that establishment, whether that is still being -- it's opened or at what point in time it began or what point in time it ended.

Q. So paragraph 23, "the class is so numerous that joinder of all individual members in one action would be impracticable."

How many members are in your class?

A. I don't know. I don't know how many clients Hugo's has on a daily basis that pay by credit card.

Q. Have you reviewed any Answers to Interrogatories that Hugo's has submitted in this case?

A. Not in the specific matter. I don't recall.
Q. Have you reviewed any documents produced by Hugo's in this case?
A. I have reviewed numerous documents relating to this specifically. Which ones were Hugo's or not right at this moment, I don't recall.
Q. Paragraph 24, did you review this paragraph before the complaint was filed?
A. Yes.
Q. Is it accurate?
A. Yes.
Q. What is the basis for the statement?
A. Information that was given.
Q. To whom?
A. Within my attorney's office in preparation of the document.
Q. What information?
A. The information that would establish this sentence from being printed stating that "there is over 100 consumers to whom Defendant Hugo's provided an electronically-printed receipt at the point of sale or transaction after December 4th, 2006. A receipt displayed more than the last five digits of





the person's credit card or debit card number or the expiration date of the person's credit or debit card or both."
Q. And my question is what information did you have in your possession prior to January 22nd, 2008, or were you aware of, that led you to believe that this is an accurate statement?
A. I never had any information in my possession.
Q. How did you determine whether this is an accurate statement?
A. In the research that the attorney's office had performed.
Q. So the attorney told you it was an accurate statement?
MR. KEOGH: Objection. Obviously anything I told him is protected by attorney-client privilege and I'll instruct him not to answer that question. So don't answer the question.
BY MS. CANTY:
Q. So do you have any basis, other than your attorney told you, to determine whether this is an accurate statement?
A. Nothing outside of our discussions.





Q. Are you aware of any Hugo's receipt from December 4th, 2006 until the present which displayed more than the last five digits of the person's credit card or debit card number?
A. I don't know of any at this time.
Q. See on paragraph 25, "Plaintiff's claims are typical of he claims of the class members. All are based on he same legal theories and arise from the same unlawful and willful conduct."
Is that an accurate statement?
A. Yes.
Q. Did you assure yourself of the accuracy of this statement before the complaint was filed?
A. From my reading it, yes.
Q. And what is the basis for your claim that plaintiff's claims are typical of the claims asserted by the class members?
A. Because if they have the same occurrence, as I earlier stated, with the violations of the receipts, if their receipts look the same, they fit the same situation, and possibly greater, because there may be people out there that have more information that's disclosed on their customer copy that I'm not aware of at this time.





Q. Prior to January 22nd, 2008 had you seen a single other receipt from any other person that was generated by Hugo's before the date of the filing of the action?
A. I personally have not seen another receipt.
Q. On paragraph 27, "Plaintiff will fairly and adequately represent the class members." What's the basis for your allegation that you can fairly and adequately represent class members?
A. Just as it's stated. I just feel that I can fairly and adequately represent the class members.
Q. What is the basis, why?
A. I don't know why. I feel that I can.
Q. So you have no interests that conflict with the interests of the class members. Is that an accurate statement?
A. Not to my knowledge.
Q. My question was --
A. None to my knowledge. I have no conflict to my knowledge.
Q. So, to your knowledge, this is an accurate statement?
A. Yes.

Q. Did you do any investigation prior to January 22nd, 2008 to determine whether you have any conflict with the interest of any other class member?
A. Prior to which date?
Q. January 22nd, 2008, the date the complaint was filed?
A. Nothing specific.
Q. Anything general?
A. I mean, just the general preparation of this filing.
Q. And what in the general preparation of this filing did you do to determine whether you have any interest that conflict with the interest of the class members?
A. I don't know of any conflict. No conflict came about. So without knowing any conflict that you may be referring to, I can't answer.
Q. Did you do anything to investigate whether you had a conflict with any other class member?
A. Not specifically to conflict, no.
Q. Did you determine whether any of the class members that you purport to represent had suffered actual damages from the printing of either an expiration date or credit card digits by Hugo's of





Naperville?
A. No.
Q. Did you determine whether any of the class members who you purport to represent had been prior members of identity theft?
A. I don't know of any.
Q. Did you do anything to determine whether the class members that you purport to represent had subsequently, after they got a receipt from Hugo's, suffered any sort of fraud or identity theft?
A. I don't know if they have.
Q. Do you seek damages from Hugo's as a result of this action, an award of money, compensation? Are you looking for anything from Hugo's?
A. Not specifically.
Q. In paragraph 27 you state, "Plaintiff has retained experienced counsel."
Is that an accurate statement?
A. Yes.
Q. Prior to January 22nd, 2008, what did you do to assure yourself of the accuracy of the statement that your counsel is experienced?
A. I felt confident that he would be able to pursue the filing.





Q. You had met him once in passing?
A. I knew of him, and through my conversations within and about that time, and I don't remember specifically what the deciding factor was, I decided to go with Mr. Keogh's office.
Q. What is it that you knew of him prior to January 22nd, 2008 that led you to go with his office?
A. As I just stated, I don't know specifically what made my decision at that time.
Q. Anything generally?
A. I decided at that time to do that.
Q. Did you decide on your own?
A. Specifically, generally, yeah, nobody made the decision for me.
Q. Did you discuss the decision with anybody?
A. I made the decision on my own to seek him and move forward.
Q. And the only time you had met him prior to that time was in passing --
A. Met him personally.
Q. Had you spoken with him on the phone prior to that time?
A. I may have.





Q. You don't recall?
A. I'm sure to some extent. How many times or whatever, I don't know.
Q. Do you recall --
A. That would fall within our conversations.
Q. Do you recall any time that you spoke with him on the phone prior to January 22nd, 2008?
A. Not specifically. I don't recall any time.
Q. Generally?
A. There would have been a time, because if this was filed on the 22nd, there had to be some time or some conversation.
Q. What conversation? About what?
A. To file on the 22nd.
Q. Do you recall the length of any conversation?
A. No.
Q. Do you recall how many conversations?
A. No.
Q. Do you recall any conversation with Mr. Keogh prior to retaining him?
A. Not off the top of my head right now.
Q. Did you contact Hugo's relating to these receipts or for any other reason prior to

January 22nd, 2008?
A. No.
Q. Have you hired an expert witness for this case?
A. Personally I have not.
MS. CANTY: Did he answer?
THE WITNESS: Personally I have not.
MS. CANTY: Okay. I'm sorry.
BY MS. CANTY:
Q. Are you aware of whether an expert witness has been hired for this case?
A. To my knowledge, no.
Q. Have you met with any expert witnesses with respect to FACTA compliance?
A. I have not personally met with any expert witness relating to this case.
Q. Do you know what court this case is pending in?
A. Not off the top of my head.
Q. You're looking at the complaint now?
A. Give me a second, and I'll see what it says.
MS. CANTY: Let the record reflect the deponent is reading from the complaint.





THE WITNESS: The U.S. District Court.
MR. KEOGH: He just answered it.
BY MS. CANTY:
Q. Do you know, without reading from the complaint, who is the judge this is pending before?
A. Not at this time.
Q. If you look at the complaint, again, Exhibit 1, you see on page two, paragraph seven states "the expiration date is generally necessary for misuse of the card number."
Do you see that?
A. Yes.
Q. Is that an accurate statement?
A. I feel that it is.
Q. What is the basis for that statement?
A. Just as you and anybody else that makes a purchase, that's one of the required information that is needed anytime a purchase is made with a credit card, be it online, be it over the phone, be it anywhere that the expiration date is required.
Q. Is there a check that if you give the expiration date that the expiration date is accurate? Do you know what the check is?
In other words, could it just be an





expiration date in the future that is given, or does it have to be the accurate expiration date that ties to the card?
A. Off the top of my head right now, I don't know.
Q. If you look at paragraph eight, is that an accurate statement?
A. Yes.
Q. What is the basis for that statement?
A. As I just explained, when you go to make a purchase, be it over the phone, internet or in fax or phone conversation, that information is required and it is taken at that time.
Q. What is the basis for your belief that that's the case, just based on your own experience or --
A. Yes.
Q. Have you had any training in the use of credit cards for purchase over the internet or fax?
A. I may have, but I don't recall anything specifically.
Q. Paragraph nine, is that an accurate statement?
A. Yes, I feel that is.





