FILED
JULY 8, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARK THOMAS, individually and on behalf of all others similarly situated | ) | 08 C 455 |
| Plaintiff, | ) | Judge Bucklo |
| v. | ) | Magistrate Judge Valdez |
| HUGO'S FROG BAR-NAPERVILLE, LLC. | ) | JURY DEMANDED |
| Defendant. | ) | |

**PLAINTIFF'S BRIEF IN SUPPORT OF
MOTION FOR LEAVE TO AMEND AND IN OPPOSITION TO
DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

The Fair and Accurate Credit Transactions Act ("FACTA") amendment to the Fair Credit Reporting Act ("FCRA"), prohibits merchants from printing more than 5 digits of cardholders' credit or debit card numbers on receipts. 15 U.S.C. 1681c(g). It also prohibits printing the expiration date on receipts. *Id.* Defendant printed the expiration date on receipts it provided to thousands of Illinois consumers.

The "Clarification Act" did not change this requirement; section 1681c(g) remains unchanged.

The *only* change that the Act made is to amend the statutory damages section of the FCRA, section 1681n, to retroactively take away a cause of action for statutory damages arising out of printing expiration dates, only, on receipts. The practice remains illegal; consumers just cannot sue for statutory damages as a result of a violation.

But the FCRA has two independent damages sections that both provide a private right action for violations. The Clarification Act did not affect a consumer's right to obtain actual

damages under 15 U.S.C. § 1681o, for violations of § 1681c(g).

Plaintiff's proposed amended complaint thus focuses on obtaining damages under section 1681o, rather than section 1681n.[1]

## I. Plaintiff is Entitled to Prove Actual Damages under the FCRA.

### A. FACTA is Designed to Stop Identity Theft and Credit Card Fraud.

Courts from this circuit agree that the express purpose of FACTA is to stop identity theft from happening. *Cicilinne v. Jewel Food Stores, Inc.*, 542 F. Supp. 2d 831 (N.D.Ill. 2008); "Congress enacted FACTA with the intent of helping to prevent the possibility of thieves stealing the identity of another by obtaining one's credit card number and the expiration date of that credit card." *Iosello v. Leiblys, Inc.*, 502 F.Supp.2d 782, 786 (N.D. Ill. 2007).

Industry experts, too, have stated that "The primary purpose of the expiration date on a Visa payment card is fraud detection and prevention." Declaration of Patrick Faith, Vice President

of Encryption and Authentication Processing for Visa U.S.A. Inc.[2]

It is clear that defendant's violation of section 1681c(g) is the proximate cause of plaintiff and the class' exposure to this harm.

### B. The Seventh Circuit has held that Prospective Damages Arising Out of Increased Risk of Identity Theft are Recognized under Federal Law.

Plaintiff intends to introduce evidence that credit card expiration dates are used by identity thieves as a pretext to gain more information about plaintiff, and to perpetrate further fraud.

---

[1] Plaintiff acknowledges that he has no claim under section 1681n, and although allegations concerning that section are in the proposed amended complaint, plaintiff is no longer pursuing damages under §1681n.

[2] This declaration is attached to the proposed amended complaint.

Plaintiff will thus prove in this case that there is a substantial prospective and compensable harm arising directly out of defendant's violation, including time and inconvenience (emotional distress) arising out of the class members' need to take action to mitigate their risk of identity theft and credit card fraud, including credit monitoring. *AFGE v. Hawley*, 2008 U.S. Dist. LEXIS 25308 (D.D.C. Mar. 31, 2008) (denying motion to dismiss under Privacy Act, which limits suits to those with actual damages even though "plaintiffs concede[d] that they 'have not pled current, actual, financial loss.'")

Defendant's citation to *Pisciotta v. Old Nat'l Bancorp*,499 F.3d 629 (7th Cir. 2007), may, in fact, be "apropos" as the response brief suggests. The *Pisciotta* plaintiff claimed prospective injury to himself and a class arising out of exposure of their personal information. The only damages alleged arose solely out of increased exposure to identity theft. Plaintiff asked for money for himself and the class to pay for prospective credit monitoring. The Court decided that these injuries would not be cognizable under Indiana law because the Appellate Court was restricted to "take[] the approach that is restrictive of liability."

*Pisciotta* also held as a matter of law that threat of future harm is a cognizable injury that confers standing upon a plaintiff:

> As we have noted, in reaching the conclusion that dismissal was appropriate, the district court in this case relied on several cases from other district courts throughout the Country. Many of those cases have concluded that the federal courts lack jurisdiction because plaintiffs whose data has been compromised, but not yet misused, have not suffered an injury-in-fact sufficient to confer Article III standing.
>
> We are not persuaded by the reasoning of these cases. As many of our sister circuits have noted, the injury-in-fact requirement can be satisfied by a threat of future harm or by an act which harms the plaintiff only by increasing the risk of future harm that the plaintiff would have otherwise faced, absent the defendant's actions.
>
> We concur in this view.

*Pisciotta*, at 634. The is the Law of the Land in the Seventh Circuit. The Court placed convincing string citations for this proposition in footnotes 3 and 4 supporting its view. Thus, although the Seventh Circuit was restricted to decide *Pisciotta* against plaintiff under Indiana law, it held that increased risk of identity theft is a cognizable and compensable injury under the Constitution of the United States.

Before *Pisciotta*, the Seventh Circuit hinted that prospective injury may be compensable as actual damages under the FCRA. *Crabill* held that a plaintiff with no actual damages and no statutory damages could not recover attorney's fees. In so holding, the Court reasoned that the FCRA is a "consumer-protection" statute, but that its damages section is different from other statutes' damages sections, such as the FDCPA, "where cases in which attorneys' fees are sought despite the absence of past or prospective harm to the plaintiff." *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 666 (7th Cir. 2001). This statement clearly indicates that the Seventh Circuit believes that an FCRA plaintiff may recover actual damages arising out of future harm. As identified in plaintiff's motion for leave to amend the complaint, although *Murray v. GMAC* dealt with a statutory damages class, it also indicates that actual damages, while small, may exist for violations similar to the one Hugo's committed. Class treatment is designed to redress multiple small claims. As the Seventh Circuit found in *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 660-61 (7th Cir. 2004):

> The more claimants there are, the more likely a class action is to yield substantial economies in litigation. It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30....
>
> The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30.
>
> But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go

> unpunished if class treatment is denied—to no litigation at all. [line breaks supplied]

The Seventh Circuit similarly found in *Mace v. Van Ru*, that:

> a *di minimis* recovery (in monetary terms) should not automatically bar a class action. The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.
>
> A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor. [line breaks supplied]

*Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).

Although it is not necessary at this pleading stage, plaintiff plans to present expert testimony that (1) defendant's violation exposed consumers to identity theft, and (2) that the class members have uniform prospective damages. Plaintiff's counsel anticipates submitting expert testimony to demonstrate this, similar to that which was considered relating to class certification in *Matthews v. United Retail, Inc.*, 248 F.R.D. 210, 213 (N.D. Ill. 2008), a statutory damages, only, FACTA case. Plaintiff's rebuttal expert submitted in support of class certification in *Matthews,* Don Coker, found that:

> a criminal with an expiration date for one card stands a good chance of being able to obtain other credit card numbers and expiration dates from an unsuspecting cardholder. [A victim of identity theft as a result of exposure of identity theft would have to expend] time and effort required in order to notify all nine credit card companies (most likely multiple times), plus the time and effort required in order to notify all three credit bureaus (most likely multiple times), plus have to monitor very closely their future credit card statements in future months in order to make sure that all charges are legitimate, as well as monitor their credit card accounts to make sure that the terms of their accounts were not changed for the worse as a result of the criminal activities, and also monitor their credit report in order to insure that the criminal did not create any new fraudulent credit card or other accounts.

<u>Exhibit 1</u>.