Q. And what is the basis for your belief that paragraph nine is an accurate statement?
A. My interpretation along the lines of the statute.
Q. What is your basis for the reason that Congress prohibited merchants who accept credit cards and debit cards from issuing receipts that display either the expiration date or more than the last five digits of the credit card number?
A. My basis on it is to minimize the amount of rapidly-increasing identity theft that continues to occur.
Q. What is your basis for stating what Congress's intent was in enacting --
A. My basis -- I am just stating that is my interpretation of it.
Q. Of the --
A. Of their reasoning.
Q. Of their reasoning?
A. (Indicating.)
Q. Are you aware that Congress is considering the Credit and Debit Card Receipt Clarification Act of 2007, which would allow the display of expiration dates on credit cards?

A. I'm not aware of it specifically.
MS. CANTY: Let's mark Exhibit 4.
(Whereupon, Thomas Deposition Exhibit No. 4 was marked for identification, LAB.)
BY MS. CANTY:
Q. I think I asked you, but just now that you've read it, are you familiar with the Credit and Debit Card Receipt Clarification Act of 2007?
A. Yes.
Q. When did you become -- how did you become aware of it?
A. In different facets over, again, as we earlier covered, be it different classes that it might have been discussed to some extent in excerpts or sentences were put out there or me reading it this moment or just as I read this other part of it earlier.
Q. What is your understanding of the purpose of this act?
MR. KEOGH: I'll say just to clear up some confusion, when you say "act," you mean amendment, the proposed amendment or are you talking about FACTA?





MS. CANTY: The Credit and Debit Card Receipt Clarification Act of 2007.
MR. KEOGH: I object. There is no such act. And that is a misnomer, I think, is the confusion.
MS. CANTY: Well, all I'm referring to down here is this act may be referred to as the Credit and Debit Card Receipt Clarification Act of 2007, so I can call it H.R. 4008 or the Credit and Debit Card Receipt Clarification Act of 2007.
BY MS. CANTY:
Q. What I'm asking you is, are you familiar with Exhibit 4?
MR. KEOGH: Yeah, just because it also says before the date of enactment of this act, and obviously this has not been enacted.
BY MS. CANTY:
Q. So are you familiar with H.R. --
A. Since I just read it five minutes ago.
Q. Were you familiar with it prior to five minutes ago?
A. I knew of this general content of what they were contemplating to try to propose -- the proposed act of it, yes.





Q. What did you know? What's your understanding of what the proposal is?
A. What's my understanding? I mean, my understanding is along the lines of what I just read word for word on what you handed me earlier.
Q. Are you aware that there is a proposal in Congress to amend the truncation requirement of FACTA?
A. Yes. I just read it. Yes, I am aware of it.
Q. What is the propped amendment in your own words?
A. Along the lines of this document, Exhibit 4, that you just gave me.
Q. What is it? What is the proposal? What is your understanding of the proposal?
A. To revise some of the guidelines of the FACTA law act or whatever you want to call it.
Q. You see on in the findings on page two, number three: "Many merchants understood that this requirement would be satisfied by truncating the account number down to the last five digits based, in part, on the language of the provision as well as the publicity in the aftermath of the passage of the





law."
Do you see that statement?
A. Uh-huh.
Q. Do you have any understanding of whether merchants understood that the truncation requirement would be satisfied by truncating the account number down to the last five digits?
MR. KEOGH: Objection, relevance. You can answer.
THE WITNESS: I don't know what specific merchants decide in their understanding or their not understanding whether it was or not.
BY MS. CANTY:
Q. In your role as controller, comptroller or in the accounting roles at any car dealerships or other jobs that you've had when dealing with FCRA or FACTA, did you have an understanding that FACTA requirements could be satisfied by truncating digits?
A. Just specifically to that?
Q. Yes.
A. No.
Q. What was your understanding during those rules of what FACTA required?
A. I don't know specifically. In the last

three years I have just been a consultant, and I haven't been in that capacity over the last three years. That would be my requirement.
The last three years I have been a consultant. I've worked for myself. I go in and out of different dealerships assisting in whatever variation they would have me do. None of them --
Q. In the accounting function, right?
A. Yes. Financial reporting, reconciliations, none of that has ever had a specific job description in the last three-and-a-half years that I have been doing this that would pertain to this that I would need to be up to date on this and make sure that they are abiding by it.
Q. You were aware of FACTA when you performed controller-type functions for various --
A. Yes.
Q. And you were familiar with the truncation requirement, correct?
A. I don't recall the specific time in looking at it.
Q. Do you recall, at any time, being familiar with the truncation requirement as it relates to your job?





A. I would have to go back to when it would be related to my job.
Q. And can you remember?
A. Well, 2004 was probably the last position that I held that, to some facet, it might have been my job. And I don't recall specifically during my employment in 2004 that I would have looked at that and known what the law was at that point in time.
Q. If you look at paragraph four, "almost immediately after the deadline for compliance passed, hundreds of lawsuits were filed alleging that the failure to remove the expiration date was a willful violation of the Fair Credit Reporting Act even where the account number was properly truncated."
Do you see that?
A. Yes.
Q. Is it your understanding that your lawsuit is based on the failure to remove the expiration date even where the account number is properly truncated?
A. In addition to my name as it is on one of the copies of the receipts, which gives additional information specific to my identity.
Q. So your lawsuit is based on the May 19th receipt which displays your name and an expiration





date but properly truncates the card number, correct?
A. If you're asking me if the May 19th receipt is properly truncating the card number, yes, I see that it is properly truncating the card number.
Q. And I'm also asking you whether it's your understanding of the lawsuit that you filed against Hugo's and against Ritz that it is one of the lawsuits described in paragraph four of the H.R. 4008 --
MR. KEOGH: Objection. That's not what you asked earlier.
THE WITNESS: It may be. I don't know where they came up with the number that is stated there so --
BY MS. CANTY:
Q. You don't have an understanding one way or the other whether it's the type of lawsuit referred to in paragraph four?
MR. KEOGH: Objection. That's not what you just asked.
MS. CANTY: I'm asking a different question.
MR. KEOGH: Well, you're referring to it. The implication is that you're following up on your





last question, which is not the case.
MS. CANTY: Okay.
Do you remember my question?
THE WITNESS: No, I don't.
MS. CANTY: Can you read that one back.
(Whereupon, the record was read as requested.)
THE WITNESS: It may be to some extent. Again, I don't know what each of the individual situations are that make up the hundred that are quoted within this whether the violations are identical to my May 19th receipt.
BY MS. CANTY:
Q. Or to the violations of the class that you purport to represent?
A. Yes. My receipt on May 19th states these violations and these things that are on my receipt. If there are other receipts that are like it, then that would fit within the class.
Q. Does your lawsuit allege that the failure to remove the expiration date is the willful violation of the Fair Credit Reporting Act in a situation where the account number is properly truncated?

97

A. You ask kind of a run-on question after question. So I don't know which part of that that you just were referring to rather than one question and go on and let me answer it before you go on to the next facet of the question.

Are you asking me whether just the truncation of the card number itself?

Q. I'm asking you, is your lawsuit a lawsuit that alleges that the failure to remove the expiration date was a willful violation of the Fair Credit Reporting Act?