Emotional distress, which includes time and inconvenience, is compensable under

the FCRA. *Wantz v. Experian Information Solutions, Inc.*, 386 F.3d 829 (7th cir. 2004), cited to *Cousin v. TransUnion* with approval, which held that "Actual damages may include damages for humiliation or mental distress even if the consumer has suffered no out-of-pocket losses, as well as damages for injury to reputation and creditworthiness." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 369 (5th Cir. 2001).

Permission to proceed with the amended complaint and class treatment is particularly important in this instance, where the class members do not know that they have been exposed to identity theft, and do not know that they should be scrutinizing their credit card statements and credit reports, and requesting new credit card numbers. Plaintiff will demonstrate through expert testimony that these inconvenient but necessary steps that each and every person for whom defendant violated section 1681c(g) should take. Plaintiff will also present evidence that each class member who, like plaintiff, has not yet been subjected to identity theft, has identical damages.

Furthermore, if the case is not permitted to continue, defendant will surely argue that the statute of limitations on any class members' FCRA claim for violation of § 1681c(g) runs two years after the violation, not after any identity theft damages accrued. Cf. *TRW v. Andrews*, 534 U.S. 19, 34-35 (2001) (identifying problem). Defendant cannot have it both ways: it is unfair to argue that there is no cause of action for prospective harm where the statute of limitations is running and a case has been filed that will both alert class members to a potential problem and assist them in mitigating damages, and provide compensation for doing so.

These damages may also be considered as the sort of damages that may be awarded for tortious invasion of privacy. "The FCRA ... expressly states that it is intended to protect 'the consumer's right to privacy.' 15 U.S.C. § 1681(a)(4)." *Pietras v. Sentry Ins. Co.*, 2007 U.S. Dist. LEXIS 16015 (N.D. Ill. Mar. 6, 2007) (holding that allegations that defendant violated the FCRA

by invading the privacy of a class persons triggered insurance coverage) (Kennelly, J.). Defendant's exposure of plaintiff and the class' credit card information on their receipts is thus akin to a public disclosure of private fact, and compensatory damages are analogously available. *Rivera Castillo v. Autokirey, Inc.*, 379 F.3d 4, 11 (1st Cir. 2004) (holding that actual damages and compensatory damages are "synonymous.") To be sure, plaintiff has no count for common law invasion of privacy at this time. But that does not mean that Congress did not intend to redress such actual damages, even though they may be less tangible than out-of-pocket.

Finally, defendant's suggestion that plaintiff is claiming damages for credit monitoring that occurred before the violation is simply not true. Such damages are obviously not recoverable because the cause of action had not yet accrued. But credit monitoring that was optional before the 1681c(g) violation became necessary afterward, and is compensable, out-of-pocket injury, the necessity for which arose directly from defendant's violation.

**II. The Clarification Act Does not Touch Claims under § 1681o.**

It is obvious that the Clarification Act was an extraordinary act of Congress; retroactively taking away consumers' right to statutory damages. Defendant touts the reference in the Clarification Act to "experts" as proof that claims under 1681o for negligent violations of 1681c(g) are not harmful to consumers. Plaintiff has never seen the expert testimony referred to in the Act, and does not believe it exists. Certainly none exists in the Congressional Record.

However, the rules of statutory construction do not permit the Court to consider changes to section 1681n, when this case involves only sections 1681c(g), and 1681o. The Supreme Court recently identified the appropriate rule of law here: "In America 'the settled principle of law is that the preamble cannot control the enacting part of the statute in cases where the enacting part is expressed in clear, unambiguous terms.'" *Dist. of Columbia v. Heller*, __ U.S.__, 2008 U.S.

LEXIS 5268 (June 26, 2008). The FCRA both before and after the Clarification Act, was unambiguous. Further, the Court should not consider legislative history of §1681n, a section of the FCRA that is no longer at issue in this case in deciding these motions under §§ 1681o and 1681c(g).

Certainly the preamble of one section of a statute cannot eviscerate a consumer's right of action under a different section. This is particularly true where, as here, the new law purports to "clarify" what it meant when passing FACTA by subsequently amending a section of the FCRA that FACTA did not affect. Neither FACTA nor the Clarification Act affected §1681o.

And if the Court does review the Clarification Act and its preamble in its deliberations on this motion (it is admittedly difficult not to), it should find that Congress' refusal to alter section 1681o as a statement of intent to permit cases like that which is proposed here go forward. "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardner*, 513 U.S. 115, 120 (1994). Certainly the retail industry sought to curb all lawsuits relating to their admitted violations of section 1681c(g). Congress did not go that far, though. Because sections 1681c(g) and 1681o were not affected by the Clarification Act, the Court should take this as an affirmative statement by Congress that actions for actual damages under the unaffected sections should go forward.

## III. Class Claims are Appropriate, and Necessary, Under these Circumstances.

Whether a class action should be certified is a question that should be decided on a Rule 23 motion. Despite this, plaintiff believes that it is appropriate to include a short explanation of his intentions as to class certification in this case.

As explained above, plaintiff will show though objective evidence, most likely through use of an expert witness and other evidence, that the class members who have not yet been

victims of identity theft as a result of defendant's violation have damages that are determinable and compensable on a standardized, class-wide basis.

As an alternative, plaintiff will suggest that the Court certify an "issue class" under Rules 23(b)(3) and 23(c)(4). The common issue to be decided will be whether defendant's actions were negligent. This procedure was explained in *Carnegie v. Household International, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004), and ratified in *In re Allstate Ins. Co.*, 400 F.3d 505, 508 (7th Cir. 2005). Of course, it is also explicitly recognized in the federal Rule.

The bottom line is that defendant violated the law, and has exposed many thousands of persons to identity theft, and the vast majority of those persons are not aware of this exposure. The violation should not go unchecked, and the consumers should be notified of the violation so that they can review their records to determine if they are already a victim and take action to limit the possibility of future ID theft. Plaintiff's motion for leave to amend the complaint should be granted, and defendant's motion for judgment on the pleadings denied as to the claims under sections 1681c(g) and 1681o.

**CONCLUSION**

As explained herein, plaintiff's motion for leave to amend the complaint to add allegations of negligent violations of 15 U.S.C. § 1681c(g) under 15 U.S.C. § 1681o should be granted, and defendant's motion for judgment on the pleadings should be denied.

Respectfully submitted,

/s/ Alexander H. Burke

Keith J. Keogh
Alexander H. Burke
LAW OFFICES OF KEITH J. KEOGH, LTD.
227 W. Monroe Street, Suite 2000

Chicago, IL 60606
(312) 726-1092
(312) 726-1093 (fax)

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| EARNESTINE MATTHEWS, individually and on behalf of all others similarly situated, | ) | |
| Plaintiff, | ) | 07 C 2487 |
| v. | ) | Judge Castillo |
| | ) | Magistrate Judge Ashman |
| UNITED RETAIL INCORPORATED Defendant. | ) | |

I, DON COKER, hereby declare as follows:

1. I have reviewed the Declaration of Joel S. Lisker executed on October 26, 2007, and the statement of Frank M. Lesher, dated October 29, 2007. My opinions are based upon my experience as a banker and consultant as well as my training, research, and study. My banking career began in 1969 at the time that bank-issued credit cards were first introduced to the public on a large scale. I was employed in the fields of banking and lending continuously until 1989 when I commenced my consulting practice. As a banker, I gained firsthand experience in how credit card operations are structured as well as how fraud occurs and how it affects individuals and their finances. Since 1989, I have been called on as a banking litigation consultant and expert witness consultant over 340 times and testified 91 times. I have opined on matters involving credit/debit card fraud, identity theft, credit damages, economic damages, and many other banking and valuation matters. I am widely published in banking and lending, and my opinions have been sought by the media numerous times, including twice recently by ABC-TV's Atlanta affiliate WSB regarding credit card fraud, data security, and identity theft matters.