A. Yes.

Q. And is your lawsuit a lawsuit that alleges that the failure to remove the expiration date was a willful violation of the Fair Credit Reporting Act in a situation where the account number was properly truncated?

A. As I just stated a few minutes earlier, in this receipt for May 19th, the card number is truncated.

Q. So is that a yes to my --

A. Yes. The card number is truncated on this specific receipt.

Q. So your lawsuit is a lawsuit for the

shelley plate reporting, inc.
(312) 345-1414

98

violation of the Fair Credit Reporting Act?

A. For the expiration date and, in this particular receipt, also having my full name spelled out which aids to my personal identity.

Q. And your lawsuit is about your personal identity?

A. No. I'm just using this example of this receipt. The lawsuit is for the class. There may be other receipts that are like that.

You can look right next to it and there's a receipt that doesn't have the name on it. So some cards are putting the information on and some cards, for whatever reason, are not. But in both cases the expiration date is put on it.

Q. Would you say there is a greater risk of identity theft arising from the May 19th, 2007 receipt than the May 12th, 2007 receipt?

A. Yes, I would.

Q. Why is that?

A. Because there is more information that could lead do the identify theft. One having a name versus one not having a name. Because with the five people in this room, if we all had a card that didn't have our name on, nobody would know which card that

shelley plate reporting, inc.
(312) 345-1414

99

was. But if we looked at the same duplicate copies of the five people in this room, obviously by having the one with the name on, it would already point us to identifying that individual.

Q. If you look on page three of that document, paragraph six, "Experts in the field agree that proper truncation of the card number, by itself, as required by the amendment made by the Fair and Accurate Credit Transactions Act, regardless of the inclusion of the expiration date, prevents a potential fraudster from perpetrating identity theft or credit card fraud."

Do you see that?

A. Uh-huh.

Q. Do you agree with that statement?

A. I can agree with the statement. But that would only be because there hasn't been a proven case that's been given to them experts to see that that violation could occur. I mean, leading to somebody's identity being stolen.

Q. Do you feel that anyone from Hugo's did anything wrong?

A. Either than the information that's given on the card, in that facet. Beyond that, not to my

shelley plate reporting, inc.
(312) 345-1414

100

knowledge.

MS. CANTY: Let's take a break.

(Whereupon, a break was taken, after which the following proceedings were had:)

BY MS. CANTY:

Q. Okay. You can put away Exhibit 4, if you'd like, and we are going to look at Exhibit 1, which is the complaint.

If we turn to page two of 15, I'm looking at paragraph 11. "Defendant has willfully violated this law and failed to protect plaintiff and others similarly situated against identity theft and credit card and debit card fraud by failing to comply with the truncation requirement."

Do you see that?

A. Yes.

Q. Is that an accurate statement?

A. Yes.

Q. What did you do to determine that defendant has willfully violated this law prior to January 22nd, 2008 when this was filed?

A. By not following the guidelines that were spelled out within the December deadline of the

shelley plate reporting, inc.
(312) 345-1414

information not being disposed on the receipt, expiration date and truncation of card number.

Q. What does it mean to willfully violation the law, in your view?

A. In my view just by not -- didn't take an active role in abiding by the law that was set out.

Q. What would it be -- what would it mean to you to negligently violate the law?

A. Negligently, in my interpretation, would be more -- promoting more of an -- I mean, obviously, negligent would be giving the whole credit card number, the expiration date, the name, more information. And then leaving it out negligently by leaving it out, giving it in other hands of other individuals.

Q. So negligently would be giving more information out than a willful --

MR. KEOGH: Of course.

MS. CANTY: -- violation; is that what you're saying?

MR. KEOGH: Sorry. Didn't mean to speak over you. I'll object to the extent it calls for a legal conclusion. But you may answer it.

BY MS. CANTY:





Q. I'm Trying to figure out your decision between negligently violating the law and willfully violating the law?

A. Well, if you put the information out and then left the cards all out in the open where people could take it, to me that's definite negligence.

Q. How does that differ from willfulness in your view?

A. In my view it's a higher degree.

Q. Than negligence is a higher degree?

A. Yes.

Q. Paragraph 17 on page three, you say you're a former victim of identity theft.

A. Uh-huh.

Q. And you describe the circumstances of your identity theft.

A. It's generalized without specifics. Somewhere within the first occurrence that comes to mind is like June of '05. There were occurrences July of '05, and then also in October of '05 where somebody stole my identity by obtaining numerous credit cards at Home Depot, Sam's Club, a few other places. And also one of the occurrences, I think it was Bridgeview police actually apprehended somebody





in that latter one. I think it was one of the July ones or the October. I can't remember specifically.

Q. Do you know if there was more than one person who was using you -- was it using credit cards?

A. Yes. I don't know who did each of them. There were numerous occurrences. I mean, there were at least eight to ten different cards in different locations.

Q. Was it somebody opening up cards under your name or using your current cards?

A. Opening with my existing credit files, credit information, obtaining brand new cards. I got a Home Depot or Lowe's and Sam's Club where they can get the immediate almost 500 right on the spot. There's a $500 thing. And what they would buy is they would buy the gift cards or whatever in one case. And that's what they -- redeem them.

Q. How did you learn about the identity theft or the credit card fraud. It's really credit card fraud, right?

A. It's identity theft. They portrayed to be me, using my information. The credit bureau was run based on my information to obtain that $500 card or a





thousand, or whatever they received. And then they used my identity by portraying to be me.

Q. How did you learn about these?

A. The first time I knew of it through the fraud alert or credit-extension thing that I have both through American Express and -- I don't remember. One of the either credit cards -- a privacy guard or something like that.

Q. All right. And what did you learn?

A. I just got a phone call, and they said you've had these numerous accounts opened within the last 48 hours. One of the phone calls was from American Express. And, obviously, another -- the second time I learned of it was when the Bridgeview Police Department asked if I gave permission for this individual that they apprehended at one of the Bridgeview stores -- I don't know if it was Sam's Club or what it was in Bridgeview. And they apprehended somebody and wanted to know whether it was me or whatever. And I never heard anything further. I know I got a couple of documents which I forwarded copies that I kept as far as court hearings. But I was never activity called to attest in court.

Q. What happened with respect to your personal situation based on this identity theft?
A. Well, I mean, obviously all these things occurred. It continues to be a little bit of a hardship if you want to call it that, because any time I want to portray myself as who I am to go and obtain credit, I have these huge obstacles now. And, in most cases, can't -- if I actively wanted to get immediate credit or something run, I have to prove who I am and go through all this initial jargon. And a lot of things that are automatic nowadays like when people say if you sign up for this card right now just by the simple running by the credit bureau and if your score fits within the guidelines and whatever, that fraud alert comes up and they don't disclose that, you're automatically turned down because of the fraud alert. Then you have to go and sit there and prove it. Obviously, getting a mortgage on a house or a car loan or anything like that, those are all personal situations as in addition to the affect of my credit score, which went down with all the additional things that were opened until they were all waived or closed out or whatever.
Q. Did you suffer any monetary loss as a





result of this or were you made whole by the credit card?
A. For the most part I was made whole.
Q. Did you pursue an action against the gentleman who was caught?
A. Personally, I didn't.
Q. Do you know if the police or the prosecutor did?
A. They said they were going to.
Q. Were you involved as a witness at all?
A. No, they never called me. They said they probably didn't need to because he also had other people that he was doing the same thing with.
Q. Do you know whether he served any time in jail?
A. I don't know.
Q. Was there an American Express card that was used at this time by any of the people or persons who did this?
A. I don't remember specifically. I know one of the specific calls that I had was from American Express themselves.
Q. Do you recall if you cancelled that card?
A. I don't recall right offhand. I want to





say that they did cancel it once there was -- and then they reissued a new one after that. But without going back and verifying card numbers prior to that first offense, I don't recall.
MS. CANTY: Mark this five, please.
(Whereupon, Thomas Deposition Exhibit No. 5 was marked for identification, LAB.)
BY MS. CANTY:
Q. I'll just have you look through Exhibit 5, which is several different documents with Bates numbers in the bottom right-hand corner.
I just want to ask you if you've ever seen any of these documents before?
A. I can't quote whether in this specific format. But in similar formats I have seen --
Q. Have you seen -- which of these documents have you seen, the ones HFB000002 and 3, have you ever seen that document before?
A. Again, specifically I don't recall. But in general content of the information I have.
Q. So you don't recall if you specifically seen the document, but you've seen the content?
A. Not in this identical format.