In regard to Mr. Lisker's Declaration:

2. For the most part, Mr. Lisker's arguments are arguments against the existence of the Fair and Accurate Credit Transactions Act ("FACTA") that was passed by the United States Congress and signed into law by the President on December 4, 2003. In my view, the issue is

not whether FACTA should exist but rather whether certain merchants choose to ignore the law.

3. In paragraph 7, for Mr. Lisker to simply state that the inclusion of a credit card expiration date on a credit card receipt can do no harm is without question a "head-in-the-sand" attitude that excludes human logic. Based upon my experience in the industry, it is obvious to me that including an expiration date on a credit card receipt provides a criminal intent on committing credit card fraud or identity theft or pretext calling to gain further personal confidential financial information with yet one more tool and one more factor to increase their appearance of credibility when making pretext calls or when sending phishing e-mails. Plus, the criminal may already have the full credit card number from any number of other sources such as going through the victim's trash, hacking, phishing, etc., making the expiration date immediately useful for online purchases, etc. And if credit card expirations dates are not of use to criminals, then why do criminals buy and sell them?[1] Also, why is it that so many of the phishing e-mails that I receive seek a credit card expiration date if that piece of personal confidential financial information is not of use to a criminal? No matter how much Mr. Lisker protests, clearly this is a fact and simple logic.

4. In paragraph 8, Mr. Lisker again states his opinion that credit card expiration dates are not necessary in order to make a purchase, and that expiration dates themselves cannot be used to make a purchase. Mr. Lisker needs to explain this to Wal-Mart Stores, Inc., the world's largest retailer, who declined my test purchase attempted a few months ago. I intentionally cited an incorrect but future expiration date, and my purchase was declined for that reason.

Clear evidence of the value and usefulness of credit card expiration dates to criminals can be found in an April 7, 2005, article in *Information Week* in which Panda Software (a California-based anti-virus software company) warned of fraudulent websites set up ostensibly to sell cut-rate airline tickets but in reality only for the purpose of obtaining personal confidential financial information including credit card expiration dates.

---

[1] "How does the Hacker Economy Work?" Information Week, February 12, 2007.

On September 19, 2007, it was reported in *Information Week* that hackers breached the network of Vertical Web Media, the publisher of *Internet Retailer* magazine and stole customer information including credit card account numbers and expiration dates.

Further evidence of the importance of expiration dates to criminals can be found in an August 16, 2006, FDIC Consumer Alert Number SA-220-2006 that clearly states a warning that criminals have been e-mailing bank customers claiming to be the FDIC and seeking various personal confidential financial information including credit card expiration dates.

A Social Security Administration News Release dated February 17, 2006, warned of a bogus Social Security website that was set up by criminals to collect specific personal confidential financial information including credit card expiration dates.

Experian's consumer information website states the following: "A stolen account number can often be just as effective for a criminal as a stolen credit card, especially if information such as the expiration date or your billing address is also available to him or her."[2]

As for Mr. Lisker's claim that expiration dates by themselves are not sufficient to make a purchase, no one has made nor would argue that point; but that contributes nothing to this dialogue.

5. In paragraphs 9 and 10, Mr. Lisker offers up a red-herring discussion that takes us through his explanation of his perceived differences between identity theft and credit card fraud. However, the Fair and Accurate Credit Transactions Act is not targeted at only one of these crimes and not the other. Based upon my experience in the industry, criminals do not determine that they are going to commit full-blown identity theft and not credit card fraud or vice-versa. Rather, a criminal takes advantage of any profitable opportunities that make themselves available, no matter what it is called or how it is classified by Visa or MasterCard. It is little comfort if the criminals are *only* committing credit card fraud and not actual identity theft or vice versa. One has to wonder why a criminal with the potential to commit one type of fraud

---

[2] http://www.consumerinfo.com/credit-card-fraud.asp

would not be inclined to commit as many types of fraud as he could. In reality, credit card fraud is one species of identity theft, as confirmed by the FTC's definition of identity theft. The Federal Trade Commission has defined "identity theft" under FACTA as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2(a). "Identifying information" means "any name or number that may be used, alone *or in conjunction* with any other information, to identify a specific person" and includes, *inter alia*, "[t]elecommunication identifying information or access device (as defined in 18 U.S.C. 1029(e).") 16 C.F.R. § 603.2 (emphasis added). 18 U.S.C. § 1029(e), for its part, defines "access device" as "any card, . . . or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds . . . ." Under the FTC's definition, one's entire identity does not have to be stolen for identity theft to occur. Indeed, a fraud does not even have to occur – an attempted fraud using another's identifying information suffices. The statutory definitions above make clear that Congress recognizes, though Mr. Lisker ignores, that identity theft and credit card fraud are often accomplished using different pieces of information, making Mr. Lisker's continuing focus solely on a single illegal receipt containing excess information that might not *alone* be used to process a credit card transaction impossible to understand.

6. In paragraph 11, Mr. Lisker cites a statement in a June 2007 General Accountability Office report that basically states that credit card numbers and expiration dates cannot be used to open new accounts. Once again, this overlooks the obvious fact that FACTA requires the truncation of credit card account numbers and expiration dates, and also totally misses the point, which is that a credit card number (or the four-digit or five-digit portion of a credit card number) plus an expiration date gives a pretext caller or e-mail phishing criminal added credibility when probing for additional personal confidential financial information. Plus, the criminal may already have the full credit card account number from some other source. Whether new accounts can be opened using solely account numbers and expiration dates misses

the point. The issue here is not whether the Defendant's conduct alone necessarily allows someone to assume the identity of another, but rather whether FACTA has been violated, and that the Defendant's failure to follow the law increases the ability of would-be identity thieves and credit card fraud perpetrators to commit identity theft, including credit card fraud, and helps the criminals obtain further personal confidential financial information. Criminals clearly disagree with Mr. Lisker since they actively collect, buy, and sell personal confidential financial information, including expiration dates.

7. It is disappointing that Mr. Lisker's report ignores page 27 of that same GAO report in which the GAO points out that 2,900 people experienced the fraudulent creation of new accounts as a result of the ChoicePoint, Inc., data intrusion in 2005 that provided criminals with the same data that they can obtain from a victim and other sources such as a credit bureau if they have the added credibility of knowing four or five digits of a credit card account number and the credit card's expiration date.[3] Mr. Lisker seems to have the opinion that credit card fraud is acceptable as long as it does not result in full-blown identity theft. I disagree. Again, as noted above, credit card fraud is, according to the FTC, a species of "identity theft," which FACTA was passed to prevent.

8. I also disagree with Mr. Lisker's contention that credit card fraud is not a problem as long as it only affects banks and merchants, which it does not since it is clear that credit card fraud and identity theft have far-reaching effects on individual victims. Based upon my experience in the banking and lending industries, and as explained in more detail *infra*, all types of fraud losses absorbed by banks and merchants affect the general public in the form of higher prices that must be paid for goods and services.

9. Also in paragraph 12, and then again in paragraph 13, Mr. Lisker chooses to sidestep the issue of how non-credit card damage can occur and reminds us again that card holders are only

---

[3] United States Government, General Accountability Office, Report titled "Personal Information, Data Breaches are Frequent, but Evidence of Identity Theft is Limited; However, the Full Extent is Unknown." June 2007.

responsible for $50.00. Mr. Lisker implies that a $50.00 per card loss is acceptable, but I disagree. Based upon my experience as a lender who has been responsible for originating thousands of loans for consumers of varying financial means, it is clear to me that there are many people for whom even one $50.00 loss is a budget-breaker, and especially onerous when you consider that the loss was not their fault. Also, you have to consider that the consumer has to detect the fraud and report it. FACTA was passed by the United States Congress and similar legislation passed by the many state legislatures to protect citizens from this problem.