Q. What about HFB000017?
A. Again, whether it was in the specific format or not, I don't know. I know I remember seeing a similar format with the different logos of some of the companies on the bottom of it. But whether it was in this specific format, I don't recall.
Q. And the information from these documents that you believe that you've seen, were they in the context of your work as a controller or other similar role in car dealerships?
A. Not to my knowledge.
Q. What was the context of you seeing these documents?
A. One similar content was at the Ritz Camera deposition.
Q. You saw a document like these?
A. Just like you turned over and said look at this, have you seen something like it, it was a similar format that I have seen at that point in time, most recently. And, prior to that, I mean, with excerpts no different than one of these earlier Exhibits that spell out the guidelines --
Q. Exhibit 2?

109

A. Right. Other than that -- again, in the specific format, I don't recall. But in roundabout aspects I know it was covered. I mean, one specifically was I know even at the Ritz Camera one there was one for Illinois Restaurant Association that was given in theirs.
Q. And those were documents that the information within them is familiar to you?
A. The basic content is, yes.
Q. The same for HFB000018?
A. Again, specific -- I don't recall specifically without having both document in front of me. But, in the general content, and with the credit card company logos on the bottom of it, yes.
Q. What about HFB000112, the next document?
A. That document I don't recall ever seeing.
Q. You've never seen that document?
A. No.
Q. What about the next document, HFB 000113?
A. No. I mean, specifically I haven't.
Q. You haven't seen the document?
A. No.
Q. In your jobs as controller or similar positions with auto dealerships, what have you done



110

to assist the dealerships in compliance with FACTA?
A. Again, in the last three-and-a-half years, I really haven't done anything actively in that role other than, to any extent, just giving some of the general information to some of the dealers I have worked with to have them look into it on their own behalf.
Q. Did you ever have any responsibilities for making sure that stores, at the time you worked at them, were not violating FACTA?
A. Yes. I mean, as we discussed earlier, there are different facets at different times to some degree. Specifically on the truncation, I don't recall. But as far as the fair credit standings, yes, I have.
Q. In the course of any of your jobs with dealerships, did you receive any manuals or newsletters from Visa or American Express with respect to FACTA compliance?
A. Perhaps I did, but I don't recall at this time.
Q. Do you recall ever looking at any Visa or Am Ex newsletters with respect to FACTA compliance?
A. No, not specifically. But generally it



111

didn't fall within my guidelines that I would be required to read through the Visa documents.
Q. Was it ever part of your job responsibilities as controller or various other roles with auto dealerships over the years to review merchant contracts, merchant bank contracts?
A. So some extent. Usually just for content of negotiating the fees from an expense structure.
Q. Do you recall ever reading any of those merchant bank contracts?
A. Just primarily for the expense structure of it.
Q. Do you recall ever seeing anything in any newsletters or manuals from Visa or American Express with respect to the requirement for truncation of digits on a receipt?
A. I may have, but I mean in none of the dealerships that I worked at and/or, you know, done any regards to, I have never seen the same violations in any of the cases that the receipts were being done properly.
Q. I didn't understand that -- what you just said.
A. For example, the places, if I did look at



112

any of them that I worked at, and this is going back where it would be within '05, maybe that would be the last one, I never remember seeing any violations.
Q. So you don't remember seeing any receipts where credit card digits were printed more than the last four?
A. Not at any of the places that I worked for.
Q. You don't recall seeing any receipts with expiration dates displayed?
A. Not the ones I worked for.
Q. Did you have any receipt from Hugo's, when you looked at your receipts, that did not display the expiration date of a credit card?
A. Not that I can recall.
Q. I'm on paragraph 35 on the complaint. It's page five. It states that "Defendant knew or should have known of the truncation requirement."
Was that an accurate statement when it was made on January 22nd?
A. Yes.
Q. And you assured yourself of the accuracy of that statement?
A. Yes. I mean, I feel that there has been more than enough information that's been out there

for that to be adhered to. And even if I was looking at the 5th of December as a violation, there might be a little bit of a gray area. But we are almost six months afterwards. There is more adequate time, at least, in the situation that I have.

Q. So you anticipated my next question which was, what was the basis for that statement? And that's the answer you just give, correct?

A. Yes.

Q. The basis for the statement, Defendant knew or should have know of he truncation requirement?

A. Well, that's additional. There was obviously more than enough advanced notice in addition prior to the effective date of December 4th, 2006.

Q. How many times have you contacted your counsel since the complaint has been filed?

A. I don't recall exact number. Several.

Q. Do you know whether that was phone, e-mail or in person?

A. All of the above.

Q. Several, three, four, two?

A. I mean, as we earlier discussed, in person in his office twice. But other than that, I don't





know a specific number of e-mails and/or phone conversations more than one that I know of.

Q. Are you currently consulting for any companies?

A. To some extent, yes.

Q. What is your sort of typical workweek?

A. There is no typical workweek.

Q. Some are 80 hours, some are 20?

A. Yes. I just got back from not working for -- well, to some extent, working for a week. I mean, I do a lot of stuff remotely, so I don't have to be at location. I travel to different places, Texas, Louisiana, local.

Q. So, I mean, typical month, as a consultant, you probably --

A. I don't have a typical month.

Q. -- write your time down? What do you bill?

A. I just bill hourly for the work I perform.

Q. How many hours do you think you bill in a typical month?

A. I don't have a specific --

Q. What about the last month?

A. Again, I don't have a specific. The number of hours for a client in Louisiana, Texas, Hawaii.





Q. Fifty or sixty hours?

A. Within a month?

Q. Yes.

A. Again, without adding up all the hours. Probably, in total, over 100 hours in a month.

Q. In the last month how often have you been traveling out of state?

A. A lot.

Q. How many times?

A. The last six months I have spent less than one month home.

Q. Traveling on work for the most part?

A. Yes.

Q. Are you still a volunteer paramedic?

A. No. I have been retired for five years.

Q. Any other commitments that you have other than sort of the work and travel commitments that we've talked about that take your time, such as are you a volunteer?

A. Minimally, obviously my kids do, but they are older, so that's minimal than what it used to be if they were a lot younger.

Q. How old are they now?

A. Twenty and sixteen.





Q. So you're not coaching soccer or anything like that?

A. No. I'm not home enough to if they were in it.

Q. Are you paying anything out of pocket for the advancement of this lawsuit?

A. Not at this time.

Q. Do you plan to?

A. The intent is not there.

Q. You don't have an intent to?

A. No.

Q. Is counsel advancing the cost and fees?

A. Yes.

Q. Do you know why?

A. Specifically I haven't discussed that.

MS. CANTY: Let's mark this as Exhibit 6.

(Whereupon, Thomas Deposition Exhibit No. 6 was marked for identification, LAB.)

MS. CANTY: Okay. We're marking Plaintiff's response to Defendant's first request for admissions to class representatives, class discovery.