10. In order to be completely honest about these matters Mr. Lisker discusses in paragraphs 12 and 13, he should point out that this is $50.00 *per compromised card*, and that a criminal with an expiration date for one card stands a good chance of being able to obtain other credit card numbers and expiration dates from an unsuspecting cardholder. Mr. Lisker should also point out that a typical credit card holder has nine credit cards[4] which means that a typical consumer could be at risk for at least $450.00 (9 X $50.00) plus the time and effort required in order to notify all nine credit card companies (most likely multiple times), plus the time and effort required in order to notify all three credit bureaus (most likely multiple times), plus have to monitor very closely their future credit card statements in future months in order to make sure that all charges are legitimate, as well as monitor their credit card accounts to make sure that the terms of their accounts were not changed for the worse as a result of the criminal activities, and also monitor their credit report in order to insure that the criminal did not create any new fraudulent credit card or other accounts. Clearly, it would be a lot easier if all merchants would simply comply with the clear legal requirements of FACTA and make life tougher for criminals.

11. Mr. Lisker's paragraphs 12 and 13 also fail to mention that the $50.00 per card loss factor does not address the true total macro economic losses that are sustained as a result of a credit card fraud. Based upon my experience in the industry, all losses over the $50.00 per card level (that must be absorbed by the cardholder) have to be absorbed somewhere in the economic

---

[4] Fair Isaac, Inc.

system, whether it is the bank that issued the credit card or the merchant that accepted it. An October 22, 2007, article in *Information Week* magazine states that a study just released by Utica College's Center for Identify Management and Information Protection stated that the average overall loss from an identity theft event is $31,356. And it is a fact that these losses are a reduction of profits for whoever has to absorb them, and that they are reflected in higher prices for everyone that purchases goods and services.

12. In paragraph 13, Mr. Lisker points out that with debit cards, a customer must report fraud within 60 days of when the bank issued the bank statement showing the fraudulent card usage. If the customer fails to report this criminal activity, it is the customer's loss, no matter what the amount. Again, it seems so logical for merchants to simply comply with the legal requirements of FACTA and make life more stressful for criminals and less stressful for the general public for whom FACTA was enacted to protect. Why should the customer be penalized as a result of identity theft accomplished with the assistance of retailers' illegal receipts particularly when many customers may not regularly or closely review their credit card statements? I am not aware of any figures stating what percentage of credit card customers regularly review their credit card statements, but based upon my experience in the banking industry, figures confirm that something like 60% of bank customers do not review their monthly checking account statements, and I would expect some figure similar to that to apply to customers' monthly credit card statements as well.

13. In paragraph 14, Mr. Lisker again makes his obviously inaccurate claim that no one loses any money and that there is no negative economic impact from any credit card fraud. See my comments *supra* that address this issue. And again, he avoids the real issues before us, i.e., that credit card expiration dates are required by FACTA to be truncated from credit card receipts, and that an expiration date in the hands of a criminal can be used to assist the criminal in obtaining further personal confidential financial information from an innocent consumer.

14. Mr. Lisker's report ignores that no one involved in any way in this case believes or has ever stated that you can make a purchase *solely* with four digits of a credit card account number

and an expiration date. Everyone involved in this case agrees with that statement. What is happening here is that since Mr. Lisker cannot address the true issues that exist in this case, he takes the tack of creating a *faux* problem that he can address in order to be able to state something that he thinks supports his client's position. Mr. Lisker's repeated return to this *faux* problem that he can solve is clear evidence that the Defendants have no viable answers.

Mr. Lisker's report also ignores the fact that credit card fraud and identity theft criminals often operate by stealing bags of trash or "dumpster diving" which typically provides them with more information than just what they have on an illegally truncated receipt. With a consumer's name, credit card number (from a discarded statement or illegally truncated receipt), address, and credit card expiration date from an illegally truncated receipt, a criminal is prepared to carry out further illegal and financially damaging activities.

15. In paragraph 15, Mr. Lisker seems to feel that an encrypted algorithm is incapable of being cracked or unencrypted by an astute hacker. This is untrue. A large part of what criminal hackers do is apply various techniques in order to hack algorithms. Algorithms certainly offer some degree of protection, but they certainly are not hack-proof.

16. Furthermore, Mr. Lisker's report fails to consider some simple facts in his analysis, such as (1) A hacker can make certain predictive assumptions about the first six digits of a credit card number that identify the issuing bank, (2) The final digit in a credit card number is a check digit, and (3) A hacker can use the expiration date and last four digits of the account number to obtain further personal confidential financial information from the card holder.

In regard to Mr. Lesher's statement:

17. Mr. Lesher served as general counsel to Sony Electronics, Inc., a subsidiary of Sony Corporation, which is headquartered in Tokyo, Japan, and whose stock is traded on the Tokyo Stock Exchange. It is not clear whether or not Japanese corporations expect the same levels of knowledge, expertise, and diligence from their legal counsels as do American corporations. At every company for which I worked as an employee, officer, or director, we relied upon our general counsel to be aware of changes in laws that would affect how we carried out our

business, and to advise us regarding those changes in law.

18. It is truly a unique experience for me to see someone claim expertise in a specific area based upon an admitted background of "jack of all trades and master of none."

19. None of the areas of his activities mentioned by Mr. Lesher in his statement cover the operations of retail stores or credit card matters. Sony typically has not operated in this country through retail stores but rather sold their products to retailers on a wholesale basis. In fact, it was just last week that I saw the first Sony retail store that I have ever seen in this country. Accordingly, it is reasonable to assume that Mr. Lesher's responsibilities while at Sony Electronics, Inc., would not have included anything that would have involved retail operations, credit card matters, and the legal requirements of FACTA.

20. As for the business community's awareness of FACTA, it was widely reported in the news media. There were numerous articles including nationwide *USA Today* articles dated December 14, 2004 ("Just Because It's the Holidays, Don't Lower Your Guard Online") that mentioned credit card receipt truncation; and January 14, 2005, ("Highlights of FACTA") that stated in its abstract: "Merchants must leave off all but the last five digits of a credit card number on electronically printed store receipts. Effective nationwide in December 2006."

Numerous articles appeared nationwide in March of 2003 in many of the various business journals published by American Business Journals.

There was an article titled "Cybercon" in the October 4, 2004, issue of *Forbes* magazine that cited the truncation requirements of FACTA.

Many professional publications carried articles on FACTA. One example is "What you should know about Credit and Debit Card Processing and the FACTAs about Card Truncation" that appeared in the March-April 2006 issue of *West Coast Dealer* magazine.

Many credit card processing equipment companies carried notices and articles about the requirements of FACTA. For example, "Does Your Terminal Make the Cut?" appeared on the

website of Heartland Payment Systems.[5] The article even shows a facsimile of a properly truncated receipt.

Similar notices and articles appeared on the websites of other credit card processing and equipment vendors such as Double Nickel Merchant Credit[6], Global Payments, Inc.[7], the Merchant Equipment Store[8] and First American Card Service[9], just to name a small sample.

Both Houses of the United States Congress held a total of six hearings on FACTA, including testimony from the General Counsel of the National Retail Federation.

The website of California Senator Dianne Feinstein carried an item on March 6, 2003, announcing new Visa regulations allowing only the last four digits of a credit card account number on receipts.

Plus, prior to FACTA, Visa and MasterCard implemented changes similar to those of FACTA in their merchant rules.

In summary, there were ample opportunities for any retailer nationwide to read and learn about FACTA. It is my opinion that any reasonable company would have investigated FACTA to determine how it would impact the way they do business.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 7, 2007, at Woodstock, Georgia.