BY MS. CANTY:

Q. Have you ever seen this document before?

A. Yes.
Q. When did you see it?
A. I've seen it a few different times.
Q. Did you see it before it was filed?
MR. KEOGH: I just want to object. This document wasn't filed.
MS. CANTY: Oh, served. Good point. Keeping me honest.
MR. KEOGH: No. It's just when you have someone who is not familiar about the discovery process, it will throw a wrench in it that's not necessary.
MS. CANTY: Okay.
BY MS. CANTY:
Q. So it says -- let me help you. It says on the back that it was "served" is the word used on April 30th, 2008. And Mr. Keogh sent it over to our office.
A. Yes.
Q. Before that time had you seen requests for admission?
A. Reviewed it prior to, yes.
Q. And did you speak with Mr. Keogh about responding to these?





A. Yes.
Q. Did you prepare any of the responses?
A. Basically, yes. And I answered each of the questions and obviously he put it in a more verbal format or in writing. I was just very brief and general in my answers.
Q. Did you review the --
A. Prior to him serving?
Q. The final copies?
A. Yes.
Q. And you see on page five of six at the top, it says "submitted by Mark Thomas by," and there is a signature there. That's not your signature, is it?
A. No.
Q. Is that Mr. Keogh's?
A. Yes.
Q. Were you asked to sign these responses?
A. Was I?
Q. Yes.
A. I wasn't available to sign them. He did it on my behalf.
Q. Did you discuss who would sign the responses?
A. I mean, I knew he was doing it on my





behalf. I wasn't at a point where I could -- I wasn't physically there where I could sign the documents and --
Q. You were out of town?
MR. KEOGH: I think we have a verification for all the discovery. I'll check with that. It should have been produced with the Interrogatories. If it wasn't, I'll follow up on my end.
MS. CANTY: You mean a verification signed by him? This can be off the record.
(Whereupon, a discussion was had off the record.)
MS. CANTY: Let's mark this as 7.
(Whereupon, Thomas Deposition Exhibit No. 7 was marked for identification, LAB.)
BY MS. CANTY:.
Q. So I'm showing you what has been marked as Exhibit 7, Plaintiff's response to Defendant's first set of document requests.
Question have you ever seen these responses before, Mr. Thomas?
A. Yes.
Q. And when these were served, if you look on





the back, the day that your counsel mailed them?
A. Similar situation. I mean, we discussed them and I reviewed them prior to him signing on my behalf for them.
Q. And did you provide responses to information to counsel from which he created responses?
A. Yes.
Q. Did you provide your counsel with any documents responsive to the requests?
A. Again, without reading the whole thing to see -- I mean, there were documents that I forwarded recently for some of the identify theft stuff.
Q. And other than the receipts from Hugo's and the document with respect to the identify theft, do you recall any other documents that were responsive to these requests?
A. Not specifically, no. Nothing specifically comes to mind.
MS. CANTY: Okay. We'll mark Exhibit 8.

(Whereupon, Thomas Deposition Exhibit No. 8 was marked

121

for identification, LAB.)

BY MS. CANTY:

Q. I'm showing you Plaintiff's Response to Defendant's first set of Interrogatories to class representative, class discovery, marked as Exhibit 8.

Have you ever seen this document before?

A. Yes. Just as the other one, we discussed it and I reviewed it prior to him signing on my behalf.

Q. Did you provide your counsel information to response to these Interrogatories?

A. Yes.

Q. Did you assure yourself of the accuracy of these responses before they were filed?

A. Yes.

Q. How did you assure yourself of the accuracy of the responses?

A. Reading it. And if I posed a question on a specific item, we discussed it.

MR. KEOGH: Just to caution you, you're fine, but anything we talk about specifically, I'll instruct you not to answer. Besides that you can answer.

BY MS. CANTY:



122

Q. Turn to page -- there is no page. Turn to Interrogatory number three. And if you look at the answer, it says, "Plaintiff states that he attended a seminar of the National Auto Dealers Association that discussed FACTA's truncation requirement as well as was reminded of the fact of the truncation requirement by his cousin."

Do you see that answer?

A. Uh-huh.

Q. What did you learn about the truncation requirement at the National Auto Dealer's Association seminar?

A. We discussed it earlier. I brought that up. That was the seminar in San Francisco this year where that content was brought up again as one of many. It wasn't the purpose of the seminar. It was one of all of the legal issues that dealers are, whatever, advised to be aware of within that coming year and going retro looking back at the prior year's activities.

Q. When you say "FACTA's truncation requirement," do you mean the truncation of the digits of the credit card number or the expiration date?



123

A. The way I initially read it was the general content of all of the above, not only the numbers of the credit card, but also the expiration date.

Q. You say as well was reminded of FACTA's truncation requirement by his cousin. Explain what you mean there.

A. Well, just that along the lines of what we discussed earlier, that I had a conversation with my cousin relating to the truncation. I mean the expiration date being given on receipts.

Q. How did that teach you of the ability to pursue a lawsuit relating to a FACTA violation based upon an expiration date being printed on a receipt?

A. I don't know if teaching is the right answer. Neither of those two taught me to pursue a lawsuit.

Q. Did they remind you that you --

A. Well, they were added elements in the decision to do it. But, again, being a victim of fraud and identity theft, I think, weighted a big part of the entire decision in itself.

Q. Let's look at your Answer to Interrogatory number nine. Is the response to number nine an accurate response?



124

A. Yes.

Q. What did you do to assure yourself of the accuracy of the response to number nine before it was served?

A. Well, it highlighted the issues that I previously seen documentation to, some of those being earlier exhibits that you gave similar copies to. Again, not necessarily specifically, but, in that general content of the reminders of the truncation requirement of the account number as well as the expiration date.

Q. You say in here "Defendant knew or should have known about the requirements of FACTA as of December 4th, 2006.

What is the basis of your statement that Hugo's knew or should have known about the requirements of FACTA as of December 4th, 2006?

A. I would presume along the lines of earlier questions you posed to me as if I was in that capacity at the dealership seeing information given to you by the -- not only the Visa or credit card companies, the processing companies, and/or agreements, or Restaurant Association materials and things like that.

Q. So it's an assumption that they knew or should have phone?
A. Yes.
Q. And your assumption was that they knew or should have known of which requirements, the truncation of the digits or the expiration date or both?
A. Both.
Q. To your knowledge, was there a point in time when businesses with point-of-sale transactions interpreted FACTA to require truncation of all but the last four digits of the credit card number, but not the expiration date?
A. Was there a time frame, or kind of simply the question. Was there a time frame that I knew of businesses being advised that just the credit card number part and not the expiration date was required.
Q. Right, that's the question?
A. I don't know specifically of a situation. I mean, whether documents were done in that regard versus the other.
Q. From your experience was there ever a time when you were familiar with FACTA where you were aware that there was a truncation requirement with





respect to the digits of the credit card, but not with respect to the expiration date?
A. No, not to my knowledge. The time frame -- again, the primary part of the time frame that this took effect, I was not in a capacity other than consulting since I came back from Colorado at the end of 2004.
Q. You also say Interrogatory number nine, "Defendant chose to ignore the requirements of FACTA." It's toward the bottom of the page.
"Plaintiff further states that Defendant chose to ignore the requirements of FACTA with respect to certain transactions and continue to print electronic receipts with credit card numbers and expiration dates;" do you see that?
A. Uh-huh.
Q. What is the basis for your statement that Hugo's ignored the requirements of FACTA and continued to print credit card numbers?
A. One example of that is in my receipt on May 19th or whatever.
Q. Is it your position that there is a violation of FACTA on the May 19th receipt with respect to the printing of the credit card number?