Don Coker

---

[5] http://www.hps.com

[6] http://55merchantcredit.com/news.asp

[7] http://www.globalpaymentsinc.com/myglobal/industry_initiatives/card_trancation_requir.html

[8] http://www.merchantequip.com/truncation.php

[9] http://www.iacceptcreditcards.com/Reprogram.html

# Testimonies in the Last Four Years

Paniello v. First National Bank of St. Louis
MO - 2007

Physicians Mutual Insurance v. Asset Allocation & Management
IL - 2007

St. Paul Travelers Insurance v. Citibank
FL – 2007

Bankruptcy Trustee for DVI, Inc., v. Toshiba American Medical Systems, Inc.
MN/DE – 2007

Wagoner v. Wachovia Bank
OH - 2007

Wilson v. Ameriquest Mortgage
MS - 2006

Grimm v. Beck
SC - 2005

Western America Properties, Inc., v. Sunrise Gardens
NV - 2005

Gonzales v. Coldwell Banker
SC - 2005

St. Paul Travelers Insurance v. Citibank
FL – 2004

§ § § § §

Curriculum Vitae

# DON COKER



## BANKING, MANAGEMENT, ECONOMIC & VALUATION CONSULTANT

423 LATIMER STREET
WOODSTOCK, GA 30188-5052 USA

TELEPHONE:
(770) 852-2286

TELECOPIERS:
(610) 643-7870
(973) 201-2534

CELLULAR:
(251) 716-3200

E-MAIL:
Bankexpert@cs.com

# Representative Client List

**Banking:**

The World Bank
Bank of America
Bank of America - Canada
NationsBank
Bank One (now JPMorgan Chase Bank)
Wachovia Bank
First Union Bank
SouthTrust Bank
Citigroup/CitiFinancial
Firstar/U.S. Bancorp
Wells Fargo Mortgage Corp.
Washington Mutual Bank
National City (Bank) Corporation
MBNA America Bank
Citizens Bank of Pennsylvania
Provident Bank
KeyCorp
Royal Bank of Scotland Group, plc
Credit Suisse First Boston Mort.Capt'l.
First National Bank of San Marcos, TX
Banco Industrial de Venezuela
Bank of Oklahoma
Southern Security Bank
First National Bank of Palm Beach
First Bank, Tallahassee, FL
Sunbelt Savings (now Bank of America)
Sunbelt Federal Bank
Bancomer, S.A. (Mexico)
Bluebonnet Savings
Standard Pacific Savings Bank
First National Bank of Brewton
Southeast Bank of Miami, FL
Barnett Banks, Inc.
Bank of the Southwest
Community National Bank,
Midland, TX
Northshore Bank, TX
Bank of Bentonville, AR
Priority Bancorp
Iowa Trust
Banco Bilbao Vizcaya Argentaria
(Bilbao and Madrid, Spain)
Tanzania Institute of Bankers
Bank of Tanzania (central bank)
Federal Reserve Bank of Atlanta
Goldome Realty Credit Corp.
PanAmerican Bank
Western Gulf Savings & Loan
(now Wells Fargo)
American Savings & Loan
Bank Insurance & Securities Ass'n.
William E. Wood & Associates
(Re: Towne Bank, VA)
EDS - BEI Golembe Consultants
Smith Barney (Citigroup)
Chase Manhattan Mortgage

**Governmental:**

FDIC
Resolution Trust Corp.
Federal Savings & Loan Insur. Corp.
Federal Home Loan Mortgage Corp.
Farm Credit Bank
U.S. Department of Education,
Inspector General's Office
Internal Revenue Service,
U.S. Treasury Department
U.S. National Library of Medicine,
National Institutes of Health
State of Texas, Savings & Loan
Department (Regulators)
13 Municipalities in CA and CO
Tanzania Revenue Authority
United Nations Conference on
Trade & Development
U.S. Agency for International
Development (Washington, D.C.;
Kiev, Ukraine; Moscow, Russia)
U.S. Air Force (Guantanamo Bay, Cuba)
Judge Advocate General's Corps
Office of Special Investigations
New York Governor George Pataki's
Office of Regulatory Reform

**INSURANCE:**

AIG
CNA
ST. PAUL TRAVELERS INSURANCE
LIBERTY MUTUAL INSURANCE CO.
EMC (EMPLOYERS MUTUAL) INSURANCE
ACADIA INSURANCE COMPANY
ERIE INSURANCE GROUP
STATE FARM INSURANCE CO.
MILITARY PREMIUM MANAGERS
PHYSICIANS MUTUAL INSURANCE CO.
PHYSICIANS LIFE INSURANCE COMPANY
RELIANCE INSURANCE
INTERNATIONAL TRANSPORT INTERMEDIARIES CLUB, LTD., UK
NORTH RIVER INSURANCE CO.
AMERICAN CASUALTY INSURANCE CO.
NATIONAL UNION FIRE INSURANCE CO.
CONTINENTAL CASUALTY INSURANCE CO.
LLOYDS OF LONDON, UK
CRUM & FORSTER MANAGERS
XEROX FINANCIAL SERVICES
THOMAS MILLER & COMPANY, UK

**CORPORATE:**

FORD MOTOR CREDIT COMPANY
CISCO SYSTEMS
IBM – LOTUS DEVELOPMENT
WAL-MART STORES, INC.
WAL-MART REAL ESTATE BUSINESS TRUST
STANDARD & POORS
EXTRAORDINARY COMMISSIONER OF PARMALAT, S.P.A. (ITALY)
TOSHIBA
KAWASAKI
INTUIT, INC.
DORAL MORTGAGE CORP.
AMBASSADOR MORTGAGE
SECURITY PROPERTIES
MCGLADREY & PULLEN, LLP (CPAS)
PRENTICE HALL PUBLISHING
HEWLETT PACKARD, INTEL BLADE SERVERS
NAPA AUTO PARTS
PIONEER FINANCIAL SERVICES
SANSBURY ACE HARDWARE
MADISON EQUITY MORTGAGE CO.
DARRYL'S RESTAURANTS
BOSLER & HASHIOKA DEVELOPERS
SEARS

**CORPORATE, CONTINUED ...:**

SCORPION INTERNATIONAL SERVICES, S.A. (ATHENS, GREECE)
HERITAGE MOTELS. INC.
SUNRISE GARDENS APARTMENTS, LAS VEGAS, NV
BARRON'S EDUCATIONAL SOFTWARE
OPERATIVE PLASTERERS & CEMENT MASONS INTERNATIONAL ASSOCIATION
ANCO MERCHANDISING
NETWORK SOFTWARE ASSOCIATES
CALCO AEROSPACE
MIDWEST MERGER MANAGEMENT
CALCO AEROSPACE
EDUCATION CENTRAL, INC. (USVI)
RUBY TUESDAY
REMINGTON INVESTMENTS
INVERELLE, INC.
ALPHA SOFTWARE
PHIVOS KARNAOS (LONDON & MOSCOW)
SIMON & SCHUSTER PUBLISHING
THE KING EDWARD INN (CANADA)
JANCIK CONCRETE SPECIALTIES
KEYTRONICS
CONCORD BOAT CORP.
NBI SOFTWARE
HOULIHAN'S RESTAURANTS
SPRINT/NEXTEL
UKRAINIAN ACCOUNTING REFORM PROJECT (KIEV, UKRAINE)
INTERNATIONAL ACCOUNTING STANDARDS BOARD FOUNDATION (LONDON)
STANFORD CARR – EWA DEVEL. (HAWAI'I)
ROYSTER-CLARK AGRIBUSINESS
AMERICAN CONSOLIDATED CREDIT
SPECIALTY MOTOR CARS
GEORGE B. KAISER, FORBES 400 LIST
BUTTONWARE SOFTWARE (PC CALC+)
FILLETTE GREEN SHIPPING
ZAPADNOE KOLTZE (MOSCOW, RUSSIA)
BENCHMARKING PARTNERS
GARY THARALDSON, FORBES 400 LIST
BOSTON CREDIT CORP.
WESTAT
SOTHEBY'S
DR. RICHARD DOMBROFF
MORRISON'S CAFETERIAS
TRANSCONTINENTAL PRODUCTS & SERVICES
REYNOLDS LUMBER COMPANY