A. No. In the expiration date. We talked about that earlier.
Q. I'm asking just with respect to -- you say, "Defendant chose to ignore the requirements of FACTA with respect to certain transactions and continued to print electronic receipts with credit card numbers and expiration dates."
So what I'm asking you is what is the basis for your statement?
A. Credit card numbers and expiration dates.
Q. Okay.
A. Well, I mean "and" -- well, again, the way I read it and reviewed it before filing it was it was one and/or both. But, again, without having sample receipts of December 4th or 5th on forward, I don't know what point in time in my receipt the account number part of it was truncated. But I don't know if there's an obligation, again, representing the class from the violation date, I don't know if I'm representing any of those parties. So without physically seeing each of their receipts, I don't know whether that aspect of it is -- but, generally speaking, the account number and expiration date was violated.





Q. On your May 19th, 2007 receipt that is here as Exhibit 3, what about this receipt to you is a violation of FACTA? What is it that's displayed here that violates FACTA?
A. Well, the expiration date. And then along with that in the 19th one, as I earlier stated several times, the name also points to my identity by having the full name on there in addition to. Not even the first initial. I mean that actually spells out the first name and already zones in on myself with the expiration date on there also.
Q. So you're not saying there is any violation with respect of the number itself?
A. Of the number itself, no, not on my receipt.
Q. What is the basis for your statement, "the Defendant chose to ignore FACTA's requirements." And I'm focusing on the "chose to ignore"?
A. Again, just by not following and having that information put on the receipts that should have been not on the receipts. It should have been X'd out or starred out or whatever.
Q. Do you have any information concerning whether Hugo's knew of FACTA's truncation requirement

129

with respect to credit card numbers prior to May 12th, 2007?
A. Not specifically.
Q. Do you have any information concerning Hugo's awareness of a requirement of FACTA not to display expiration dates before May 12th of 2007?
A. Not specifically.
Q. You go on to state that -- in the next sentence you identify a number of entities that informed Hugo's about FACTA, including its specific requirements concerning the truncation of credit card and debit card numbers?
A. Uh-huh.
Q. And the prohibition on the printing of expiration dates, and Defendants need to comply with the same; is that an accurate statement?
A. Uh-huh.
Q. What is the basis for your statement that these entities informed Hugo's about FACTA and the specific requirements of truncation and prohibiting the printing of expiration dates?
MR. KEOGH: I just want to caution you about revealing anything that we may have talked about. Obviously any communication between you and I



130

that norm the basis of that would be protected by attorney-client privilege. If you can answer without revealing any privileged information, please do so, otherwise I'll instruct you not to answer.
A. I'll reiterate, just in our client-attorney discussions.
Q. So the basis for that statement is information that you were given or discussed with your counsel?
A. Right. We discussed and this was the final response to this question.
Q. So you don't have an independent basis to know whether any entities informed Hugo's about FACTA or certain requirements of FACTA?
A. Not specifically.
Q. It also says that most other retailers readily brought their credit card and debit card receipt printing process into compliance with FACTA. Are you aware -- do you know that for a fact? Is that accurate?
A. Just based on the majority of the receipts that I can look at. And obviously I save my receipts, so I can look back and see the numerous places that I have purchased -- I have seen that.



131

Q. Do you know when other retailers brought there credit card and debit card receipt-printing process into compliance with FACTA?
A. No, not specifically I don't.
Q. You also state Defendant could have readily done the same. What is the basis for that statement?
A. Just other than what we've already discussed. If the information was given out there and just by actively doing it prior to that deadline, again, knowing that there was enough information that was given prior to the deadline and as well as after the deadline, that it gave more than enough sufficient time for it to be corrected.
Q. So it's an assumption the Defendant could have readily done the same?
A. Yes.
Q. You also state "Defendant willfully disregarded FACTA's requirement and continued to print receipts in violation of FACTA."
What is the basis for that statement?
A. Just the same as we previously discussed with the expiration date and information that was disclosed on the receipts.
Q. So it's just an assumption that they



132

willfully disregarded FACTA because you received a receipt on May 12th, 2007 and May 19th, 2007 that displayed the expiration date?
A. Yes.
Q. Let's turn to 15. See we are making progress.
Did you review the response to number 15 before the responses were filed?
A. Uh-huh.
Q. Is the response accurate?
A. Yes.
Q. In the first paragraph do you see the statement, "further answering, Plaintiff states that while credit card expiration dates and four numbers of the card alone are not enough for an identity thief to steal. That information coupled with the information that a thief may obtain through an account statement is sufficient to make a card-not-present transaction."
Do you see that statement?
MR. KEOGH: Do you want me to show you where that is?
THE WITNESS: I just found it.
Yes.

133

BY MS. CANTY:
Q. Is that an accurate statement?
A. Yes.
Q. What did you do to assure yourself of the accuracy of the statement before the Interrogatory responses were filed?
A. Obviously I read it and prior to it being filed I agreed to it.
Q. You agreed with it?
A. Yes.
Q. Did you do any independent investigation or read any expert reports?
A. I didn't read formally any expert reports. But, again, as that second receipt, there is more information having my name on that second receipt on the 19th, which also adds to just having part of the numbers and the expiration date.
Q. And you consider having your name on the receipt on May 19th as a violation of FACTA?
A. I didn't say that. I just said it aids in the possibility of identify theft.
Q. So it's not a violation?
A. As I discussed earlier, when we had five people in the room, if we had ten receipts in here,

shelley plate reporting, inc.
(312) 345-1414

134

five with no name on and five with, the five that had the name already would point to the identity of whose receipts those were.
Q. So, in your view, your name being displayed on this sheet on the May 19th receipt is not a violation of FACTA?
A. I'm saying it assists the possibility of a heightened risk of the identity theft.
Q. So you don't know whether that in itself violates FACTA or not?
A. I would agree. It does not violate.
Q. Do you ever discard your receipts in the same trash as your account statements?
A. As we earlier discussed, I save my receipts and statements. And, on occasion, if I would, I have a shredder t home that I shred them.
Q. You would never throw them out in the same trash?
A. I don't put them shredded in the same garbage. I separate that.
Q. See the statement that -- you probably have to read the whole sentence on the next page. It says, "while such requirements are commendable," you see at the end of that statement it says, "the only

shelley plate reporting, inc.
(312) 345-1414

135

place other than the card itself that this information is ever printed is on Defendant's illegal receipt." Do you see that?
A. Uh-huh.
Q. Was that an accurate statement?
A. Yes.
Q. With respect to your situation, you have receipts where the expiration date of your card is displayed other than those that were given to you by Hugo's, correct?
A. On my receipt I have --
Q. You have other receipts where the expiration date is displayed?
A. Is or isn't.
Q. Is.
A. Just in general by Hugo's?
Q. No, no, no. Other than by Hugo's?
A. Yes.
Q. How many receipts do you think?
A. I have no idea.
Q. Ten, 15, 20?
A. No idea specifically.
Q. Any ideas generally?
A. Several, many. I don't know.

shelley plate reporting, inc.
(312) 345-1414

136

Q. How about is the envelope?
A. Just of ones with expiration dates?
Q. Yes.
A. I mean, just ones offhand I know may be somewhere within 20 to 40 that I know of.
Q. In response to number 22, just a few pages back, you state, "Plaintiff is seeking statutory damages under the FCRA between $100 and $1,000 per receipt plus attorney's fees and costs of this suit."
Do you see that?
A. Uh-huh.
Q. What is the criteria for how much you're seeking? Is it closer to 100 or closer to 1,000, and what is the basis for the amount?
A. Again, I just know that the variety is out there as far as -- as you had posed the question earlier, I'm not looking for specific dollar amount for the settlement of this. It's a range from the FCRA.
Q. And you haven't settled on an amount that you're hoping to get within that range?
A. No.
Q. Can we look at the response to the request to admit which I think was 6.