**CORPORATE, CONTINUED ...:**

BRODERBUND SOFTWARE
MARCHESE CHEVROLET
AVTOVAZ (RUSSIA'S LARGEST CAR CO. – LADA AUTOMOBILES)
IMPORT SPECIALISTS
AUTOVAZBANK (TAGLIATTI, RUSSIA)
BRIGADE CAPITAL MANAGEMENT, LLC
TIMEWORKS SOFTWARE
FLEMING ELECTRIC CO.
CENTRAL FINANCIAL SERVICES
GFK CUSTOM RESEARCH
SAP AMERICAS, INC.
WORDSTAR
FORRESTER RESEARCH, INC.
BEACON PROPERTIES
OWNBEY OIL COMPANY
RUSSELL RESEARCH
MILLWARD BROWN INTELLIQUEST
THE CURA GROUP, INC.
CHRISTIAN BAY SHIPPING COMPANY
CLIFF'S NOTES PUBLISHING

**CORPORATE, CONTINUED ...:**

COMPUTER ASSOCIATES
DATAEASE INTERNATIONAL
MCGRAW-HILL COMPANIES
CREDITCARE CREDIT COUNSELING
HEARTLAND DEVELOPMENT GROUP
CERTIFIED H. R. SERVICES, INC.
SAVANNAH-BALTIMORE CAPITAL MGT., LLC
ADDSTOR SOFTWARE
LAS CRUCES SURGERY CENTER
RADIO ENGINEERING INDUSTRIES
SURGENCY
ANSWERS RESEARCH, INC.
L&L CONSTRUCTION COMPANY
FRAUD DISCOVERY INSTITUTE
VISTA RESEARCH
OLYMPIC CUBE (ATHENS, GREECE)
KILIMANJARO INTERNATIONAL (AFRICA)
CHEMONICS INTERNATIONAL
TAX EXPRESS INCOME TAX SERVICES
SUNGARD AVAILABILITY SERVICES
INSTITUTE FOR STOCK MARKET AND MANAGEMENT (MOSCOW, RUSSIA)

## PAST PROFESSIONAL MEMBERSHIPS

AMERICAN BANKERS ASSOCIATION
AMERICAN INSTITUTE OF BANKING, CHAPTER OFFICER AND BANK CONSUL
U.S. LEAGUE OF SAVINGS INSTITUTIONS
INSTITUTE OF FINANCIAL EDUCATION, INSTRUCTOR
MORTGAGE BANKERS ASSOCIATION
TEXAS MORTGAGE BANKERS ASSOCIATION
AMERICAN COUNCIL OF STATE SAVINGS SUPERVISORS
AMERICAN BANKRUPTCY INSTITUTE - COMMITTEES: PUBLIC COMPANIES, REAL ESTATE, INTERNATIONAL, U.C.C., COMMERCIAL FRAUD TASKFORCE, HEALTHCARE.
BOARD OF REALTORS
NATIONAL ASSOCIATION OF HOMEBUILDERS
INTERNATIONAL COUNCIL OF SHOPPING CENTERS
HOUSTON (TX) CHAMBER OF COMMERCE, ECONOMIC DEVELOPMENT COMMITTEE, 9 YEARS

## BOOKS, PUBLICATIONS & NEWS MEDIA

COMPLETE GUIDE TO INCOME PROPERTY FINANCING & LOAN PACKAGING, PRENTICE HALL, 1984.
SELF-MANAGEMENT: A GUIDE TO CAREER ADVANCEMENT AND DEVELOPMENT, WRITTEN UNDER CONTRACT FOR PRENTICE HALL, 1985.
COMPLETE REAL ESTATE COMPUTER WORKBOOK, TECHNICAL EDITOR, PRENTICE HALL, 1986.
THE COMPLETE LOAN OFFICERS HANDBOOK, PRESENTLY WRITING.
"MONEY LAUNDERING: A DIRTY BUSINESS," WHITE-COLLAR CRIME REPORTER, OCT. 1991.

Treasury Magazine published by The Economist. Interviewed and quoted in an article written by a U.S. News and World Report Editor.

"How You Can Help Your Client Get a Loan to Finance Real Estate Projects," Practicing Attorney's Newsletter, April 1984.

"Getting a Grip on Core Deposit Intangibles," American Banker newspaper, 1996.

"The Dollars and Sense of Business Valuation," published on the website of the American Bank Attorneys Association, April 1996.

"Putting a Cash Value on a Business," interviewed by Lawyers Weekly, May 6, 1996.

"Business Valuation Techniques," Business Locator, May 1996.

"Valuing Businesses," TAB Letter, Technical Assistance Bureau, June 1996.

"Using Business Value to Achieve Ad Valorem Tax Reductions on Commercial Real Estate Properties," Journal of Property Management, June 1997.

What's Working in Credit & Collection, quoted re: bank drafts, March 1997.

"Making Sense of Internet Stock Values," TAB Letter, July 1999.

*Africa Today*, extensive video coverage by Reuters News Agency of Tanzania Revenue Authority training program, Arusha, Tanzania, March 11, 2001 and other dates.

Interviewed by ITV Television Network on the subjects of banking, taxation, economic growth and development, and capitalism in Tanzania, in Arusha, Tanzania, March 16, 2001. Aired nationwide on March 17, 2001, and subsequent dates.

*The Atlanta Journal-Constitution*, interviewed for an article on banking regulatory policies and procedures, and banking practices, August 21, 2001.

*The Atlanta Journal-Constitution*, interviewed for an article on banking practices and procedures to help deter terrorism, September 19, 2001.

Collections & Credit Risk, interviewed regarding banking practices, Sept. 20, 2001.

*The Atlanta Journal-Constitution*, interviewed for an article on banking practices and procedures involving funds transfers and money laundering by terrorist groups. September 21, 2001.

*The Baltimore Sun*, interviewed for an article regarding considerations for the future of Allied Irish Banks, PLC's, American subsidiary Allfirst Bank. May 30, 2002.

*The Atlanta Journal-Constitution*, interviewed for an article on the effects of the Sept. 11, 2001, terrorist events on banking practices and procedures, August 29, 2002.

*Credit and Collections World* magazine and website, interviewed regarding bank account opening practices and identity theft, September 20, 2002.

*Outside the Lines* television show and ESPN.com website, interviewed regarding identity theft matters. November 1 - 3, 2002.

*Lending Intelligence* magazine and website, interviewed regarding lending practices and interest rates, November 25, 2002.

*NBC Evening News*, interviewed regarding identity theft, November 25, 2002.

*Lending Intelligence* magazine and website, interviewed regarding credit scoring and loan approval policies and procedures, December 10, 2002.

*Charlotte Observer* newspaper, interviewed regarding bank branching and operations policies, January 21, 2003.

Street & Smith's *SportsBusiness Journal*, interviewed regarding business ethics and corporate governance issues involving the U.S. Olympic Committee's Chief Executive Officer, February 25, 2003.

*Family Finances* column that appears in *The Boston Herald, the Pittsburgh Post Gazette, the Palm Beach (FL) Daily News*, and some Scripps Howard newspapers. Interviewed regarding credit card debt matters, September 23, 2003.