shelley plate reporting, inc.
(312) 345-1414

Number one says "admit that Plaintiff has suffered no actual damages as a result of Defendant's alleged violations of FACTA." And you say, "Denied. Plaintiff states that he is now at a heightened risk of identity theft as a result of Defendant's actions."
What do you mean by that?
A. I mean, to my knowledge, at the time of this being filed, I'm not aware of any identity theft that is occurred after May 19th where the last receipt was. But that doesn't mean that would not happen at some point in time in the future by that information being out there.
Q. When you say "that information being out there," where is that information?
A. Well, I mean, on my copy. Obviously on store copies. Not knowing what you guys do with your information on your copies, I don't know whether there was a second -- you know, whether the card was run once and voided and then run a second time, that there would be also in addition to the merchant copy, there was a customer copy that was generated and/or thrown out or whatever happened. I mean, I don't know -- just as you pay a bill in a restaurant or





wherever you go, you give them a card. And other than them doing it right in front of you, you don't know when they go to the back room how many times they run it. If they have a problem with the machine, the machine is out of paper and they have to run it again, I mean, I was not aware of any occurrence as of that date, but obviously still being of heightened risk, and that doesn't rule out that it wouldn't be -- but it still can happen.
Q. And when you say you're at a heightened risk of identity theft, is that as you explained it in response to Interrogatory number nine?
MR. KEOGH: Exhibit Number 7 -- I'm sorry, Exhibit Number 8.
BY MS. CANTY:
Q. I'm sorry, Interrogatory Number 15. Where you explain exposure to identify theft?
A. Well, that, and as I discussed several times with the 19th receipt having my name on it also in addition to the expiration date. But --
Q. But the response to Interrogatory number 15 explains why you believe that display of the expiration date put you at a greater risk for identity theft; is that correct?





A. If that's what it says. I don't have that specifically right in front of me. But if that's what it says --
Q. Do you have anything to add with respect to your answer that you're now at a heightened risk of identity theft as a result of Hugo's actions?
A. Nothing comes to mind to add at this moment other than what is written on there, no.
Q. Other than what is written in response to Interrogatory Number 15.
A. No.
Q. All right. The complaint, again, which is Exhibit 1, I wanted to ask you a couple more questions about that. Hopefully we are getting close.
You see complaint paragraph 41, that's page 6. There is a reference to the rules for Visa merchants. Are you aware --
A. 41 you said?
Q. Paragraph 41. Are you aware of the Visa merchant bank requirements?
A. Am I aware of them?
Q. Yes.
A. Specifically.





Q. Yes.
A. No.
Q. Have you read the rules for the Visa merchants that are referenced in paragraphs 41 and 42?
A. Not specifically other than what is on the filing.
Q. You've read the summary that is contained in 41 and 42?
A. Yes. I read them prior to them being filed.
Q. But the rules for Visa merchants that is referenced in paragraph 41 you have not read?
A. Not in its entirety, no.
Q. Do you recall reading any portions of it?
A. Well, there may be excerpts of it. Without seeing them side by side, I don't know if part of that is typed in any of these documentations that we have here.
Q. Any of the documents that I gave to you earlier that I gave to you that are exhibits --
A. That are filed that are previous exhibits or whatever.
Q. Prior to this lawsuit, do you know if

filing the complaint on January 22nd, 2008, had you read any portion of the rules for Visa merchants?
A. Along those lines with exception to what was filed and stated on this document, Exhibit 1, I mean, specifically I did not read any rules. I know that they are out there. I know because many years back I had read them or referred to them possibly in other regards of my duties or my jobs if they occurred to that. I know they are out there.
Q. So you may have referred to the Visa -- the rules for --
A. You asked me if I ever read them, and that's what I as saying is that I know that they are out there. Did I specifically read them at this time, no.
Q. At what time, at the time you filed the complain?
A. Yes.
Q. You may have read them earlier in connection with your jobs?
A. Some format of them.
Q. What about if we look at paragraph 43, it says, "American Express has a manual that contains a similar depiction of what information must be





suppressed."
Are you familiar with the American Express manual referenced in paragraph 43?
A. Again, not specifically to the manual reading of it itself. But I know there is one that exists.
Q. Do you know what the American Express manual states needs to be suppressed?
A. Not offhand.
Q. Have you ever relied on the American Express manual rules?
A. No, not personally.
Q. Paragraph 46 references an office of theft supervision of the Treasury Department examination handbook.
Prior to filing this lawsuit on January 22nd, 2008, were you familiar with that handbook?
A. Not prior to filing.
Q. Did you ever read it?
A. No.
Q. Paragraph 47 references a Heartland Payment Systems, Inc., pamphlet. Prior to January 22nd, 2008 had you ever read that pamphlet?
A. Not in its entirety, no.





Q. Have you ever read any portion of it?
A. Not to my knowledge. But that doesn't mean that I wouldn't have seen an excerpt of it in some reading. Nothing comes to mind, though.
Q. Paragraph 51, the April 23rd, 2003 addition of National Association of Convenient Stores article titled, "Visa USA Targets Identity Theft."
Prior to January 22nd, 2008, did you read that?
A. Not in its entirety, but possibly an excerpt of it I might have.
Q. Do you recall ever using that in connection with your jobs, your functions as controller of the accounting department at various auto dealerships?
A. No.
Q. Paragraph 52 you reference a April 2005 edition of the Food Industry Advisor newsletter.
Did you ever read that newsletter?
A. Again, not in its full extent, but possibly in a revised or excerpt version of it I may have seen.
Q. Do you recall ever utilizing the information in connection with your job duties at any of the auto dealerships we've discussed?





A. No.
Q. Also referenced there is the NACS magazine. Do you recall reading the article referred in paragraph 52 in the April 2005 edition of the NACS magazine?
A. No, not specifically.
Q. Did you ever read the Connecticut Restaurant Association Newsletter from the spring of 2004 that talked about truncation of credit cards?
A. Not specifically, but I may have seen excerpts or thereabouts, but nothing specifically comes to mind at that time.
Q. Do you recall being aware in the spring of 2004 about truncation requirements under the Fair Credit Reporting Act?
A. I may have, but I don't recall at this time.
Q. On paragraph 54 to 60 there is a number of Restaurant Association newsletters referenced. Do you recall ever reading any of these, the truncation articles or notifications in any of these newsletters?
A. Again, the same way. Not specifically in the full entirety of it, but I may have seen portions

of it, but none specifically that I can recall.
Q. Have you ever met or talked with anyone who is or was employed by Hugo's and/or is an account of Hugo's?
A. Not to my knowledge.
Q. Have you ever received any materials from Hugo's?
A. Material --
Q. Anything from them, mailings?
A. Might have gotten a coupon at some point in time, but --
Q. Nothing you can remember?
A. I mean, a receipt from going to Hugo's, but that's about it.
Q. Do you have any documents referring or relating to Hugo's other than potentially a coupon or a receipt?
A. No.
Q. If you look at Exhibit 3, and let's use the May 12th, I guess, coupon or receipt -- sorry.
Can an identify theft decipher an account number through the information printed on this receipt?
A. I would assume not in its entirety.