*The Denver Post*, interviewed regarding banking economics and bank branching January 21, 2004.
*Mortgage Lending Compliance Alert*, interviewed regarding housing market outlook, economic and interest rate outlook, and lender profitability strategies. Feb. 2004.
*CFA (Chartered Financial Analyst) Magazine*, published by the Association for Investment Research, which recently became the CFA Institute. Interviewed by this professional certification organization that promulgates "standards for investment professionals worldwide" regarding business ethics and corporate governance issues. July/August 2004.
*Continental Magazine*, interviewed regarding banking and its effect on economic resurgence, especially as it relates to Ireland. July 6, 2004.
European Business School, International University; Schloß Reichartshausen, Germany. Interviewed regarding intellectual property and business valuation techniques. July 24, 2004.
*San Francisco (CA) Daily Journal*, a legal newspaper, quoted regarding the alleged bank fraud and credit card fraud factors related to alleged Guantanamo Bay, Cuba, U.S. Air Force translator spy Ahmad Al Halabi, July 28, 2004.
*Bank Tech & Security Newsletter*, provided direction to a bank on the proper way to handle an attempted fraudulent international wire transfer. September 30, 2004.
*Small Business Times*, provided information concerning business valuation issues. September 30, 2004.
*Mortgage Lending Compliance Alert*, interviewed regarding the Bank Secrecy Act and Suspicious Activity Reports (SARs). October 12, 2004.
*Mortgage Lending Compliance Alert*, provided input for an article concerning compliance with the rules and regulations of lending. November 4, 2004.
*Mortgage Lending Compliance Alert*, provided input for an article on the Fair and Accurate Credit Transactions Act of 2003, a/k/a/ FACTA or FACT Act. Mar. 16, 2005.
*Bank Technology & Security Alert*, provided input for a question and answer section regarding online bill paying. April 11, 2005.
*Mortgage Lending Compliance Alert*, provided input for a question and answer section regarding closing costs for home mortgages. May 18, 2005.
*Newark Star-Ledger* newspaper, interviewed on the subjects of check cashing and the need for enhanced identification verification systems. May 26, 2005.
*Bank Insurance & Securities Marketing Magazine*, interviewed regarding ethical training considerations and the Securities & Exchange Commission's recently enacted Investment Adviser Code of Ethics. June 21, 2005.
*Mortgage Lending Compliance Alert*, provided input for an article regarding the legal, regulatory, and marketing considerations of providing lending services to Spanish speakers. June 21, 2005.
*Bank Security & Technology*, provided input for a question and answer section regarding bank facility security. August 11, 2005.
*Bank Security & Technology Wire* published by Medical Newswire, provided input for an article regarding the security of bank computer systems. November 14, 2005.
*Chicago Sun-Times*, interviewed on bank marketing issues. January 9, 2006.
*American Prospect Magazine*, provided input for an article on business and banking ethics written by a reporter for the *Philadelphia Daily News*. February 1, 2006.
*Bank Security & Technology Alert*, provided input for a question and answer section regarding bank record retention. February 8, 2006.

*Chief Executive* magazine, CEO Newswire, quoted regarding economic and interest rate projections. March 7, 2006.
*Chicago Sun-Times*, interviewed on checking account issues, March 13, 2006.
ABC News/Disney - Miami, FL, interviewed for a national radio broadcast regarding credit card fraud and identity theft issues. April 21, 2006.
*AML (Anti-Money Laundering) Compliance Alert*, provided input for an article about the BankAtlantic money laundering case and anti-money laundering policies and procedures. May 5, 2006.
WJNO AM 1290 Clear Channel Radio, live on-air telephone interview by John Howe regarding the loss of credit information on 26.5 million veterans. May 23, 2006.
*Mortgage Lending Compliance Alert*, provided input for an article about documentation requirements for closing a loan. June 12, 2006.
*Virginia Pilot* newspaper, Provided opinions for an investigation into suspected mortgage fraud. October and December 2006.
*Chicago Sun-Times*, interviewed and quoted regarding bank economics and ABN Amro's decision to layoff 900 people at LaSalle Bank in Chicago. December 28, 2006.
WSB-TV (ABC), Atlanta, GA, interviewed on television regarding the T.J. Maxx credit file data loss and data losses in general. March 29, 2007.
WSB-TV (ABC), Atlanta, GA, interviewed on television regarding credit card and debit card fraud. May 3, 2007.
*Chicago Sun-Times*, interviewed and quoted regarding bank marketing matters and Washington Mutual's activities in the Chicago market. August 27, 2007.

## Patent

On July 8, 2002, the United States Patent & Trademark Office registered a Provisional Patent to Don Coker for a business process for improving the prevention and detection of financial fraud involving personal and business checks, cashier's checks, postal and commercial money orders, letters of credit, bills of exchange, drafts, and many other types of financial instruments. On July 1, 2003, the formal Patent Application was filed. A sale agreement (including a retained profit participation) assigning (selling) this Pending Patent Application was executed in December 2006 and closed in February 2007.

## Civic Activities

Katy School District (Houston suburb), Trustee, publicly elective position.
U.S. Army Reserve, 1966-1968, Officer Training, Ft. Bragg, NC; Honorable Discharge.
Nottingham Country Civic Club, officer, 1,500 family neighborhood association.
Sunday School teacher, usher, host.
Member of the High Museum of Art, Atlanta, GA.
Grady Health System – Uncompensated volunteer consultant to the Metro Atlanta Chamber of Commerce's Greater Grady Task Force studying the financially troubled Grady Hospital and Grady Health System for the purpose of making recommendations to improve the operations and finances of Georgia's largest hospital and healthcare system.

# Education

## College & University:

University of Alabama, BA, 1968.
Awards and Activities: Gold Merit Key Award for Outstanding Service to the University, Outstanding Army ROTC Platoon Leader Award, numerous publications activities, apartment manager.
University of Alabama, 1968, post-graduate work in finance, economics, real estate, and accounting.
University of Houston, 1973, post-graduate work in finance, valuation, real estate, and law.
Spring Hill College, 1995, AL, masters degree-level liberal arts and ethics courses.
Southern Methodist University, TX, commercial real estate finance and securities, loan syndication, construction finance, 1983 - 1984.
Harvard Business School, Harvard University, MA.
Certificate in Business Valuation.

## Secondary:

University Military School, Mobile, AL. 12-year prep day school. Graduated 1963.
Awards & Activities: Outstanding Student in English, military awards, publications.

## Other Professional Education:

American Bankers Association - American Institute of Banking: financial statement analysis, accounting, corporate finance, bank investments, principles of bank operations, bank management, trusts.
National Institute of Real Estate Boards, real estate investment & finance.
International Council of Shopping Centers, shopping center finance & valuation.
National Hospital Ass'n., 1-week workshop, healthcare entity finance & valuation.
Mortgage Bankers Association, two workshops: multi-family and SFR lending.
Federal Home Loan Bank of Dallas, training workshops on financial institution management, lending, investments, operations, et al.
Texas Savings & Loan Department, training workshops on financial institution management, lending, investments, operations, et al.
Federal Home Loan Mortgage Corp., real estate financing workshop.
First National Bank of Mobile, AL (later AmSouth Bancorporation, now Regions Financial), financial statement analysis, business finance, bank investments, credit card operations, deposit operations, bank management, trusts.
Gibraltar Savings Association (now Bank of America), commercial real estate finance, valuation, joint-ventures.
Citicorp, business, corporate and real estate finance, valuation, deposit products, investments.
Southwest Bancshares (later Bank One, now JPMorgan Chase Bank) business finance and real estate investments.
Commercial Credit Corp. (now Citigroup), one-week Corporate Marketing Conference covering in-depth training in all financial products, plus 28 CDC Learning Center courses in business and economic subjects.
Frost Bank, advanced credit analysis and business finance.

# Professional Background Summary

20+ years experience in management at banks, savings & loans, credit companies, mortgage banking companies, and a governmental financial institution regulatory agency. Positions held include Board of Directors member, Executive Vice President, Senior Vice President, Manager of Lending, Manager of Mortgage Banking, Regulatory Supervisory Agent tantamount to CEO). Committee memberships included Loan Committee, Executive Committee, Audit Committee, and Pension Plan Trustee. Served as a corporate officer of various financial institution subsidiaries. Management responsibilities included as many as 300 people in 22 locations nationwide in ten states and $1 billion in gross assets. Directly responsible for originating over 36,000 loans of all types totaling over $5 billion, reviewing over 25,000 real estate appraisals, and reviewing well over 100,000 financial statements and credit reports.