However, it doesn't mean that it might give vital information that's needed if they were able to obtain the other information.
Q. So, to the best of your knowledge, you don't know -- you're not aware of any way in which an identity theft or fraudster could decipher the account number from the information on the May 12th receipt?
A. Not in its entirety, no.
Q. What about the May 19th receipt?
A. Same thing. Not in its entirety, however, that doesn't mean that it would provide the missing information they would need from having the other information to be able to commit the fraud.
Q. Have you had contact with anyone else who has received a receipt from Hugo's in Naperville?
A. No, not personally.
Q. Are you financially able to satisfy a cost judgment in this case if the judgment should be rendered against you?
A. I don't follow your question.
Q. If Hugo's were able to seek judgment against you in this case for filing the case if there was no basis for it or for some other reason, are you





financially able to satisfy that judgment?
A. Not knowing what judgment we would be speaking of, I can't answer that.
Q. Not knowing the amount you --
A. Yes.
Q. As of the time you filed the suit on January 22nd, 2008, did you believe that Hugo's tried to harm you?
A. Personally and negligently or -- I mean, other than what we've been spending the last couple hours discussing that could result in harming me if it creates an opportunity for identity theft.
Q. Do you thing Hugo's intended to harm you?
A. If the information that they disclosed leads to that occurrence, then, yes, in that situation it would be. But not knowing that specifically at this time, I can't answer that.
Q. Did you ever learn how your information was obtained that led to the identity theft in 2005?
A. Not specifically, no.
Q. Did you learn anything? Was there any --
A. Nothing specifically was given like this was the resource or this was how they found it.
Q. Did you change your habits after that





identify theft with respect to your use of credit cards?
A. As a pure result of that, I don't know. To some extent I probably did. But specifically I can't recall what I would have done.
Q. What did you do to prepare for your deposition today?
A. I reviewed the documents that I had with me and just got a little bit familiar with the items.
Q. And is that Exhibits --
A. Various. Without having them, I wouldn't know specifically.
Q. You don't know which documents you reviewed?
A. No.
Q. How long did you spend reviewing documents to prepare for your deposition?
A. Minimal amount of time.
Q. Half hour?
A. 30 to 60 minutes.
Q. And did you peak with anyone in preparation for your deposition?
A. Other than my attorney, that's it.
Q. How long did you speak with your attorney

today to prepare for your deposition?
A. Not specific for preparation. Just in general review of items or if I had any questions on anything, which, again, would lead into our personal conversations about the case.
Q. How long did you speak with Mr. Keogh today?
A. Less than 30 minutes.
Q. Did you meet with or speak with him at any other times in preparation for this deposition?
A. Yes. As previously stated, we talked several times prior to this.
Q. How many times, do you recall?
A. Whatever I said the last time. The answer isn't different. I don't know specifically. Several times, phone, e-mail, in person only twice.
Q. Did you have a meeting before today to prepare for your deposition with Mr. Keogh?
A. Not a scheduled meeting. I met with him prior to coming over here, and that was the second time I saw him in person, as I previously stated.
Q. It's a different question. So let's back up a second.
A. It sounds the same to me.





Q. I know. That's why I'm trying to explain it to you.
To prepare for your deposition, just today, to get ready to come today, you said you read some stuff, you met with Mr. Keogh this morning but didn't really have substantive conversation.
Are there any other times that you talked to him to prepare for your deposition where you had a meeting or a phone call where you went through the deposition? You don't have to tell me the substance, but I'm just allowed to ask you what you did to prepare for your dep?
A. Again, in my interpretation, it's the same because all of this leads to, in essence, a preparation of what turns out to be, in this case, a deposition process.
So there are elements that were discussed that are pertinent to what I discussed in answer to your question. So, I mean, we did meet prior to. And, in my interpretation, it is prior to meeting for the deposition.
MR. KEOGH: If I may, you might want to specify between meetings and phone calls.
MS. CANTY: Right.





BY MS. CANTY:
Q. Did you have any phone calls with Mr. Keogh to discuss that would happen today at the deposition?
A. Yes.
Q. How many?
A. I don't recall.
Q. How long did they take?
A. Less than 30 minutes, if it was that.
Q. You don't know how many occurrences?
A. No.
Q. Did Mr. Keogh present you with any documents to review to prepare for the deposition?
A. No. I mean nothing that I have already reviewed and we've discussed.
Q. So he didn't give you any documents that he wanted you to look at?
A. Not today prior to coming here, no.
Q. Or at any other time when you were preparing?
A. All of the documents -- as I said, we just got done reviewing all of these documents, which we talked about today in this deposition. And all these documents, prior to them being filed, I read at that point in time.





Q. Did you meet with Mr. Keogh and prepare for your deposition and go over these documents?
A. No.
MS. CANTY: I'll explain it to you off the record.
(Whereupon, a discussion was had off the record.)
MS. CANTY: I'm done. Thank you very much for your time.
MR. KEOGH: I have no questions either. I just want to state for the records several of these exhibits, especially the receipt exhibit were marked "confidential."
And though we don't have an order in place yet, we have exchanged provisions. And I would expect -- or ask that your agreement they remain confidential until we work on an agreement or we agree to disagree.
MS. CANTY: That's fine.
(Witness excused at 1:03 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARK EDWARD THOMAS, individually and )
on behalf of all others similarly )
situated, )
)
Plaintiff, )
)
-vs- ) No. 08 C 455
)
HUGO'S FROG BAR-NAPERVILLE, L.L.C., )
)
Defendant. )

I, MARK EDWARD THOMAS, being first duly sworn, on oath, say that I am the deponent in the aforesaid deposition, that I have read the foregoing transcript of my deposition taken May 13th, 2008, consisting of Pages 1 through 156 inclusive, taken at the aforesaid time and place and that the foregoing is a true and correct transcript of my testimony so given.

_____ Corrections have been submitted
_____ No corrections have been submitted

MARK EDWARD THOMAS, Deponent

SUBSCRIBED AND SWORN TO before me this _____ day of __________ A.D., 2008.

Notary Public





NORTHERN DISTRICT OF ILLINOIS )
EASTERN DIVISION )
STATE OF ILLINOIS )
) SS:
COUNTY OF COOK )

I, Linda A. Barger, Certified Shorthand Reporter in and for the County of Cook, State of Illinois, do hereby certify that on the 13th of May, A.D., 2008, the deposition of the witness, MARK EDWARD THOMAS, called by the Defendant, was taken before me, reported stenographically and was thereafter reduced to typewriting through computer-aided transcription.

The said witness, MARK EDWARD THOMAS, was first duly sworn to tell the truth, the whole truth, and nothing but the truth, and was then examined upon oral interrogatories.

I further certify that the foregoing is a true, accurate and complete record of the questions asked of and answers made by the said witness, at the time and place hereinabove referred to.

The signature of the witness was not waived by agreement.

Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure for the United States District





Courts, if deponent fails to read and sign this deposition transcript within 30 days or make other arrangements for reading and signing thereof, this deposition transcript may be used as fully as though signed, and the instant certificate will then evidence such failure to read and sign this deposition transcript as the reason for signature being waived.

The undersigned is not interested in the within case, nor of kin or counsel to any of the parties.

Witness my official signature in and for Cook County, Illinois, on this 15th day of May, A.D., 2008.

Linda A. Barger, CSR
79 West Monroe Street, Suite 1110
Chicago, Illinois 60603

License No. 084-004442





shelley plate reporting, inc.
79 west monroe street, suite 815
chicago, illinois 60603
05-15-08

Mr. Mark Thomas
c/o Mr. Keith J. Keogh
The Law Offices of Keith J. Keogh
227 West Monroe Street, Suite 2000
Chicago, Illinois 60606

RE: Thomas v. Hugo Frog Bar-Naperville

Dear Mr. Thomas:

Your deposition in the above-captioned matter on 5-13-08 has been transcribed and is ready for review. Please contact April Richards or Nicole Bruton at (312) 345-1414 to arrange a convenient time for review in our office when a notary public is available.

Under the provisions of the Rules pertaining to the reading and signing of deposition transcripts, the deponent has 28 days from the date of this notice to attend to this matter. If any corrections/changes are required, they must be made on the errata sheets, not on the transcript itself. All errata sheets must be signed, and all signature pages must be signed as well as notarized. After the deponent has completed the above, please return all signature pages and errata sheets to our office, and we will handle distribution to the respective parties.

Our office has no authority to grant an extension of time for review of the transcript. So please understand that should the deponent fail to sign and return the certificate within the specified time period, the unsigned deposition may then be used as fully as though signed, with certain exceptions under the Rules.

If the certificate is not signed within the specified time period, then if requested, we shall forward an appropriate affidavit of noncompliance to all counsel.

Very truly yours,

Linda A. Barger, CSR