# Other Professional Activities

Consultant on various economic, valuation, real estate, marketing, and banking matters for clients in 45 states, two U.S. Territories, and 20 foreign countries involving work covering 51 countries in the Americas, Europe, Asia, and Africa.
Expert Witness, for plaintiff and defense, listed in the Association of Trial Lawyers of America's and the Defense Research Institute's databases of recommended consultants, plus state and local databases in at least 18 states and cities.
Engaged for over 320 expert witness cases nationwide, testified 91 times and achieved 10 courthouse settlements.
Approved Registered U.S. Government Contractor.
Phillips College, former Adjunct Professor of Business.
Institute of Financial Education, approved Instructor for the educational arm of the U.S. League of Savings Institutions.
Gulf Coast School of Real Estate, Instructor and Course Writer.
Prentice Hall Publishing, Simon & Schuster, Paramount Communications, technical editor and consultant on banking and real estate subjects.
Holiday Inn and Rodeway Inns, Lender Advisory Panels.
Novick's Money Market Seminars, panelist.
National Directory of Corporate Distress Specialists, approved mgt. consultant.
Licensed Sports Agent, approved by the NCAA, Major League Baseball Players Association, and the AL Athlete Agents Regulatory Commission.
American Arbitration Association, approved Professional Commercial Arbitrator.
State of Texas Real Estate Commission, approved instructor and course author.
Texas Real Estate Broker's License held for over ten years.

## RECOGNITION IN BIOGRAPHICAL REFERENCE BOOKS

WHO'S WHO IN AMERICA, 52ND – 60TH EDS.
WHO'S WHO IN THE WORLD, 12TH - 16TH EDS.
WHO'S WHO IN FINANCE & INDUSTRY, 26TH – 29TH AND 33RD EDS.
WHO'S WHO IN MEDICINE & HEALTHCARE, 1ST – 6TH EDS.
WHO'S WHO IN THE SOUTH & SOUTHWEST, 21ST – 33RD EDS.
DIRECTORY OF DISTINGUISHED AMERICANS, 5TH ED.
WHO'S WHO REGISTRY OF GLOBAL BUSINESS LEADERS, 1993 - 1994 ED.
WHO'S WHO OF EMERGING LEADERS OF AMERICA, 3RD ED.
WHO'S WHO REGISTRY OF BUSINESS LEADERS, 1994 ED.
PERSONALITIES OF AMERICA, 5TH ED.; PERSONALITIES OF THE SOUTH, 14TH ED.

## EMPLOYMENT HISTORY

1986 - PRESENT: BANKING, MANAGEMENT & ECONOMIC CONSULTANT, WOODSTOCK, GA.

- CONSULTING ASSIGNMENTS COVERING A BROAD RANGE OF ACTIVITIES SUCH AS GOVERNMENTAL REGULATORY OVERSIGHT, INTERIM MANAGEMENT, WORKOUT AND RESTRUCTURING OF TROUBLED LOANS, BUSINESS & ASSET VALUATION, INTANGIBLE ASSET ISSUES, BANK INCOME TAX ISSUES, MERGER & ACQUISITION ASSISTANCE, DUE DILIGENCE, BUSINESS PLANS, MANAGEMENT ADVICE, POLICY AND PROCEDURE MANUAL MATTERS, INTERNATIONAL ENGAGEMENTS, WRITING & EDITING BUSINESS BOOKS, FEASIBILITY STUDIES, MARKETING STUDIES, RESEARCH, COMMERCIAL REAL ESTATE STUDIES & ADVICE, TRAINING & EDUCATIONAL ACTIVITIES.
- EXPERT WITNESS ENGAGEMENTS NATIONWIDE FOR PLAINTIFFS AND DEFENDANTS COVERING ALL AREAS OF BANKING, VALUATION, SECURITIES, ECONOMICS, ECONOMIC DAMAGES, TRUSTS & ESTATES, REAL ESTATE, CREDIT CARDS, LEASING, INTERNATIONAL MATTERS, MANAGEMENT, CREDIT, FINANCE, AND BUSINESS. OVER 320 CASES AND 91 TESTIMONIES NATIONWIDE.

1985 - 1986: EXECUTIVE VICE PRESIDENT, MANAGER OF LENDING & MORTGAGE BANKING, BOARD OF DIRECTORS MEMBER, HOME SAVINGS (NOW CITIGROUP), HOUSTON, TX. NUMBER TWO EXECUTIVE. HEAVILY INVOLVED IN INVESTMENTS & DEPOSIT ACTIVITIES. OFFICER OF SEVERAL SUBSIDIARY COMPANIES. MEMBER OF LOAN COMMITTEE, EXECUTIVE COMMITTEE, AUDIT COMMITTEE, ET AL. RESTRUCTURED THE MANAGEMENT RESPONSIBILITIES OF SEVERAL DEPARTMENTS, INCREASING PRODUCTION, EFFICIENCY, AND STAFF UTILIZATION. COMPLETED A $54 MILLION COLLATERALIZED MORTGAGE OBLIGATION LOAN SECURITIZATION TRANSACTION THROUGH SALOMON BROS. IMPROVED PROFITS AND REDUCED DELINQUENCIES.

1984 - 1985: SENIOR VICE PRESIDENT, MANAGER OF LENDING & MORTGAGE BANKING, FIRST FEDERAL SAVINGS (NOW GUARANTY BANK), SAN ANTONIO, TX. NUMBER TWO EXECUTIVE. HEAVILY INVOLVED IN INVESTMENTS & DEPOSIT ACTIVITIES INCLUDING CREDIT CARDS. INCREASED LENDING ACTIVITIES 40% IN ONE YEAR WHILE REDUCING DELINQUENCIES WITHOUT ADDING TO HEADCOUNT.

1983 - 1984: Southwest Regional Manager, Ford Motor Credit Corp., Houston, TX. Manager of commercial real estate finance, and some financing with dealers.

1977 - 1983: Regional Manager, Commercial Credit Company (now Citigroup), Houston, TX. Manager of commercial and residential real estate financing for the southwest, and formally trained & involved in all financial products offered by the $7 billion company. Chosen to open the company's first commercial real estate lending field office. Top business producer every year. Received the company's largest bonus ever awarded - twice.

1974 - 1977: Manager of Commercial Real Estate Lending and Mortgage Banking, Southwest Bancshares (later Bank One, now JPMorgan Chase Bank), Houston, TX. Also involved in the origination and administration of construction loans, deposit & investment activities for lending clients including wealthy foreign nationals, corporate & personal lending, and credit card operations. Created and managed a commercial mortgage banking entity for a multi-bank holding company.

1973 - 1974: Assistant Regional Manager & Assistant Treasurer, Citicorp Real Estate, Houston, TX. Mortgage banking and construction lending for Citibank, N.A. (NY), and deposit & investment activities for wealthy foreign clients. Helped establish a new office in Houston, including staffing and the formulation of operating policies & procedures. Primary territory covered seven states, and operated nationwide & internationally. One of Citicorp's youngest officers ever. Top business producer.

1972 - 1973: Loan Officer & Manager of Lending Department, Gibraltar Savings (now Bank of America), Houston, TX. At age 26, managed the day-to-day lending operations of Texas' largest S&L (55th largest in the U.S.). Handled construction & subdivision development loans, joint-ventures, and high-volume builder accounts. Completed & implemented several bonus-winning workflow efficiency improvement projects for various departments.

1968 - 1972: First National Bank of Mobile (later AmSouth, now Regions Financial), Mobile, AL. Mortgage and real estate specialist in the Wealth Management area of the Trust Department. Trained and worked in all areas of the bank including checking & savings, credit, corporate lending, personal lending, operations, check processing, audit, international, investments, trusts & estates, corporate pension plan management, portfolio management, stock transfer, corporate bond trustee, bank security, credit card ops, and funds transfers.

§ § § § §

§ § § § §

Terms of This Consulting Engagement

The attorneys for the Plaintiffs engaged me on November 6, 2007, to assist them as their expert witness consultant. Compensation for working on this case is based upon an hourly rate of $360.00 plus expenses.

Don Coker
Banking, Management & Economic Consultant

§ § § § §